IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDWARD TANSEY, Derivatively on Behalf of DUKE ENERGY CORPORATION, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) ) | Case No. _____ |
| JAMES E. ROGERS, MICHAEL G. BROWNING, G. ALEX BERNHARDT, SR., ANN MAYNARD GRAY, JAMES T. RHODES, JAMES H. HANCE, JR., WILLIAM BARNET, III, PHILIP R. SHARP, DANIEL R. DIMICCO, JOHN H. FORSGREN, E. JAMES REINSCH, LYNN J. GOOD, and STEVEN K. YOUNG, | ) ) ) ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) | |
| -and- | ) ) | |
| DUKE ENERGY CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SECURITIES AND EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, AND WASTE OF CORPORATE ASSETS**

**OF COUNSEL:**
ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  619/525-3990

COOCH AND TAYLOR P.A.
BLAKE A. BENNETT (#5133)
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE  19899-1680
Telephone: (302) 984-3800
Facsimile: (302) 984-3939
bbennett@coochtaylor.com

August 17, 2012

> *…[T]his can only be described as an incredible act of bad faith with regard to the undertakings of the Merger Agreement.*
>
> *…[T]his is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street and as a director of ten publicly traded companies…*

John H. Mullin, III, former Lead Director of Progress Energy in a Letter to the Editor of *The Wall Street Journal.*

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Duke Energy Corporation ("Duke" or the "Company") against certain of its officers and directors for their violations of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duty, and waste of corporate assets relating to Duke's merger (the "Merger") with Progress Energy, Inc. ("Progress").  These wrongs resulted in damages to Duke's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2.      Duke is presently the largest electric power holding company in the United States. The Company has approximately seven million electric customers and about 500,000 gas customers in the United States, mostly in the American South and Midwest.  Before the Merger, Progress was also a large electric power holding company in the United States and served over three million customers in North Carolina, South Carolina, and Florida.

3.      Specifically, the Merger Agreement between Duke and Progress called for Progress' President and Chief Executive Officer ("CEO"), William Johnson ("Johnson"), to serve

in the same capacities for the post-Merger combined entity.  This was a significant, material term in the Merger Agreement.  Nevertheless, defendants failed to disclose that they did not believe that Johnson would be capable of serving in these capacities and that defendants intended to force Johnson to resign immediately after completion of the Merger.

4.      On January 10, 2011, Duke and Progress announced that the two entities would merge and Duke would be the surviving entity from the Merger.  Consummation of the Merger required approval by the boards of directors of both Duke and Progress, the shareholders of both companies, and various regulatory authorities, including the Federal Energy Regulatory Commission, the North Carolina Utilities Commission ("NCUC") and the utilities regulatory agencies of several other states.

5.      On March 17, 2011, Duke and Progress filed with U.S. Securities and Exchange Commission ("SEC") a Preliminary Joint Proxy on a Form S-4 Registration Statement (with its subsequent amendments, the "Proxy") indicating the mutual intent of Duke and Progress to proceed with the Merger.  Duke and Progress filed the definitive Proxy on July 7, 2011, after five different amendments.

6.      In all of their SEC filings, press releases, proxies soliciting shareholder approval, written communications, and in the text of the Merger Agreement itself, defendants stated that Johnson would become the President and CEO of post-Merger Duke.  The same filings, communications, declarations, and the Merger Agreement also called for defendant James E. Rogers ("Rogers"), the President and CEO of pre-Merger Duke, to become the Executive Chairman of post-Merger Duke.  Johnson's position as President and CEO of post-Merger Duke was a material provision of the Merger Agreement, which even analysts following the Company relied upon.  For example, analysts at Credit Suisse reported that "Johnson is an ideal successor,"

and analysts at RBC Capital stated that "[they] think combining entities and turning over the reigns to Bill Johnson creates a smooth exit for Jim Rogers."

7.     Despite the statements in the Proxy, other SEC filings, and the Merger Agreement, defendants determined that, once the Merger was complete, they would cause Duke to force Johnson to resign and subsequently name defendant Rogers as CEO of post-Merger Duke.   Defendants did not, however, disclose this determination and, in fact, kept the determination secret from Duke's shareholders, regulators, and the public in general.

8.     Immediately after completion of the Merger, on July 2, 2012, the new post-Merger Duke Board of Directors (the "Board") held its first meeting.  The Board entered an executive session, at which time it voted to force Johnson to resign.  The Board voted in favor of asking Johnson to resign by a vote of 10-5, split precisely along company lines, with all pre-Merger Duke directors voting for Johnson's termination (defendant Rogers, the eleventh pre-Merger Duke director, did not vote).  The Board then immediately reinstated Rogers as CEO of Duke.   As Rogers would later admit, concerns regarding Johnson's leadership emerged long before this July 2, 2012 executive session.  Rogers explained that the Board "felt [Johnson's] style was autocratic and discouraged different points of view."   Despite these purported concerns, however, none of the defendants communicated these issues to Johnson or to the Progress directors during the eighteen months leading up to the Merger.  Instead, defendants waited until the close of the Merger to abruptly dismiss Johnson after a twenty minute executive session.

9.     In connection with Johnson's resignation, he collected a severance package worth approximately $44 million.  The Director Defendants (as defined herein) wasted the Company's corporate assets by approving Johnson's undeserved benefits.

10.     The regulatory and public reaction to the Board's termination of Johnson and reinstatement of defendant Rogers as CEO was negative.  First, the NCUC launched an investigation into these actions because defendants acted contrary to their repeated assurances regarding Duke's intended post-Merger leadership.  The NCUC faced a tremendous amount of embarrassment for being "duped" by these defendants, who rushed the approval of the Merger with their improper statements.  Then, Standard & Poor's Rating Services ("S&P") downgraded Duke's credit rating from A- to BBB+ on July 26, 2012.  In so doing, S&P pointed to the Board's decision to force Johnson to resign, stating: "We view the *lack of transparency* associated with this process and with some board members ... as *significantly heightening regulatory risk for Duke and weakening its consolidated business risk profile*."

11.     The revelations concerning the Board's decision to terminate Johnson caused Duke's market capitalization to plunge $1.5 billion in only three days.  As a direct result of the defendants' wrongdoing, the Company is now the subject of multiple federal securities class action lawsuits (the "Securities Class Actions") filed in the U.S. District Court for both the Western and Eastern Districts of North Carolina.  The Securities Class Actions pose the risk of billions of dollars in damages to the Company.  This is in addition to the liability faced by the Company as a result of the NCUC and North Carolina Attorney General investigations into the wrongdoing alleged herein.

12.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. Section 1331 because of claims arising under sections 14(a) and 20(a) of the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28

U.S.C. Section 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.   Jurisdiction is also conferred by 28 U.S.C. §1332.   Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein had an impact on this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

16.     Plaintiff Edward Tansey was a shareholder of Duke at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Duke shareholder.   Plaintiff is a citizen of Maine.

**Nominal Defendant**

17.     Nominal Defendant Duke is a Delaware corporation with its principal place of business located at 550 South Tryon Street, Charlotte, North Carolina.   Accordingly, Duke is a

citizen of Delaware and North Carolina.  Duke was formed as a result of the merger between pre-Merger Duke and Progress, which was completed on July 2, 2012.  Duke is the largest electric power holding company in the United States with more than $100 billion in total assets.  The Company serves approximately 7.1 million electric customers located in six states in the Southeast and Midwest through its regulated utility operations, and owns and operates diverse power generation assets in North America and Latin America through its commercial power and international business segments.

**Defendants**

18.    Defendant Rogers is Duke's Chairman of the Board and has been since 2007; President and CEO and has been since 2006; and a director and has been since 1988.  On July 2, 2012, upon Johnson's resignation as Duke's President and CEO, positions Johnson had assumed that day, Rogers was reappointed as Duke's President and CEO in addition to his role as Chairman of the Board.  Rogers is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").  Rogers knowingly, recklessly, or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, Rogers acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Rogers is a citizen of North Carolina.

19.     Defendant Michael G. Browning ("Browning") is a Duke director and has been since 1990.  Browning is also a member of Duke's Audit Committee and the Corporate Governance Committee and has been since at least March 2011.  Browning was Chairman of Duke's Audit Committee from at least March 2011 to at least March 2012.  Browning is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Browning recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, Browning acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Browning is a citizen of Indiana.

20.     Defendant G. Alex Bernhardt, Sr. ("Bernhardt") is a Duke director and has been since 1991.  Bernhardt is also a member of Duke's Audit Committee and has been since at least March 2011.  Bernhardt is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Bernhardt recklessly or with gross negligence: (ii) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, Bernhardt acted with at least negligence in approving the Proxy tainted

by false and misleading statements regarding the Company's intended leadership.  Bernhardt is a citizen of North Carolina.

21.     Defendant Ann Maynard Gray ("Gray") is Duke's Lead Independent Director and has been since April 2006 and a director and has been since 1994.  Gray is also Chairman of Duke's Corporate Governance Committee and a member of the Compensation Committee and has been since at least March 2011.  Gray is named as a defendant in the Securities Class Actions that allege she violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Gray recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, Gray acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership. Gray is a citizen of North Carolina.

22.     Defendant James T. Rhodes ("Rhodes") is a Duke director and has been since 2001.  Rhodes is also a member of Duke's Audit Committee and has been since at least March 2011.  Rhodes is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Rhodes recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

and (iv) committed corporate waste by authorizing an improper severance package for Johnson. Moreover, Rhodes acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.   Rhodes is a citizen of Virginia.

23.      Defendant James H. Hance, Jr. ("Hance") is a Duke director and has been since 2005.  Hance is also a member of Duke's Compensation Committee and has been since at least March 2011.  Hance was Chairman of Duke's Compensation Committee from at least March 2011 to March 2012.  Hance is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Hance recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, Hance acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Hance is a citizen of Florida.

24.      Defendant William Barnet, III ("Barnet") is a Duke director and has been since 2005.  Barnet is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Barnet recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement

adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson. Moreover, Barnet acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Barnet is a citizen of South Carolina.

25.     Defendant Philip R. Sharp ("Sharp") is a Duke director and has been since 2007. Sharp was also a member of Duke's Audit Committee from at least March 2011 to July 2012. Sharp is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Sharp recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson. Moreover, Sharp acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Sharp is a citizen of Washington, D.C.

26.     Defendant Daniel R. DiMicco ("DiMicco") is a Duke director and has been since 2007.  DiMicco is also a member of Duke's Corporate Governance Committee and the Compensation Committee and has been since at least March 2011.  DiMicco is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  DiMicco recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii)

made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, DiMicco acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  DiMicco is a citizen of North Carolina.

27.     Defendant John H. Forsgren ("Forsgren") is a Duke director and has been since 2009.  Forsgren is also a member of Duke's Audit Committee and has been since at least March 2011.  Forsgren was a member of Duke's Compensation Committee from at least March 2011 to July 2012.  Forsgren is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Forsgren recklessly or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson.  Moreover, Forsgren acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Forsgren is a citizen Florida.

28.     Defendant E. James Reinsch ("Reinsch") is a Duke director and has been since 2009.  Reinsch is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Reinsch recklessly or with gross negligence: (i) misled regulatory authorities in charge of

approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) committed corporate waste by authorizing an improper severance package for Johnson. Moreover, Reinsch acted with at least negligence in approving the Proxy tainted by false and misleading statements regarding the Company's intended leadership.  Reinsch is a citizen of Maryland.

29.     Defendant Lynn J. Good ("Good") is Duke's Chief Financial Officer ("CFO") and has been since July 2009 and an Executive Vice President and has been since July 2012.  Good was also a Duke Group Executive from July 2009 to July 2012.  Good has served in various other positions at Duke since joining the Company in April 2006, including as President, Commercial Business; Senior Vice President and Treasurer; and Vice President.  Good is named as a defendant in the Securities Class Actions that allege she violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Good knowingly, recklessly, or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; and (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Good is a citizen of North Carolina.

30.     Defendant Steven K. Young ("Young") is Duke's Vice President, Controller, and Chief Accounting Officer and has been since at least July 2012.  Young was also Duke's Senior Vice President and Controller from December 2006 to July 2012 and Vice President and Controller from June 2005 to December 2006.  Young has served in various other positions at

Duke since joining the Company in 1980, including as Senior Vice President and CFO of Duke Carolinas.  Young is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act.  Young knowingly, recklessly, or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; and (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Young is a citizen of North Carolina.

31.     The defendants identified in ¶¶18, 29-30 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18-28 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-20, 22, 25, 27 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶21, 23, 26-27 are referred to herein as the "Compensation Committee Defendants."  The defendants identified in ¶¶19, 21, 26 are referred to herein as the "Corporate Governance Committee Defendants."  Collectively, the defendants identified in ¶¶18-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32.     By reason of their positions as officers, directors, and/or fiduciaries of Duke and because of their ability to control the business and corporate affairs of Duke, the Individual Defendants owed and owe Duke and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Duke in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Duke and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, each

officer and director of the Company owes to Duke and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

**Additional Duties of the Audit Committee Defendants**

33.     In addition to their general fiduciary duties, the Audit Committee Defendants, Bernhardt, Browning, Forsgren, Rhodes, and Sharp owed and owe specific additional duties to Duke under the Company's Audit Committee Charter.  The Audit Committee duties include assisting the Board in supervising the Company's compliance with legal and regulatory requirements, and policing the Company's internal controls and procedures.  According to the Audit Committee Charter, the following duties and responsibilities have been delegated by the Board to the Audit Committee Defendants:

Legal Compliance/General

14.     *Review* periodically, with the Corporation's chief legal officer, any legal matter that could have a significant impact on the Corporation's financial statements and *any material inquiries or reports received from regulatory or governmental agencies*.

* * *

20.     *Report regularly to the full Board* including:

(i) *with respect to any issues that arise with respect to the quality or integrity of* the Corporation's financial statements, *the Corporation's compliance with legal or regulatory requirements*, the performance and independence of the Corporation's independent auditors or the performance of the internal audit function;

(ii) following all meetings of the Committee; and

(iii) *with respect to such other matters as are relevant to the Committee's discharge of its responsibilities*.

The report to the Board may take the form of an oral report by the Chair of the Committee or any other member of the Committee designated by the Committee to make such report.

21.    *Maintain minutes or other records of meetings and activities of the Committee*.

**Additional Duties of the Compensation Committee Defendants**

34.    In addition to their general fiduciary duties, the Compensation Committee Defendants, DiMicco, Forsgren, Gray, and Hance owed and owe specific additional duties to Duke under the Company's Compensation Committee Charter.  The Compensation Committee duties include assisting the Board with respect to the Company's compensation programs and compensation of the Company's executives.    According to the Compensation Committee Charter, the following duties and responsibilities have been delegated by the Board to the Compensation Committee Defendants:

5.    Review and make recommendations to the full Board, or approve, any contracts or other transactions with executive officers of the Corporation, including consulting arrangements, employment contracts and severance or termination arrangements, or any revisions thereto. Notwithstanding any other provision of this Charter, the Committee shall review and *make recommendations to the Board for approval of any* consulting arrangement, employment contract, *severance or termination arrangement with the Chief Executive Officer*, or any revision thereto.

**Additional Duties of the Corporate Governance Committee Defendants**

35.    In addition to their general fiduciary duties, the Corporate Governance Committee Defendants, Browning, DiMicco, and Gray owed and owe specific additional duties to Duke under the Company's Corporate Governance Committee Charter.  The Corporate Governance Committee duties include assisting the Board by developing and recommending a set of corporate governance principles applicable to the Company, shaping the corporate governance of the Company, and recommending the CEO succession plan and monitoring the management continuity planning process.    According to the Corporate Governance Committee Charter, the following duties and responsibilities have been delegated by the Board to the Corporate Governance Committee Defendants:

Continuity / Succession Planning Process / Management Evaluation

14.    ***Oversee and approve the management continuity planning process***.

15.    At least annually, recommend the Chief Executive Officer succession plan and make recommendations to the Board for the successor to the Chief Executive Officer.

16.    ***Report to the Board any concerns or issues that might indicate that organizational strengths are not equal to the requirements of long-range goals***.

17.    ***Oversee the evaluation of the Chief Executive Officer*** and management.

**Additional Duties of the Transition Committee**

36.    Pursuant to the Merger Agreement, pre-Merger Duke and Progress established a Transition Committee to oversee integration planning, including, to the extent permitted by applicable law, consulting with respect to operations and major regulatory decisions. The Transition Committee was co-chaired by defendant Rogers and Johnson.

**Control, Access, and Authority**

37.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Duke, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

38.    Because of their advisory, executive, managerial, and directorial positions with Duke, the Individual Defendants had access to non-public information about the Company's future leadership changes. While in possession of this material, non-public information, these defendants made improper representations regarding the Company's operations and plans for leadership to shareholders, regulatory authorities, and the public at large.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Duke, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

40.     To discharge their duties, the officers and directors of Duke were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Duke were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to regulatory authorities and the investing public;

(c)     remain informed as to how Duke conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with regulatory and securities laws;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's operations and plans for leadership changes.

**Breaches of Duties**

41.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed and owe to the Company and to its shareholders the fiduciary duty of loyalty and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Duke, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Duke's Board.

42.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make improper statements regarding its plans for Duke's leadership and operations.  Due to these defendants' illegal actions and course of conduct, the Company is now the subject of government investigations and of the Securities Class Actions.  As a result, Duke has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, these defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did deceive regulatory authorities and the investing public, including shareholders of Duke, regarding their plans for Duke's future leadership and operations.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

45.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, these defendants caused the Company to issue improper statements regarding their plans for Duke's future leadership and operations.

46.     The purpose and effect of Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise their violations of law, breaches of fiduciary duty, and waste of corporate assets.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of these defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     The Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, these defendants acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## MISLEADING NEGOTIATIONS LEADING UP TO THE MERGER

49.     Duke first conceived of merging with Progress at a two-day strategic retreat in June 2010.   There, the Duke Board authorized the Company's management to open merger discussions with Progress.   At the time, the Progress board of directors was weighing potential business combinations with two utility companies, Duke and another unnamed company.

50.     For the next seven months, every meeting between defendant Rogers and Johnson reflected the fact that Rogers would serve as the executive chairman and Johnson as the CEO of the combined company.   On January 8, 2011, both the Duke board and the Progress board voted unanimously to approve the Merger Agreement.   The Merger Agreement was then executed and, on January 10, 2011, Duke and Progress issued a joint press release announcing the Merger.

51.     Notably, according to the Merger Agreement, the defendants had an obligation to notify Progress about any discussions to replace Johnson as CEO.   The Merger Agreement required that:

> [E]ach of Progress and Duke shall … (i) confer on a regular and frequent basis with one or more representatives of the other party to **discuss material operational and regulatory matters and the general status of its ongoing operations**, (ii) **advise the other party of any change or event that has had or could reasonably be expected to have a material adverse effect on such party**, and (iii) furnish promptly all other information concerning its business, properties and personnel, in each case as such other party may reasonably request ….

## THE MATERIALLY FALSE AND MISLEADING PROXY

52.     In order to secure shareholder approval of the Merger, the Director Defendants filed a materially misleading Proxy with the SEC on March 17, 2011.   In this Proxy, the Director Defendants signaled their intent to register 264 million shares of Duke common stock at a proposed maximum aggregate offering price of approximately $13.6 billion – the value of the consideration given to Progress shareholders.   Moreover, the Proxy stated that Progress shareholders would receive 2.6125 shares of Duke common stock for each share of Progress

common stock they held at the time of the Merger, with cash to be paid in lieu of any fractional shares, before giving effect to a one-for-three reverse stock split of Duke common stock.

53.    The Proxy, which recommended that Duke's shareholders vote in favor of the Merger, omitted and/or misrepresented material information about post-Merger Duke's future leadership and operations.  Specifically, the Proxy omitted and/or misrepresented the material information set forth below in contravention of sections 14(a) and 20(a) of the Exchange Act and the Board's duty of candor.

54.    In this March 17, 2011 Proxy, the Director Defendants reiterated the fact that Johnson would serve as CEO of Duke, whereas defendant Rogers would serve as executive chairman of the Board. The Proxy included the following question and answer:

> *Q: What will Jim Rogers' role be with Duke following completion of the merger? What will Bill Johnson's role be?*
>
> A: Duke and Progress Energy have agreed that Mr. Rogers will serve as executive chairman of the board of directors of Duke Energy and *Mr. Johnson will serve as president and chief executive officer of Duke* following the completion of the merger.

55.    In addition, the Proxy stated the following:

> *Members of the Progress Energy board of directors noted that they viewed the strategic emphasis on the regulated utility business as critical to the value of the potential transaction, that the corporate governance and organizational structure of the combined company created by the combination of Duke and Progress Energy would have to support that strategy, and that they viewed having Mr. Johnson as the chief executive officer of the combined company as an important element in ensuring implementation of that strategy.*

Thus, Johnson becoming CEO was a material term of the Merger Agreement.  Moreover, the presence of the above quoted passage in the Proxy, dated a year before Johnson's forced resignation, and signed by each and every one of the Director Defendants, establishes that the Director Defendants knew this.

56.     On April 8, 2011, Duke filed a Form S-4/A Amendment with the SEC, amending the Proxy.  This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke.

57.     On April 25, 2011, Duke filed a second Form S-4/A Amendment with the SEC, amending the Proxy. This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke.

58.     On May 13, 2011, Duke filed a third Form S-4/A Amendment with the SEC, amending the Proxy. This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke.

59.     On June 30, 2011, Duke filed a fourth Form S-4/A Amendment with the SEC, amending the Proxy. This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke.

60.     On July 7, 2011, Duke filed a fifth Form S-4/A Amendment with the SEC, amending the Proxy. This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke.  In addition, this Proxy stated that: "In the event either Mr. Johnson or Mr. Rogers is unable or unwilling to serve in such capacity, the parties agreed in the merger agreement to confer and mutually designate a replacement."

61.     The SEC declared the Proxy, including its five amendments, effective on July 7, 2011.  At this time, and as set forth in Duke's July 13, 2011 Form 425 SEC filing, the Merger needed to be approved by pre- Merger Duke and Progress shareholders, the NCUC, the Federal Communications Commission, the Federal Energy Regulatory Commission, the Nuclear Regulatory Commission, the South Carolina Public Service Commission, and the Kentucky Public Service Commission.  Over the next few months, these entities approved the Merger.  In

addition, on August 23, 2011, Duke and Progress shareholders approved the Merger, based on the statements contained in the Proxy.

### IMPROPER STATEMENTS POST-SHAREHOLDER APPROVAL OF MERGER

62.    Every Duke filing after the shareholders approved the Merger on August 23, 2011, until June 29, 2012, the date of Duke's last pre-Merger SEC filing, either indicated that Johnson would serve as the CEO of the post-Merger entity, or did not address this matter.  None of these filings indicated any plan to force Johnson to resign after the Merger was completed.

63.    However, on May 3, 2012, the Duke board held an executive session and discussed concerns regarding Johnson's ability to serve as CEO.  Also on May 3, 2012, pre-Merger Duke held its annual shareholder meeting.  While the Merger was addressed multiple times, none of the defendants suggested or stated that Johnson would not serve as CEO of the post-Merger entity.

64.    The next day, on May 4, 2012, Duke held an earnings conference call with analysts and investors for its first fiscal quarter of 2012.  Despite many questions about the Merger, none of the participants disclosed that the Duke board had any reservations about Johnson's ability to serve as CEO of the post-Merger entity.

65.    On June 8, 2012, the Federal Energy Regulatory Commission conditionally approved the Merger, pending a joint compliance filing by Duke and Progress.  This filing was made on June 25, 2012, at which time the Merger had effectively received final approval from the Federal Energy Regulatory Commission.

66.    On June 11, 2012, Duke disclosed to the public, via a Form 8-K filing with the SEC, that the Federal Energy Regulatory Commission had conditionally approved the Merger. As this Commission's approval was widely viewed as the last, or one of the last, major hurdles to completion of the Merger, Duke's June 11, 2012 SEC filing suggested that the Merger was going

to proceed as planned.  Again, defendants did not disclose that they had any reservations about Johnson's ability to serve as CEO of Duke after the Merger, even though this was a material part of the Merger Agreement that Progress and Duke shareholders had approved.

67.     Two weeks later, on June 25, 2012, Duke and Progress represented to the NCUC that its approval was an emergency because under the Merger Agreement, the Merger had to be completed by July 8, 2012.  Based on this representation, the statements contained in the Merger Agreement and those in the Proxy, the NCUC reopened its hearings on June 25, 2012.  The NCUC subsequently gave its approval on June 29, 2012.  At no time did the defendants inform the NCUC or shareholders that the Duke board had reservations about Johnson's ability to serve as CEO of the combined companies.

68.     In the two months leading up to the completion of the Merger on July 2, 2012, Duke filed twenty-three filings with the SEC. None of these filings mentioned any information about the Duke board's reservations about Johnson's ability to serve as CEO of Duke after the Merger.  Indeed, Duke's last pre-Merger SEC filing was on June 29, 2012 – well after, as defendant Rogers would later acknowledge, the Duke board had already secretly discussed its concerns with Johnson and the possibility of replacing Johnson with Rogers.  Duke had more than adequate time to notify the SEC, state and federal regulators, investors, and the general public of its decision that Rogers was being considered to replace Johnson.  Nevertheless, Duke never disclosed this information until after completion of the Merger and after Johnson had already been forced to resign.

69.     On the morning of July 2, 2012, the South Carolina Public Service Commission approved the Merger.  The Merger was completed that same day.

**THE TRUTH EMERGES**

70.     On July 2, 2012, immediately after the Merger was completed, the Duke Board called its first meeting.  Shortly into this first meeting, the Board called for an executive session, at which time defendant Rogers and Johnson were asked to leave.  During this executive session, the Board voted to ask Johnson to resign from his position as President and CEO of the Company.  The vote was 10-5, in favor of asking Johnson to resign. All of the pre-Merger Duke directors voted in favor of the measure, while all five former Progress directors voted against it. Approximately twenty minutes elapsed between the completion of the Merger and the vote to force Johnson to resign.

71.     Three of the five top Progress executives that Duke had hoped to retain, including Executive Vice President John McArthur, Chief Integration and Innovation Officer Paula Sims, and Chief Administration Officer Mark Mulhern, resigned immediately after Johnson was forced out of the Company.  Their severance rights are currently under negotiation, and are likely to cost Duke additional expenses.

72.     On July 3, 2012, S&P placed Duke's debt on "watch for a possible downgrade" because of the "abrupt change in executive leadership."  S&P stated that it was placing Duke's "A-" rating on "CreditWatch Negative."  Duke had hoped that pre-existing Progress debt that Duke assumed in the Merger would be upgraded by the rating agencies, but S&P negatively changed its outlook on a possible upgrade of the debt of Progress and its subsidiaries from "positive" to "developing," again based on the "sudden shift in management."

73.     The actions of the Director Defendants prompted the former Lead Director of Progress to write a biting Letter to the Editor of *The Wall Street Journal* shortly after the Merger was completed.  The letter was published on July 5, 2012 and in it, John H. Mullin, III ("Mullin") wrote:

As the former Lead Director of Progress Energy, I feel compelled to speak out on behalf of the former shareholders, employees, customers and communities served by Progress who are now all part of or are served by the "new" Duke.

In negotiations with Duke leading to the merger our Board voted to accept a "semi-merger of equals" transaction with the ***explicit agreement that the Progress CEO, Bill Johnson, would become the CEO of the combined company upon consummation of the merger. This was a critical element in the merger deliberations of our Board because we had confidence that Bill would successfully lead the combined companies to achieve the potential synergistic benefits of the combination. I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company.***

After a long gestation period, the merger finally closed on July 2nd. As stipulated in the Merger Agreement, Bill Johnson became the President and CEO of the newly combined companies – for approximately 20 minutes!

Following a short organizational meeting, the newly constituted board, which contains a majority of "old Duke" directors, went into executive session and voted to request the resignation of Bill Johnson and the retention of Jim Rogers as CEO of the newly combined company. ***In my opinion, this can only be described as an incredible act of bad faith with regard to the undertakings of the Merger Agreement. I think it was a clearly premeditated contravention of one of the most central tenets of our Agreement.***

***In my opinion this is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street and as a director of ten publicly traded companies and as a former Trustee of Putnam's numerous mutual funds.***

As a non-continuing director of the combined company I now, along with similarly situated former directors of Progress, find myself without a constituency and without an ability to mount a challenge to what I believe is ***one of the greatest corporate hijackings in US business history.***

Consequently, this letter is being written in hopes that what I believe to be a deceitful and pre-meditated contravention of good faith negotiations will not go un-noticed in the "court of public opinion."

74.     On July 6, 2012, *Bloomberg* published an article entitled "Ex-Progress Directors

Say Duke CEO Switch Was 'Deceit.'"  This article provides, in relevant part:

Three former Progress Energy Inc. board members say they would have voted against Duke Corp. (DUK)'s takeover had they known that Duke's chief executive

- 26 -

officer would remain in charge of the combined companies.

*"I wouldn't have voted for the deal,"* James Bostic Jr., who served on Progress's board since 2002, said in a phone interview today. "I believed that Bill Johnson would be able to run the combined companies in a more efficient manner and offer a much stronger return to shareholders."

\* \* \*

The surprise decision to change CEOs as its takeover closed was deceitful, according to John H. Mullin, who also served on Progress's board.

*"I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company,"* Mullin…wrote

\* \* \*

*"There was information that Duke didn't share with us, and it may have changed the outcome,"* Alfred Tollison, another former Progress Director, said in a phone interview today. "Duke may have fulfilled the letter of the agreement, but they didn't fulfill the spirit," he said, referring to Johnson occupying the CEO position for one day.

75.     Mullin's letter and James Bostic Jr.'s statements confirm the fact that: (i) the defendants breached the Merger Agreement; and (ii) the Proxy was false and misleading because it contained material misstatements and omissions.  Moreover, Mullin's letter confirms another important point: the decision to request Johnson's resignation was premeditated and designed to by-pass months of negotiations between the parties.

76.     Also on July 6, 2012, the NCUC initiated an investigation into the wrongdoing alleged herein.  The Attorney General of North Carolina, Roy Cooper, has sought to intervene in this investigation and has begun an investigation of his own.

77.     On July 10, 2012, Edward S. Finley, Jr., Chairman of the NCUC, gave his recollection of the events immediately preceding the Merger, from the NCUC's perspective:

The Commission reopened the hearings in the dockets on a limited basis on June 25, 2012.

*The Commission understood that the parties wished to close the business*

*combination by July 1, 2012*, and pursuant to the agreement between them that if the closing did not occur by July 8, 2012, either party was free to walk away from the transaction without financial penalty.

*In an effort to comply with the applicants' conveyed wishes, the Commission issued its Order approving the business combination*, with conditions and code of conduct on June 29, 2012.

*At that time the Commission had not been made aware of any discussions or decisions concerning change in the representations with respect to the individual that would hold the position of president and CEO of The New Duke and issued its Order on the understanding, based on the sworn testimony it had received, that that individual would be William D. Johnson*.

78.     That same day, on July 10, 2012, the NCUC held a public hearing at which defendant Rogers testified.  Rogers testified that the subject of who would assume the titles of President and CEO of post-Merger Duke received significant discussion and attention during Merger negotiations.  Rogers also testified that it was his understanding that Johnson was going to assume these titles.  Rogers stated:

[T]he Duke Board somewhere in mid-May [2012] period based on – made the decision to enter into deliberations in executive session and excuse me from that executive session.

*I was advised the nature and extent of the board's concerns with Mr. Johnson by the lead director on June 23 in a meeting the next day with the lead director and another member of the Duke Board.... At that time they indicated that the board had doubts about Mr. Johnson's ability to lead the combined company, and asked me whether if the combined company's board were to make the decision to appoint me as CEO following the closing I would be willing to accept the position*. They said they had reached the preliminary view that Mr. Johnson was not the best person to lead the combined company, but that no decision had been made at that time. In fact, no final decision could be made prior to the closing.

79.     Defendant Rogers' testimony as to the Director Defendants' discussion on leadership is questionable in that the Director Defendants could not without prior discussion have made the decision to request Johnson's resignation in a short executive session.  Rather, common sense dictates that this decision was made well before the close of the Merger, and that

the Director Defendants failed to disclose this material change in order to ensure the close of the Merger.  Indeed, Rogers testified that concerns regarding Johnson leadership "emerged in May" of 2012.  "[I]t was then that my board excluded me from the deliberations, which is always uncomfortable for a CEO, and they went into their conversations about it without consulting me. It was those conversations that really led to them ultimately pulling me aside in late June, around June 23rd, and sharing with me their concerns."   Rogers explained that the Board "felt [Johnson's] style was autocratic and discouraged different points of view."   Despite these purported concerns, however, none of the directors communicated these issues to Johnson, to the Progress directors, to regulators, or to the shareholders of Duke or Progress.   Instead, the Individual Defendants waited until the close of the Merger to abruptly dismiss Johnson after a twenty minute executive session.

80.     The Director Defendants' behavior and highly questionable judgment have had a substantially negative effect on Duke's credibility and caused NCUC Commissioner Susan Rabon to ask defendant Rogers on July 10, 2012:

> *Have we as the Commission been misled, or as others have said, duped in this process to get approval of this merger*?" Further, Commissioner Rabon stated to Rogers, "I hope you can understand that I may not find your commitment as reassuring as I would have several weeks ago.

81.     Commissioner ToNola Brown-Bland of the NCUC stated on the record on July 10, 2012, that utility commissions in other states in which Duke operates are "watching and listening."   Her implication is that other regulatory investigations or actions in other states besides North Carolina may follow.

82.     In addition, during the NCUC hearing, defendant Rogers testified about the Separation Agreement Johnson had entered into with Duke, in which Johnson received a severance package worth approximately $44 million.  All of the Director Defendants were

responsible for authorizing this improper severance package.  When questioned about this windfall compensation, defendant Rogers stated that, "I will assure that none of these dollars will be – they will all be paid by the investors and none will be charged to the customers of this state."

83.     On July 20, 2012, the NCUC held a final public hearing at which it called upon defendants Gray and Browning to testify.  Both directors' testimony made express that, at least several weeks before the Merger was consummated, the Duke board had substantial questions about Johnson and would likely decline to permit Johnson to serve as the post-Merger CEO. Gray admitted that the Duke board had substantially determined that it did not want Johnson to serve as CEO by, at the latest, sometime in May 2012.  Browning's testimony is even more revealing. He testified that by the time the two companies signed the Merger Agreement in January 2011, the Duke board already had concerns over whether Johnson was the right person to lead the post-Merger entity.  Browning also testified that, for him personally, he knew that Johnson could not be the post-Merger CEO before the Merger was commenced.  Browning also disclosed that his personal decision would not have changed whether or not he had a personal conversation with Johnson regarding Browning's concerns.

84.     As made apparent by the allegations set forth above, particularly as revealed in the testimony of defendants Rogers, Gray, and Browning before the NCUC, the Director Defendants had determined well before the Merger was completed that they were going to force Johnson to resign as CEO of the post-Merger entity.

## DAMAGES TO DUKE

85.     As a result of the Individual Defendants' improprieties, Duke disseminated improper, public statements concerning the Company's future leadership and operations.  These

improper statements have demolished Duke's credibility as reflected by the Company's over $1.5 billion three-day market capitalization loss.

86.     Further, as a direct and proximate result of the Individual Defendants' actions, Duke has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in responding to the NCUC and North Carolina Attorney General investigation;

(b)     costs incurred in responding to possible other investigations and regulatory actions outside of North Carolina,

(c)     costs incurred in paying Johnson's severance package;

(d)     costs incurred in paying possible severance packages to the former Progress officers and directors who resigned in response to Johnson's forced resignation;

(e)     costs incurred in investigating and defending Duke and certain officers and directors in the Securities Class Actions;

(f)     costs incurred from paying any potential settlement or adverse judgment in the Securities Class Actions; and

(g)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Duke.

87.     Moreover, these actions have seriously damaged Duke's corporate image and goodwill.  For at least the foreseeable future, Duke will suffer from what is known as the "liar's discount," a term applied to the stocks of companies which have been implicated in improper behavior and have misled the investing public, such that Duke's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Moreover, Duke faces a loss of

prospective revenue through denial or delay of rate increases due to its recent debacle with the NCUC, an agency that controls 45% of Duke's business.[1]

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.     Plaintiff brings this action derivatively in the right and for the benefit of Duke to redress injuries suffered, and to be suffered, by Duke as a direct result of breaches of fiduciary duty, and waste of corporate assets, as well as the aiding and abetting thereof, by the Individual Defendants.  Duke is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89.     Plaintiff will adequately and fairly represent the interests of Duke in enforcing and prosecuting its rights.

90.     Plaintiff was a shareholder of Duke at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Duke shareholder.

91.     The current Board of Duke consists of the following fifteen individuals: defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Sharp, Rhodes, Reinsch and non-defendants James B. Hyler, Jr., E. Marie McKee, Harris E. DeLoach, Jr., and Carlos A. Saladrigas.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

_____

[1] In North Carolina, Duke has sought a one percentage point increase in the rates it charges, from a 10.5% return on equity to an 11.5% return.  An article in *Reuters* dated July 11, 2012, reported that Duke "could face a cold reception" when it seeks new power rates in North Carolina later this year.  According to Robert Gruber, Executive Director of NCUC's public staff, NCUC could impose a penalty short of undoing the Merger.  According to the *Reuters* article, Mr. Gruber stated that "a percentage point or two [in rates in North Carolina] could easily top $100 million for Duke's earnings."

**Demand Is Excused Because Defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Sharp, Rhodes, and Reinsch's Decision to Mislead the NCUC Is Not a Valid Exercise of Business Judgment**

92.     Defendants' Rogers, Barnet, Bernhardt, Browning, DiMicco, Gray, Hance, Sharp, Rhodes, and Reinsch's challenged misconduct at the heart of this case constitutes a threat to the Company's very survival given the fact that the NCUC controls 45% of Duke's business, amounting to several billions of dollars in revenue and several hundreds of millions of dollars in net income each year.  As the ultimate decision-making body of the Company, a majority of the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate improper activities.  More specifically, these directors intentionally withheld material information from the NCUC while pressing it to issue final approval of the Merger.  As such,  Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Sharp, Rhodes, and Reinsch's challenged misconduct is not a protected business decision and can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Sharp, Rhodes, and Reinsch Face a Substantial Likelihood of Liability for Their Misconduct**

93.     As explained above, defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp, constituting eleven of the fifteen current members of the Board, at least negligently approved the false and misleading Proxy.  As a result of the substantial likelihood of liability stemming from these federal securities law violations, demand upon Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp is futile.

94.     Moreover, these same eleven current directors, defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp, breached

their fiduciary duty of loyalty by knowingly or recklessly making improper statements in the Company's SEC filings regarding post-Merger Duke's leadership.  Accordingly, demand upon Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp is futile.

95.    Defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp breached their duty of loyalty by causing the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including but not limited to the statements in the Proxy.  Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp also failed to prevent the other Individual Defendants from committing this wrongdoing.  As a result of Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp's course of conduct, the Company is now the subject of the Securities Class Actions. These directors face a substantial likelihood of liability for their misconduct, rendering any demand upon them futile.

96.    Defendants Bernhardt, Browning, Forsgren, Rhodes, and Sharp, as members of the Audit Committee, reviewed and approved the improper statements regarding the planned changes in the Company's future leadership.  The Audit Committee's Charter provides that it is responsible for supervising the Company's compliance with legal and regulatory requirements and policing the Company's internal controls and procedures.  Thus, Bernhardt, Browning, Forsgren, Rhodes, and Sharp are responsible for knowingly or recklessly allowing the false misleading statements in the Proxy and improper statements in the Company's SEC filings regarding post-Merger Duke's leadership and operations.  Moreover, Bernhardt, Browning, Forsgren, Rhodes, and Sharp reviewed and approved the improper press releases made to the

public.  Despite their knowledge, or with reckless disregard, the Audit Committee Defendants caused, and additionally in some instances signed, these improper statements.  In addition, the Audit Committee Defendants completely and utterly failed in their duty of oversight, and Bernhardt, Browning, Forsgren, Rhodes, and Sharp failed in their duty to supervise the Company's compliance with legal and regulatory requirements, as required by the Audit Committee Charter in effect at the time.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties. Any demand upon them is futile.

97.     Defendants Browning, DiMicco, and Gray, as members of the Corporate Governance Committee, breached their fiduciary duty of loyalty.  The Corporate Governance Committee Defendants completely and utterly failed in their duty to monitor the "management continuity planning process," as required by the Corporate Governance Committee Charter in effect at the time.  Accordingly, the Corporate Governance Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Browning, DiMicco, and Gray face a substantial likelihood of liability for their breach of fiduciary duties. As a result, any demand upon them is futile.

98.     Similarly, defendant Rogers, as a chair of the Transition Committee, faces a substantial likelihood of liability for failing to oversee the "integration planning" related to the Merger.  As a result of Rogers' failure to properly monitor the leadership transition of post-Merger Duke, the Company has suffered reputational damages and now faces increased scrutiny from credit rating agencies and government regulatory authorities.  Thus, demand upon Rogers is futile.

99.     The Compensation Committee Defendants, DiMicco, Forsgren, Gray, and Hance, face a substantial likelihood of liability for breaching their fiduciary duty of loyalty by authorizing an improper severance package for Johnson.  The Compensation Committee Defendants failed in their duty to properly "make recommendations to the Board for approval of any consulting arrangement, employment contract, severance or termination arrangement with the Chief Executive Officer," as required by the Compensation Committee Charter in effect at the time.  As such, any demand upon DiMicco, Forsgren, Gray, and Hance is futile.

100.    Moreover, the entire current Board breached its fiduciary duty to the Company by wasting its corporate assets and approving the undeserved benefits included in Johnson's Severance Package.  Accordingly, any demand upon the Board is futile.

101.    The acts complained of constitute violations of the fiduciary duties owed by Duke's officers and directors and these acts are incapable of ratification.

102.    Duke has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Duke any part of the damages Duke suffered and will suffer thereby.

103.    If Duke's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Duke. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Duke against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors

were to cause Duke to sue themselves or certain of the officers of Duke, there would be no directors and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause Duke to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

## COUNT I

### Against the Director Defendants for Violations of
### Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The Director Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106.    The Proxy was prepared, reviewed, and/or disseminated by the Director Defendants.  It misrepresented and/or omitted material facts, including material information about the future leadership and operations of the Company.

107.    In so doing, the Director Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

108.    The Director Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

109.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Merger.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

110.    By reason of the foregoing, the Director Defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

111.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy as described herein.

## COUNT II

### Against the Director Defendants for
### Violation of Section 20(a) of the Exchange Act

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Director Defendants acted as controlling persons of Duke within the meaning of section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as directors of Duke, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

114.    Each of the Director Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

115.    In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Director Defendants to approve the Merger.  They were, thus, directly involved in the making of the Proxy.

116.    In addition, as the Proxy sets forth at length, and as described herein, the Director Defendants were each involved in negotiating, reviewing, and approving the Merger.

117.    By virtue of the foregoing, the Director Defendants have violated section 20(a) of the Exchange Act.

118.    As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.

### COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The Individual Defendants owed and owe Duke fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe Duke the highest obligation of good faith, fair dealing, loyalty, and due care.

121.    The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, these defendants violated their duty of good faith by creating a culture of recklessness and deception within Duke, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

122.    The Officer Defendants, Rogers, Good, and Young, either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants knowingly, recklessly, or with gross negligence: (i) misled regulatory authorities in charge of approving the Merger; (ii) made improper statements in the Company's press releases and public filings concerning the Company's planned management changes; and (iii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

123.    The Director Defendants, Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp, as directors of the Company, owed Duke the highest duty of loyalty.  These defendants breached their duty of loyalty by knowingly or recklessly: (i) making false and misleading statements regarding the Company's leadership and operations in the Proxy; (ii) misleading regulatory authorities in charge of approving the Merger; (iii) making improper statements in the Company's press releases and public filings concerning the Company's planned management changes; (iv) failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (v) committing corporate waste by  authorizing an improper severance package for Johnson.  Accordingly, defendants Rogers, Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp breached their duty of loyalty to the Company.

124.    The Audit Committee Defendants, Bernhardt, Browning, Forsgren, Rhodes, and Sharp, breached their fiduciary duty of loyalty by approving the improper statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and Bernhardt, Browning, Forsgren, Rhodes, and Sharp failed in their duty to supervise the Company's compliance with legal and regulatory requirements, as required by the Audit Committee Charter in effect at the time.

125.    The Compensation Committee Defendants, DiMicco, Forsgren, Gray, and Hance, breached their fiduciary duty of loyalty by authorizing an improper severance package for Johnson.  The Compensation Committee Defendants completely and utterly failed in their duty to properly "make recommendations to the Board for approval of any consulting arrangement, employment contract, severance or termination arrangement with the Chief Executive Officer," as required by the Compensation Committee Charter in effect at the time.

126.    The Corporate Governance Committee Defendants, Browning, DiMicco, and Gray, breached their fiduciary duty of loyalty by facilitating and/or allowing the scandalous CEO switch to occur.  The Corporate Governance Committee Defendants completely and utterly failed in their duty to monitor the management continuity planning process and oversee the evaluation of the CEO, as required by the Corporate Governance Committee Charter in effect at the time.

127.    Similarly, defendant Rogers, as a chair of the Transition Committee, breached his fiduciary duty of loyalty by failing to oversee the "integration planning" related to the Merger.

128.    As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Duke has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

129.     Plaintiff, on behalf of Duke, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

130.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.     As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the government investigations and Securities Class Actions that they brought on with their improper statements. In addition, due to the defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to remediating the Company's potential regulatory violations. Finally, the Individual Defendants have caused Duke to waste its assets by authorizing an improper severance package for Johnson.

132.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133.     Plaintiff, on behalf of Duke, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Duke, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of the Exchange Act, breaches of fiduciary duties, and waste of corporate assets;

B.      Directing Duke to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Duke and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over its compliance with legal and regulatory bodies;

2.      a proposal to create a committee of the Board that polices the Company's compliance with regulatory bodies, including, but not limited to, the NCUC;

3.      a proposal to strengthen the Company's internal controls policing the Board's future authorizations of severance packages;

4.      a proposal to strengthen the Company's disclosure controls and procedures;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

6.      a provision to permit the shareholders of Duke to replace the faithless pre-Merger Duke directors with shareholder-nominated candidates;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Duke has an effective remedy;

D.     Awarding to Duke restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 17, 2012

COOCH AND TAYLOR, P.A.

*/s/ Blake A. Bennett*
BLAKE A. BENNETT (#5133)
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE  19899-1680
Telephone: (302) 984-3800
Facsimile: (302) 984-3939
bbennett@coochtaylor.com
*Attorneys for Plaintiff*

OF COUNSEL

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com
kkim@robbinsumeda.com

759395