EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| MAURINE NIEMAN<br><br>            Plaintiff,<br><br>     v.<br><br>DUKE ENERGY CORPORATION, JAMES E. ROGERS, LYNN J. GOOD, STEVEN K. YOUNG, WILLIAM (BILL) BARNET III, G. ALEX BERNHARDT SR., MICHAEL G. BROWNING, R. DIMICCO, JOHN H. FORSGREN, ANN MAYNARD GREY, JAMES H. HANCE, JR., E. JAMES REINSCH, JAMES T. RHODES, and PHILIP R. SHARP,<br><br>            Defendants. | C.A. No.  3:12-cv-00456<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Maurine Nieman ("Plaintiff"), individually and on behalf of all persons who exchanged shares of Progress Energy, Inc. ("Progress") common stock for shares of Duke Energy Corporation ("Duke") common stock in connection with the merger between Progress and Duke that was announced on January 10, 2011, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief is based upon, among other things, her investigation of: (a) a registration statement filed with the Securities and Exchange Commission ("SEC") on or about July 7, 2011 under the Securities Act of 1933 (the "Securities Act")  Form S-4/A the ("Registration Statement"); (b) other filings made by Duke with the SEC; (c) press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Duke; (d) statements from former Progress directors; and (e) other publicly available information about Duke.

Many other facts supporting the allegations contained herein are known only to the

defendants or are exclusively within their custody and/or control.  Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Class Action Complaint after a reasonable opportunity for discovery.

## INTRODUCTORY STATEMENT

1.      On January 10, 2011, Duke and Progress issued a joint press release announcing that the boards of directors of both companies had unanimously approved a definitive merger agreement ("Merger Agreement") pursuant to which Duke would acquire Progress in a stock-for-stock transaction (the "Merger").  In order to induce approval of the Merger by Progress shareholders, Duke touted the transaction as a merger-of-equals that would create a combined company in which the Progress and Duke constituents were equals in power, management and governance.  Progress shareholders not would receive a takeover premium typically paid by the buyer when power is not as equally shared.  Under the terms of the Merger each outstanding share of Progress common stock was to be converted into the right to receive 2.6125 shares of New Duke common stock.  Based on Duke's closing share price on January 7, 2011 (one day prior to the signing of the Merger Agreement), the share exchange ratio represented a value to Progress shareholders of $46.48 per share – a premium of only 3.9 percent.  Both companies argued this lower premium was appropriate because this was not a buyout but rather a merger-of-equals.

2.      Upon closing of the Merger, Duke represented in the Registration Statement the new combined company ("New Duke") would be governed by executives and directors of both companies creating a merger-of-equals.

3.      Specifically, the Registration Statement explained that the Progress CEO William D. Johnson ("Johnson"), would become the CEO of the New Duke, and Duke CEO James E.

Rogers ("Rogers"), would serve as the New Duke Chairman. Also, the New Duke Board would be comprised of 11 members of the Duke Board and seven members of the Progress Board. Finally, the executive team of New Duke would be comprised of executives of both Progress and Duke.

4.      Contrary to the representations in the Registration Statement of sharing power in a merger-of-equals, on July 2, 2012, just hours after the Merger closed and Progress shareholders received their shares under the Registration Statement, New Duke voted to oust Johnson as CEO of the combined Company, New Duke, and appoint Rogers as CEO.

5.      On June 23, 2012, prior to the closing of the offering under the Registration Statement, Rogers agreed to go along the New Duke Board's plan to oust Johnson and act as CEO of New Duke.

6.      Despite this shift in the leadership of the New Duke the Registration Statement was not amended to reflect the change in leadership making the operative Registration false and misleading.

7.      Instead, on June 27, 2012, with full knowledge that the Duke members of the New Duke Board intended to oust Johnson, the New Duke Board entered into a three-year employment agreement with Johnson that provided terms should Johnson be terminated, as the New Duke Board knew would occur.

8.      Within hours of the closing of the Merger on July 2, 2012, the New Duke Board voted to terminate Johnson and hire Rogers as the New Duke CEO.

9.      On July 3, 2012, New Duke filed a current report on Form 8-K ("8-K") attaching Johnson's June 27, 2012 employment agreement, and July 3, 2012 Separation Agreement. The 8-K also stated that the New Duke Board had reinstated Rogers effective July 3, 2012, despite

the fact that his appointment as CEO had been orchestrated weeks, if not months, earlier.

10.     Johnson immediately became eligible to receive a payment of approximately $44.7 million as per his Separation Agreement.  In return for this generous exit package, Johnson agreed to a non-disparagement clause as part of his Separation Agreement.  Due to this agreement, Johnson has not yet publically spoken about his termination from New Duke.

11.     Contrary to the representations in the Registration Statement, there has been no combination of the companies' complementary strengths to create a stronger unified whole under a combined leadership structure.

## NATURE OF CLAIMS

12.     This is a securities class action brought on behalf of Plaintiff and the Class identified below alleging violations of the Securities Act of 1933, specifically: Count I (Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)), and Count II (Section 15 of the Securities Act, 15 U.S.C. §77o).

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.  New Duke has operations in this District, the misrepresentations were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

14.     Plaintiff Maurine Nieman was a Progress shareholder who received shares of New Duke pursuant to the Registration Statement.

15.     Defendant New Duke is a Delaware corporation with a principal place of business located at 550 South Tyron Street Charlotte, North Carolina 28202-4200.  New Duke common stock trades on the New York Stock Exchange under the trading symbol "DUK."  New Duke is

the successor to Progress.

16.     Defendant James E. Rogers ("Rogers") is the Chairman and CEO of New Duke. Prior to the Merger, Rogers had been President, CEO and a member of the Board of Directors of Duke since its merger with Cinergy Corp. in 2006 and had served as Chairman of Duke since 2007.  Rogers was Chairman and CEO of Cinergy Corp. from 1994 until its merger with Duke. Rogers signed the Registration Statement.

17.     Defendant Lynn J. Good ("Good") is CFO of New Duke.  Prior to the Merger, Good was the Group Executive and Chief Financial Officer of Duke and signed the Registration Statement.

18.     Defendant Steven K. Young ("Young") was the Senior Vice President and Controller of Duke and signed the Registration Statement.

19.     Defendant William (Bill) Barnet III ("Barnet") is a director of New Duke.  Prior to the Merger, Barnet was a director of Duke since 2001 and signed the Registration Statement.

20.     Defendant G. Alex Bernhardt Sr. ("Bernhardt") is a director of New Duke.  Prior to the Merger, Bernhardt was a director of Duke since 1991 and signed the Registration Statement.

21.     Defendant Michael G. Browning ("Browning") is a director of New Duke.  Prior to the Merger, Browning was a director of Duke since 1990 and signed the Registration Statement.

22.     Defendant Daniel R. DiMicco ("DiMicco") is a director of New Duke.  Prior to the Merger, DiMicco was a director of Duke since 2007 and signed the Registration Statement.

23.     Defendant John H. Forsgren ("Forsgren") is a director of New Duke.  Prior to the Merger, Forsgren was a director of Duke since 2009 and signed the Registration Statement.

24.     Defendant Ann Maynard Grey ("Grey") is a director of New Duke.  Prior to the Merger, Grey was a director of Duke since 1994 and signed the Registration Statement.

25.     Defendant James H. Hance, Jr. ("Hance") is a director of New Duke.  Prior to the Merger, Hance was a director of Duke since 2005 and signed the Registration Statement.

26.     Defendant E. James Reinsch ("Reinsch") is a director of New Duke.  Prior to the Merger, Reinsch was a director of Duke since 2009 and signed the Registration Statement.

27.     Defendant James T. Rhodes ("Rhodes") is a director of New Duke.  Prior to the Merger, Rhodes was a director of Duke since 2001 and signed the Registration Statement.

28.     Defendant Philip R. Sharp ("Sharp") is a director of New Duke.  Prior to the Merger, Sharp was a director of Duke since 2007 signed the Registration Statement.

29.     Defendants listed in paragraphs 16-28 above are collectively herein referred to as the "Individual Defendants."

## COMMON FACTUAL ALLEGATIONS

**The Merger**

30.     On January 10, 2011, Duke and Progress issued a joint press release announcing that the boards of directors of both companies had unanimously approved a definitive merger agreement pursuant to which Duke would acquire Progress in a stock-for-stock transaction that was represented to be a merger-of-equals.

31.     The newly formed company, New Duke, was to be the country's largest utility with assets of over $95 billion (calculated on a pro forma basis as of December 31, 2010), approximately $65 billion in enterprise value, and approximately $37 billion in market capitalization.  Moreover, New Duke was said to have the country's largest regulated customer base, with service to approximately 7.1 million customers in six regulated service territories –

North Carolina, South Carolina, Florida, Indiana, Kentucky, and Ohio.

32.     Pursuant to the terms of the Merger, each outstanding share of Progress common stock was to be converted into the right to receive 2.6125 shares of Duke common stock.  Based on Duke's closing share price on January 7, 2011 (one day prior to the signing of the Merger Agreement), the share exchange ratio represents a value to Progress shareholders of $46.48 per share – a premium of only 3.9 percent.  The companies explained at the time that the small premium was due to the fact that the Merger was not a buyout but rather a merger-of-equals.

33.     Progress had an attractive asset and business mix that made it a valuable standalone enterprise in its own right.  For instance, Progress's business was 100 percent regulated, because Progress had divested itself of its less stable, non-regulated businesses over the past decade.  In addition, Progress had made significant investments toward modernization and environmental upgrades, an effort to move away from dirtier coal resources that has transformed its generation capabilities to be based on just 33 percent (owned capacity) and 42 percent (actual capacity) coal.  These measures would permit Progress both to comply with forthcoming environmental regulations and to benefit from rate base increases and earnings growth that are only just beginning to take shape.

34.     Following the announcement of the Merger, on February 18, 2011 a Progress investor conference call made clear that Progress's future was promising.  Defendant Johnson stated that its capital investments in modernization and environmental upgrades were paying off in terms of rate base growth that support ongoing earnings targets and that by merging with Progress just after Progress completed these upgrades, New Duke shareholders would reap the benefits of those investments under his continued leadership.

**The Registration Statement**

35.     Following the announcement of the Merger Duke and Progress filed a Registration Statement with the SEC.  The initial Registration Statement was filed on March 17, 2011.  The Registration Statement was subsequently amended on April 8, 2011, April 25, 2011, May 13, 2011, and June 30, 2011.  The final Registration Statement was filed on July 7, 2011. No amendments have been made to the Registration Statement since July 7, 2011.

36.     The Registration Statement repeatedly represented that New Duke was to be a merger-of-equals.  Specifically, the Registration Statement stated that the Progress Board was recommending the Merger to its then shareholders because of the "*Shared Strategic Vision and Governance.*"

37.     The Registration Statement stated:

- Mr. Johnson will be the president and chief executive officer of the combined company.
- Mr. Rogers will be the executive chairman of the board of directors of the combined company.
- The senior management team named in the merger agreement draws from the senior management teams of both companies.  The combined company's board of directors will have seven directors designated by Progress Energy and eleven directors designated by Duke Energy.  The lead director will be designated by Duke Energy.
- The combined company's board committee assignments will be allocated on a balanced basis among Progress Energy and Duke Energy designees.

38.     Furthermore the Registration Statement stated that New Duke would be managed by the leadership of both companies:

The following individuals will be the senior officers of Duke Energy upon completion of the merger:

- Lynn J. Good, currently group executive and chief financial officer of Duke Energy, will continue as chief financial officer;
- Dhiaa M. Jamil, currently group executive, chief generation officer and chief nuclear officer of Duke Energy, will lead nuclear generation;

- Jeffrey J. Lyash, currently executive vice president of energy supply of Progress Energy, will lead energy supply;
- Marc E. Manly, currently group executive, chief legal officer and corporate secretary of Duke Energy, will be general counsel and corporate secretary;
- John R. McArthur, currently executive vice president, general counsel and corporate secretary of Progress Energy, will lead regulated utilities;
- Mark F. Mulhern, currently senior vice president and chief financial officer of Progress Energy, will be chief administrative officer;
- B. Keith Trent, currently group executive and president of commercial businesses of Duke Energy, will lead commercial businesses;
- Jennifer L. Weber, currently group executive – human resources and corporate relations of Duke Energy, will lead human resources; and
- Lloyd M. Yates, currently president and chief executive officer of Progress Energy Carolinas, will lead customer operations.

39.     Overall the Registration Statement painted a picture to Progress shareholders that the transaction was structured as a merger-of-equals thereby protecting Progress shareholders interests in New Duke.

**The Registration Statement was False and Misleading**

40.     The Registration Statement was false and misleading at the time of the offering of the New Duke shares to Progress shareholders on July 2, 2012.

41.     Contrary to the repeated representations in the Registration Statement, members of the Duke Board began to meet in May 2012 to discuss the ouster of Johnson and retention of Rogers to lead New Duke as CEO.

42.     On June 23, 2012, members of the Duke Board met with Rogers who then agreed to act as CEO of New Duke.

43.     Four days later, on June 27, 2012, with full knowledge that the Duke members of the New Duke Board intended to oust Johnson, the New Duke Board entered into a three-year employment agreement with Johnson that provided terms should Johnson be terminated, as the Duke members of the New Duke Board knew would occur.  The employment agreement provided should Johnson be resign for "good reason" he would be entitled to:

(A)     a cash lump sum payment equal to the sum of (w) any earned but unpaid Annual Base Salary through the Date of Termination, (x) any of the Employee's business expenses that are reimbursable, but have not been reimbursed as of the Date of Termination, (y) the Employee's annual cash bonus for the fiscal year immediately preceding the fiscal year in which the Date of Termination occurs, if such annual cash bonus has not been paid as of the Date of Termination and (z) any accrued vacation pay to the extent not theretofore paid (the sum of the amounts described in subclauses (w), (x), (y) and (z), the "Accrued Obligations");

(B)     a cash lump sum payment equal to 300% of the sum of (x) Annual Base Salary and (y) the greater of (1) the average annual cash bonus paid to the Employee with respect to the three completed calendar years immediately preceding the year during which the Date of Termination occurs (including years during which the Employee was an employee of Progress); *provided*, *however*, that if the Employee was not eligible to receive an annual cash bonus with respect to each of the three calendar years immediately preceding the year in which the Date of Termination occurs, the average shall be determined for that period of calendar years, if any, for which the Employee was eligible to receive an annual cash bonus, or (2) the Target Bonus Opportunity for the year during which the Date of Termination occurs;

(C)     Duke Energy shall pay the total cost for continued participation under the applicable medical, dental, vision and life insurance plans in which the Employee participated immediately prior to the termination of his employment until the earlier of the third anniversary of the Date of Termination and the date or dates that the Employee receives comparable coverage and benefits under the plans, programs and/or arrangements of a subsequent employer;

(D)     a cash lump sum payment equal to 100% of his Target Bonus Opportunity for the year during which the Date of Termination occurs;

(E)     all outstanding unvested stock options and restricted stock units shall vest immediately and each performance share award outstanding at the time of termination shall vest at target level;

(F)     vesting of any awards which have been granted to the Employee by the Company or any of its Affiliates under any incentive compensation plan, program or agreement (other than those plans or agreements specified above) prior to the Date of Termination; and

(G)     payment of accrued benefits in all accrued nonqualified deferred compensation plans.

44.     Immediately following the closing of the Merger on July 2, 2012, the New Duke Board met and voted 10-5 on its pre-arranged plan to oust Johnson, with all five nay votes coming from former Progress directors who joined the New Duke Board.

45.     On July 3, 2012, New Duke filed an 8-K announcing that the Merger was completed, that New Duke had signed an employment agreement with Johnson, and that Johnson had agreed to resign effective 12:01a.m. on July 3, 2012 and agreed to terms for his resignation in a formalized agreement (the "Separation Agreement").  The 8-K also stated that the New Duke Board had reinstated Rogers as CEO.

46.     Attached to the 8-K filed with the SEC at 5:07p.m. on July 3, 2012 was a copy of the Johnson employment agreement dated June 27, 2012, and the Separation Agreement dated July 3, 2012.

47.     The Separation Agreement states that Johnson is entitled to "the payments and benefits" contemplated in his June 27, 2012 employment agreement.  In addition, the Separation Agreement stated it would reimburse Johnson for business expenses incurred and any expenses incurred in connection with his relocation to Charlotte.  In addition, all outstanding equity awards immediately vested upon his resignation.  Finally, in exchange for Johnson's agreement not to disparage New Duke, Johnson will be entitled to up to $1.5 million as an additional payment.

48.     This shocking information as disclosed in the 8-K led to both regulatory agencies and Progress directors who approved the deal publically stating that they were mislead.

49.     Statements and sworn testimony of Rogers confirm the falsity of the Registration Statement.  Rogers testified before the North Carolina Utilities Commission (the "Commission") on July 9, 2012.  During his sworn testimony he stated that he was made aware that the Duke Board was not satisfied with Johnson's "autocratic" leadership in May 2012.

50.     Johnson also made sworn statements before the Commission on July 19, 2012.  Johnson testified that Duke wanted out of the Merger and when they could not determine a way to get out, they decided to oust Johnson:  "They wanted the merger.  Then they didn't.  Then they

couldn't get out of it, and they didn't want to be stuck with me, as the person who dragged them into it." Johnson also testified that after the Federal Energy Regulatory Commission expressed concerns about the Mergers' effect on wholesale power prices in December 2011, Duke and Progress disagreed over the cost and method, to resolve those issues causing his relationship with Rogers to begin to deteriorate. Johnson also testified that he heard that Duke executives were telling investors that the Merger might not go through in early 2012.

51.     Two former Progress directors have also publically commented on Duke's actions.

52.     Alfred Tollison Jr., who served on the Progress Board until the completion of the merger stated: "Frankly, I felt misled. Just from circumstantial evidence you would have to think it didn't happen overnight, that there was a lot of forethought given to it." Despite this likely forethought, Duke failed to amend the Registration Statement or provide any notice to the Progress shareholders that the information contained therein was false.

53.     Another former Progress board member, John Mullin III, told *The Wall Street Journal*, that: "I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company." Mullin also stated: "In my opinion this is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street and as a director of 10 publicly traded companies and as a former trustee of Putnam's numerous mutual funds."

## The Fall Out Over the False and Misleading Registration Statement

54.     After the truth emerged, Standard & Poor's placed New Duke on a credit watch. Standard & Poor's analyst, Dimitri Nikas, stated: "The sudden shift in management raises

concerns about effective corporate governance, successful handling of the anticipated merger integration and the ongoing effective management of pending challenges that face the combined entity."

55.     Moreover the Commission has launched an investigation.  Robert Gruber, the chief public advocate at the Commission, had deep concerns about Johnson's dismissal publicly stating: "Had [the Commission] known about this management structure before the merger closed, we might not have voted to approve it.  Mr. Rogers is very competent but that is not how the deal was advertised."

56.     The Commission has also ordered testimony from the key players at New Duke and Progress.  Rogers testified before the Commission on July 9, 2012.  Johnson testified on July 19, 2012.  And the Commission has ordered four New Duke Board members – two former Duke directors, Ann Maynard Gray and Michael Browning, and two former Progress directors, E. Marie McKee and James Hyler Jr. – to testify as well.

57.     Gray testified before the Commission on July 20, 2012 telling the Commission that the Duke Board members were concerned about Johnson's "leadership style."  Gray testified under oath that Johnson got off to a rocky start even before the companies' announced the Merger, when he gave a presentation in 2010 and discussed how he liked to operate.  Gray testified that Johnson "describe[d] himself as an individual who likes to learn but not to be taught. That was an expression that stayed with the board."  Gray said she DiMicco were both concerned about Johnson after that initial meeting.

58.     Despite the concern of these Due Board members prior to the Merger, Duke still agreed to a Merger Agreement that called for Johnson to be CEO and issued a Registration

Statement stating that Johnson would be CEO despite their knowledge that the Duke members of the New Duke Board would never allow Johnson to actually take control of New Duke.

59.     The Commission has indicated that its investigation is not complete.

60.     Commentators have speculated that while the Commission is unlikely to unwind the Merger, as it is empowered to do, it will likely seek to impose a substantial fine or other regulatory penalties on New Duke.

61.     In addition, analysts have speculated that trust will be an issue when New Duke seeks future rate increases from the Commission.

62.     North Carolina's Attorney General, Roy Cooper, is also seeking documents to find out what else the public was not told and see if consumers were misled about the Merger.

63.     After Johnson's forced resignation, three senior Johnson lieutenants resigned: Chief Administrative Officer, Mark Mulhern, Chief Integration and Innovation Officer, Paula Sims, and Executive Vice President, John McArthur.

64.     Also, four former Progress directors who did not join the New Duke Board have said they would not have approved the Merger had they known Rogers would be put in charge.

65.     As a result of the change in leadership at New Duke, shareholders appear to be concerned as demonstrated by New Duke's stock prices dropping.  New Duke's stock prices began to fall following the July 3, 2012 announcement of Johnson's termination.  On July 13, 2012, alone New Duke's stock dropped $2.34, or 3.4 percent, on heavy volume, while broader utility stock indexes were essentially flat resulting in damages to former Progress shareholders that exchanged their shares as part of the Merger.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all former Progress shareholders who acquired New Duke stock as a result of the Merger.  Excluded from the Class are the defendants, all of the officers and directors of Duke, members of their immediate families and their legal representatives, heirs, predecessors, successors and assigns and any entity in which any of the foregoing has a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  As of July 5, 2011, the record date for the Progress special meeting, there were approximately 295 million shares of Progress outstanding that were to be exchanged for shares of New Duke shares upon the completion of the Merger.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     Whether statements made in the Registration Statement to Progress shareholders misrepresented and/or omitted material facts about the Merger;

(c)     Whether defendants' statements made in the Registration Statement misrepresented and/or omitted material facts about the Merger;

69.     Plaintiff's claims are typical of the claims of the members of the Class as she and members of the Class sustained damages arising out of the defendants' wrongful conduct in violation of federal securities laws as complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of Section 12(a)(2) of the Securities Act**
<u>**Against All Defendants**</u>

72.     Plaintiff incorporates by reference herein each and every allegation set forth above.

73.     Plaintiff asserts this claim within one year of the date on which she discovered or should have discovered, through the exercise of reasonable diligence, the untrue statements and omissions alleged herein, and within three years after the bona fide sale of Duke common stock pursuant to the exchange of securities which occurred in connection with the Merger.

74.     Plaintiff and the other members of the Class were recipients of stock issued by New Duke and offered pursuant to the Registration Statement.  Defendants were sellers, offerors and/or solicitors of sales of the Duke stock offered pursuant to the Registration Statement.  The defendants knew or should have known that the Registration Statement prepared by the defendants and distributed in connection with the Merger was inaccurate and misleading, contained untrue statements of material facts, omitted other material facts necessary to make the

statements made not misleading and concealed and failed to adequately disclose material facts as described above.

75. Accordingly, Plaintiff and the other members of the Class have the right to rescind and recover the consideration exchanged for their Duke shares and hereby reserve the right to rescind and tender their shares to Duke. To the extent that Plaintiff and other members of the Class have sold their shares, they are entitled to recissory damages.

## COUNT II
### For Violation of Section 15 of the
### Securities Act Against Rogers and Gray

76. Plaintiff incorporates by reference herein each and every allegation set forth above.

77. Rogers and Gray participated in the preparation and/or dissemination of the foregoing false representations by providing information or approving their substance.

78. Rogers and Gray are controlling persons with respect to New Duke regarding the content of the misrepresentations made to Plaintiff and the Class, within the meaning of Sections 11 and 12(a)(2) of the Securities Act, because they had the authority or power to control or influence the conduct of Duke, signed the Registration Statement and/or otherwise participated in the process which allowed the offering to be completed.

79. Rogers and Gray knew or should have known of the violations of Sections 11 and 12(a)(2) of the Securities Act as set forth in Counts I above.

80. Rogers and Gray failed to disclose to Plaintiff and other members of the Class, the truth concerning the false and misleading statements contained in defendants' communications with Plaintiff and the Class, and failed to advise Plaintiff and the Class of the omitted statements

of material fact.  Rogers and Gray knew these representations and omissions to be false and misleading at the time that they were made.

81.     As a consequence of these defendants' unlawful course of conduct, Plaintiff and the other members of the Class have been damaged and continue to be damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, pray for a judgment as follows:

A.     Determining that this action is a proper class action and certifying, *inter alia,* Plaintiff as the Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and all other Class members against all defendants for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding rescission or recissory damages to Class members who exchanged Progress stock for Duke stock in the Merger;

D.     Awarding Plaintiff and all other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.     For pre-and post-judgment interest in the maximum amount prescribed by law; and

F.     For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury in this action of all claims asserted against all defendants.

Dated: July 24, 2012

**GRAY, LAYTON, KERSH, SOLOMON, FURR & SMITH, P.A.**

By:   /s/ William E. Moore, Jr.
        William E. Moore, Jr.
        N.C. State Bar No. 9962
        516 South New Hope Road
        P.O. Box 2636
        Gastonia, North Carolina 28053-2636
        Telephone:    (701) 865-4400
        Facsimile:    (704) 866-8010
        bmoore@gastonlegal.com
        *Local Counsel for Plaintiff*

GARDY & NOTIS, LLP
James S. Notis
Jennifer Sarnelli
501 Fifth Avenue, Suite 1408
New York, New York 10017
Tel: 212-905-0509
Fax: 212-905-0508

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DR. MICHAEL WILLIAM SUNNER AND DR. GLADYS SUNNER, On Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> DUKE ENERGY CORPORATION, JAMES E. ROGERS, WILLIAM BARNET III, G. ALEX BERNHARDT SR., MICHAEL G. BROWNING, DANIEL R. DIMICCO, JOHN H. FORSGREN, ANN MAYNARD GRAY, JAMES H. HANCE JR., E. JAMES REINSCH, JAMES T. RHODES, AND PHILIP R. SHARP, <br><br> Defendants. | No. <br><br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br> Fed. R. Civ. P. 23 <br><br><br> **JURY TRIAL DEMANDED** <br><br> CLASS ACTION |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
## PROLOGUE

> In my opinion this can only be described as an incredible act of bad faith with regard to the undertakings of the Merger Agreement.  I think it was a clearly premeditated contravention of one of the most central tenets of our Agreement.

> In my opinion this is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street and as a director of ten publicly traded companies and as a former Trustee of . . . numerous mutual funds.

John H. Mullin, III, Former Lead Director of Progress Energy, Inc., Letter to the Editor of the *Wall Street Journal*, July 5, 2012.

Plaintiffs, Dr. Michael William Sunner and Dr. Gladys Sunner ("Plaintiffs"), allege the following based upon the investigation of plaintiffs' counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Duke Energy Corporation ("Duke Energy" or the "Company"), securities analysts' reports about the Company, and information readily available

on the Internet.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities fraud class action on behalf of persons who purchased the common stock of Duke Energy between June 11, 2012 and July 9, 2012 (the "Class Period"). This action is brought against Duke Energy, its Chief Executive Officer ("CEO") and President, James E. Rogers ("Rogers"), William Barnet III, G. Alex Bernhardt Sr., Michael G. Browning, Daniel R. DiMicco, John H. Forsgren, Ann Maynard Gray, James H. Hance Jr., E. James Reinsch, James T. Rhodes and Philip R. Sharp (collectively, "Defendants"), for violations of the federal securities laws in making false and misleading statements concerning Duke Energy's merger (the "Merger") with Progress Energy Incorporated ("Progress").

2.      Specifically, the Merger Agreement between Duke Energy and Progress called for Progress' President and CEO, William Johnson ("Johnson"), to serve in the same capacities for the post-Merger combined entity. This was a significant, material term in the Merger Agreement. Nevertheless, Defendants failed to disclose that they did not believe that Johnson would be capable of serving in these capacties and that Defendants intended to force Johnson to resign immediately after completion of the Merger.

3.      Duke Energy is presently the largest electric power holding company in the United States.  It has approximately seven million electric customers and about 500,000 gas customers in the United States, mostly in the American South and Midwest.  Duke Energy also has commercial and international businesses elsewhere in North America and Latin America. The Company has over $100 billion in assets.

4.      Progress was a large electric power holding company in the United States.  Prior to the Merger, Progress served about 3.1 million customers in North Carolina, South Carolina, and Florida.

5.      On or about January 10, 2011, Duke Energy and Progress announced that the two entities would merge and Duke Energy would be the surviving entity from the Merger. Consummation of the Merger required approval by the Boards of Directors of both Duke Energy and Progress, the shareholders of both companies and various regulatory authorities, including the Federal Energy Regulatory Commission, the North Carolina Utilities Commission and the utilities regulatory agencies of several other states.

6.      On March 17, 2011, Duke Energy filed with the Securities and Exchange Commission ("SEC") a Form S-4 Registration Statement (with its subsequent amendments, the "Registration Statement") indicating the mutual intent of Duke Energy and Progress to proceed with the Merger.  The SEC declared this Registration Statement effective on July 7, 2011.  Also on July 7, 2011, Duke Energy filed a Form S-4/A Amended Registration Statement and Prospectus.

7.      In *all* of the pre-Merger SEC filings, press releases, proxies soliciting shareholder approval, written communications, other declarations made by Duke Energy and Progress, and in the text of the Merger Agreement itself, it was made clear that after the Merger was completed, Johnson would become the President and CEO of post-Merger Duke Energy.  The same filings, communications, declarations, and the Merger Agreement also called for Rogers, the pre-Merger President and CEO of Duke Energy, to be the Executive Chairman of post-Merger Duke Energy. Johnson's position as President and CEO of post-Merger Duke Energy was a material provision of the Merger Agreement.

8.      Despite these statements in the filings, communications, declarations and the Merger Agreement, the pre-Merger directors of Duke Energy determined that, once the Merger was complete, they would cause Duke Energy to force Johnson to resign and subsequently name Rogers as CEO of post-Merger Duke Energy.  The pre-Merger Board of Duke Energy did not, however, disclose this determination and, in fact, kept the determination secret from its shareholders, Progress' shareholders and Board of Directors, regulators, and the public in general.

9.      After the pre-Merger, directors of Duke Energy made this secret determination, but before the Merger was completed, they reached an employment agreement with Johnson on June 27, 2012.

10.     The Merger was completed on July 2, 2012 at 4:02 p.m.

11.     Immediately after completion of the Merger, on July 2, 2012, the new, post-Merger Duke Energy Board of Directors (comprised of the eleven pre-Merger Duke Energy directors and six pre-Merger Progress directors) held its first meeting.  The Board entered an executive session, at which time it voted to force Johnson to resign.  The Board voted in favor of asking Johnson to resign by a vote of 10-5; all pre-Merger Duke Energy directors voted for his termination (Rogers, the eleventh pre-Merger Duke Energy director, did not vote).   Once Johnson resigned, the post-Merger Duke Energy Board reinstated Rogers as CEO of Duke Energy.

12.     As set forth more fully herein, public and regulatory reaction to the post-Merger Board's termination of Johnson and reinstatement of Rogers as CEO was angry and negative. For example, the North Carolina Utilities Commission immediately launched an investigation

into these actions and Standard & Poor's Rating Services questioned Duke Energy's credit rating, which it put on watch.  Other investigations have already begun or are likely to follow.

13.     Worse, Standard & Poor's downgraded Duke Energy's credit rating from A- to BBB+ on July 26, 2012.  In so doing, it cited the Duke Energy Board of Directors' decision to force Johnson to resign.  "We view the lack of transparency associated with this process and with some board members . . . as significantly heightening regulatory risk for Duke Energy and weakening its consolidated business risk profile."

14.     The negative public reaction was reflected in the market's valuation of post-Merger Duke Energy stock.  Specifically, immediately upon the consummation of the merger, the stock price of Duke Energy common stock had risen to approximately $69.00 per share on July 2.  However, once the truth was finally revealed about Defendants' decision to terminate Johnson, the price of Duke Energy common stock dropped to approximately $65.00 per share on July 9, 2012, an approximately 6% percent drop on volume of over ten million shares, an unusually high trading volume for the stock.  Plaintiffs, who purchased Duke Energy common stock before the Merger and before disclosure, were misled by Defendants' false and misleading statements and were damaged thereby.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.

16.     The Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue in this Complaint within this District.

17.     Venue is proper in this district pursuant to §27 of the 1934 Act.  Additionally, venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.

## PARTIES

18.     Plaintiffs, Dr. Michael William Sunner and Dr. Gladys Sunner purchased Duke Energy common stock during the Class Period as set forth in the attached certification and were damaged thereby.

19.     Defendant Duke Energy is a Delaware corporation with its principal place of business at 550 South Tryon Street, Charlotte, North Carolina.

20.     Defendant James E. Rogers ("Rogers") is, and was at the time of the Merger, Duke Energy's Chief Executive Officer and a director of Duke Energy.  Rogers has been a director of Duke Energy and its predecessors since 1988.  Rogers has served as the President and CEO of Duke Energy since 2006.

21.     Defendant William Barnet III ("Barnet") is a director of Duke Energy and has served in that capacity since 2005.[1]

22.     Defendant G. Alex Bernhardt Sr. ("Bernhardt") is a director of Duke Energy and has served in that capacity since 1991.

23.     Defendant Michael G. Browning ("Browning") is a director of Duke Energy and has served in that capacity since 1990.

24.     Defendant Daniel R. DiMicco ("DiMicco") is a director of Duke Energy and has served in that capacity since 2007.

---

[1] For Barnet and all of the Individual Defendants, their dates of service on the Duke Energy Board of Directors includes any predecessor companies to Duke Energy.

6

25.     Defendant John H. Forsgren ("Forsgren") is a director of Duke Energy and has served in that capacity since 2009.

26.     Defendant Ann Maynard Gray ("Gray") is a director of Duke Energy and has served in that capacity since 1994.  Both before and after the Merger, Gray served as Lead Director of the Duke Energy Board of Directors.

27.     Defendant James H. Hance Jr. ("Hance") is a director of Duke Energy and has served in that capacity since 2005.

28.     Defendant E. James Reinsch ("Reinsch") is a director of Duke Energy and has served in that capacity since 2009.

29.     Defendant James T. Rhodes ("Rhodes") is a director of Duke Energy and has served in that capacity since 2001.

30.     Defendant Philip R. Sharp ("Sharp") is a director of Duke Energy and has served in that capacity since 2007.

31.      The Defendants set forth in ¶¶20-30 are referred to collectively as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement.

32.     Per the Registration Statement, Duke Energy had the right to nominate eleven directors to the post-Merger Duke Energy Board, while Progress had the right to nominate seven. Duke Energy nominated all eleven of the Individual Defendants.  Progress nominated seven of its pre-Merger directors, one of which, Johnson, the former Chairman of the Board and CEO of Progress, resigned from the post-Merger Duke Energy Board in the afternoon or evening of July 2, 2012.

33.     In addition to the eleven Individual Defendants, six former Progress directors comprise the post-Merger Duke Energy Board of Directors.  They are: John D. Baker (who

7

served on the Progress Board of Directors since 2009), Harris E. DeLoach Jr. (since 2006), James B. Hyler ("Hyler") (since 2008), E. Marie McKee ("McKee") (since 1999), Carlos A. Saladrigas (since 2001) and Theresa M. Stone (since 2005). These six former Progress directors are not defendants in this lawsuit.

## <u>CONDUCT ALLEGATIONS</u>

### A.  Background About Duke Energy

34.     Post-Merger Duke Energy is the largest electric power holding company in the United States. It has approximately seven million electric customers and about 500,000 gas customers in the United States. Post-Merger Duke Energy has electric customers in the following states: (1) North Carolina – 3.2 million; (2) Florida – 1.6 million; (3) South Carolina – 715,000; (4) Indiana – 790,000; (5) Ohio – 690,000; and (6) Kentucky – 140,000. Duke Energy also has 500,000 gas customers; 400,000 in Ohio and 100,000 in Kentucky.[2]

35.     Post-Merger Duke Energy's market cap is approximately $49 billion. The Company had operating revenues of $23.4 billion in 2011 (when combining the 2011 revenues of pre-Merger Duke Energy and pre-Merger Progress). Post-Merger Duke Energy's total assets are worth over $100 billion.

### B.  Buildup to the Merger

36.     The Duke Energy Board of Directors first conceived of merging with Progress at a two day strategic retreat in June 2010. There, the Duke Energy Board of Directors authorized the Company's management to open merger discussions with Progress.

37.     On July 6, 2010, Rogers and Johnson spoke via telephone and decided to meet with each other to discuss a possible business combination between Duke Energy and Progress.

---

[2] See http://www.duke-energy.com/pdfs/de-factsheet.pdf (last visited on July 18, 2012).

38.     On July 8, 2010, the chief legal officers of Duke Energy and Progress began drafting a "confidential disclosure agreement" so that the two companies might exchange information to explore a possible business combination.

39.     At the time, the Progress Board of Directors was weighing potential business combinations with two utility companies, Duke Energy and another unnamed company. On July 14, 2010, the Progress Board of Directors decided that it was in the best interests of Progress to combine with Duke Energy rather than the unnamed utility company. At this time, the Progress Board of Directors authorized Johnson to investigate and consider a strategic rationale for the possible merger with Duke Energy.

40.     On July 18, 2010, the two CEOs met to discuss market strategy with regard to a proposed merger. Rogers and Johnson discussed the fact that a merger of the two companies would almost certainly bring with it increased regulatory scrutiny and greater emphasis on the regulated utilities business of any post-merger entity. Rogers informed Johnson that Duke Energy was receptive to the proposition of a merger; the two men then discussed regulatory concerns connected to Duke Energy and Progress' businesses in North Carolina and South Carolina.

41.     At this July 18, 2010 encounter, Rogers specifically told Johnson that Rogers was open to the idea of Johnson becoming the CEO of the post-merger entity, in which case Rogers would assume the role of executive chairman.

42.     Shortly after the July 18, 2010 CEO meeting, John H. Mullin III, then Lead Director of Progress, authorized Johnson to meet with the full Board of Directors of Duke Energy to continue discussions over a potential merger.

9

43.     On or about July 19, 2010, Johnson called the CEO of the other unnamed utility company that Progress had also considered combining with.  At that time, Johnson informed the unnamed utility company that the Progress Board of Directors was no longer presently interested in combining with them, but would give them a final answer later in September 2010.  In September 2010, Johnson confirmed to the CEO of the unnamed utility company that the Progress Board of Directors had decided not to combine with them.

44.     On July 29, 2010, Duke Energy and Progress entered into a mutual confidentiality agreement, including an eighteen month "standstill" provision.

45.     On July 29, 2010 and August 2, 2010, Johnson met with separate groups of the Duke Energy Board of Directors.  There, the parties discussed, *inter alia*, potential strategies for a combined company.  These meetings gave the Duke Energy Board of Directors occasion to get to know Johnson.  At this time, potential terms of any merger or combination between the companies were not discussed.  Shortly thereafter, the two companies began exchanging financial information.

46.     On August 9, 2010, the Progress Board of Directors held a special meeting by telephone.  There, Johnson updated the Progress Board about his meetings with Rogers and with the Duke Energy Board.  Johnson indicated that due diligence for a potential transaction between Duke Energy and Progress had begun, including financial and regulatory reviews.  As disclosed in the Registration Statement, at this time, the Progress Board of Directors informed Johnson "that the corporate governance and organizational structure of the combined company created by the combination of Duke Energy and Progress Energy would have to support" the Progress Board's strategy and significantly "***that they viewed having Mr. Johnson as the chief executive***

10

*officer of the combined company as an important element in ensuring implementation of that strategy.*"

[Emphasis added.]

47.     Thus, as Duke Energy specifically disclosed in the Registration Statement, the Progress Board of Directors considered having Johnson serve as CEO of the combined company to be a material term of any potential merger.  Mr. Johnson's continued role as CEO of the combined entity, moreover, was considered essential in the Progress Board's strategy for the future of the combined company.  All of the Individual Defendants signed the Registration Statement, thereby demonstrating their awareness of the importance to the Progress Board of Directors that Johnson serve as CEO of the post-merger entity.

48.     Between August and September 2010, the Duke Energy and Progress Boards commenced intense negotiations and performed their due diligence.  Both companies held board meetings, explored various regulatory issues, explored management issues, including the future organizational structure, and held meetings and initial discussions over what the exchange ratio would be in a stock-for-stock merger.

49.     On September 26, 2010, Johnson and Rogers met and discussed, *inter alia*, "how best to organize management in order to implement" the optimal business strategy for the combined company.

50.     On October 2, 2010, Johnson and Rogers again met and sketched out an "illustrative outline" for the post-merger entity.  They discussed a preliminary exchange ratio of 2.5 to 2.55.  Significantly, this preliminary outline "reflected that Mr. Rogers would serve as the executive chairman and Mr. Johnson as the chief executive officer of the combined company . . . ."

11

51.     In the weeks following this October 2, 2010 CEO meeting, both companies and their respective counsel continued negotiations and due diligence over all aspects of the potential merger.

52.     On November 13, 2010, Johnson and Rogers "met and discussed a range of topics, including the business strategy and organizational design for the combined company" and "the potential allocation of roles and responsibilities between the executive chairman position and the chief executive position . . . ." At this time, the plan continued to be that Johnson would be the CEO and Rogers the executive chairman.

53.     On November 15, 2010, Johnson and Rogers met with Mullin and Gray, the lead directors of Progress and Duke Energy, respectively.  The four discussed strategy and management design of the proposed post-merger entity.

54.     On November 19, 2010, the Duke Energy Board of Directors held a meeting.  The Board discussed many aspects of the proposed merger, but most significantly, discussed "the proposed roles of Mr. Johnson as the chief executive officer and Mr. Rogers as the executive chairman."  Then, shortly after that meeting, "the Duke Energy board met with Mr. Johnson and discussed the potential combination further, including several topics discussed in their prior meeting."

55.     On November 20, 2010, each CEO met individually with senior executives from the other respective company.  They discussed the senior executives' potential roles in the proposed new entity.  Discussions and negotiations between the two companies continued through November and December of 2010.

56.     On December 18, 2010, Johnson and Rogers met.  They discussed several aspects of the proposed merger, but most notably addressed two things: (1) "a pro forma board

composed of ten Duke Energy designees and seven Progress Energy designees," plus an extra year for one Duke Energy director, bringing the total board count to eighteen, with eleven Duke Energy designees and seven Progress designees; and (2) "the allocation of roles and responsibilities between the executive chairman and the chief executive officer."  At this time, it was known and understood by all parties that Johnson would serve as CEO and Rogers as executive chairman of the proposed new entity.

57.    After a few more weeks of intense discussions and negotiations through early January 2011, on January 6, 2011, various news outlets began reporting the possible combination of Duke Energy and Progress.

58.    On January 8, 2011, the Duke Energy Board of Directors held a special teleconference.  The Board voted unanimously to approve the Merger Agreement, at which time Rogers called Johnson and told him of the Duke Energy Board's approval.  Later on the same day, the Progress Board of Directors also voted unanimously to approve the Merger Agreement. After these meetings, the two companies executed the Merger Agreement.  Also at this time, Johnson and Rogers executed term sheets with Duke Energy concerning their terms of employment.

59.    After extensive negotiations and discussions, on January 8, 2011, the Boards of Directors of pre-Merger Duke Energy and Progress voted unanimously to approve the Merger. The Merger Agreement was then executed and on January 10, 2011, pre-Merger Duke Energy and Progress issued a joint press release announcing the Merger.

C.    **The Registration Statement and Related SEC Filings**

60.    On March 17, 2011, Duke Energy filed a Form S-4 Registration Statement (No. 333-172899) with the SEC, signaling its intent to register 264 million shares of Duke

13

Energy common stock at a proposed maximum aggregate offering price of approximately $13.6 billion – the value of the consideration given to Progress shareholders. In this Registration Statement, Duke Energy and Progress announced that Progress shareholders would receive 2.6125 shares of Duke Energy common stock for each share of Progress common stock they held at the time of the Merger, with cash to be paid in lieu of any fractional shares, before giving effect to a one-for-three reverse stock split of Duke Energy common stock.

61.     In this March 17, 2011 Form S-4 Registration Statement, Duke Energy wrote the following question and answer:

> **Q:  What will Jim Rogers' role be with Duke Energy following completion of the merger?  What will Bill Johnson's role be?**
>
> A:  Duke Energy and Progress Energy have agreed that Mr. Rogers will serve as executive chairman of the board of directors of Duke Energy and ***Mr. Johnson will serve as president and chief executive officer of Duke Energy*** following the completion of the merger.

[Emphasis added.]

62.     This same, unequivocal statement is repeated throughout the March 17, 2011 Form S-4 Registration Statement: upon completion of the Merger, Johnson was to become the CEO of post-Merger Duke Energy.

63.     On April 8, 2011, Duke Energy filed a Form S-4/A Amendment with the SEC, amending the Registration Statement. This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke Energy.

64.     On April 25, 2011, Duke Energy filed a second Form S-4/A Amendment with the SEC, amending the Registration Statement. This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke Energy.

14

65.     On May 13, 2011, Duke Energy filed a third Form S-4/A Amendment with the SEC, amending the Registration Statement.  This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke Energy.

66.     On June 30, 2011, Duke Energy filed a fourth Form S-4/A Amendment with the SEC, amending the Registration Statement.  This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke Energy.

67.     On July 7, 2011, Duke Energy filed a fifth Form S-4/A Amendment with the SEC, amending the Registration Statement.  This Form S-4/A repeated that Johnson was to become the CEO of post-Merger Duke Energy.

68.     In the July 7, 2011 Form S-4/A Amended Registration Statement, Duke Energy disclosed that: "In the event either Mr. Johnson or Mr. Rogers is unable or unwilling to serve in such capacity, the parties agreed in the merger agreement to confer and mutually designate a replacement."

69.     The SEC declared the Registration Statement, including its five amendments, effective on July 7, 2011.  At this time, and as set forth in Duke Energy's July 13, 2011 Form 425 SEC filing, the Merger needed to be approved by Duke Energy and Progress shareholders, the Federal Communications Commission, the Federal Energy Regulatory Commission, the Nuclear Regulatory Commission, the North Carolina Utilities Commission, the South Carolina Public Service Commission, and the Kentucky Public Service Commission.  Over the next few months, these entities gradually approved the Merger.

70.     On August 2, 2011, the Kentucky Public Service Commission approved the Merger, based on the statements contained in the Merger Agreement and the Registration Statement.

15

71.     On August 23, 2011, pre-Merger Duke Energy and Progress shareholders approved the Merger, based on the statements contained in the Merger Agreement and the Registration Statement.

72.     On August 24, 2011, Duke Energy filed a Form 425 with the SEC which disclosed the transcript from Duke Energy's Special Meeting of Shareholders held on August 23, 2011.  In it, Rogers states: "Upon closing [of the Merger], Bill Johnson will assume the role of CEO, and I will become executive chairman of the Board."

73.     At a North Carolina Utilities Commission public hearing on September 20, 2011, Johnson told the Commission: "I will become president and chief executive officer of the combined company."

**D.     Defendants' Fraudulent Omissions**

74.     Between July 7, 2011 and June 29, 2012, the date of Duke Energy's last pre-Merger SEC filing, Duke Energy filed one hundred and nine (109) filings with the SEC, including over two dozen prospectus updates on Form 425.  *All* of these filings either indicated that Johnson would serve as the CEO of the post-Merger entity, or did not address this matter. *None* of these filings indicated Defendants' pre-Merger plan to force Johnson to resign after the Merger was completed.

75.     On May 3, 2012, the pre-Merger Duke Energy Board of Directors held an executive session and discussed concerns regarding Johnson's ability to serve as CEO.

76.     Also on May 3, 2012, pre-Merger Duke Energy held their annual shareholder meeting.  While the Merger was addressed multiple times, none of Defendants suggested or stated that Johnson would not serve as CEO of the post-Merger entity.

16

77.     On May 4, 2012, Duke Energy held an earnings conference call with analysts and investors for its first fiscal quarter of 2012.  Despite many questions about the Merger, none of the participants disclosed that the Duke board had serious reservations about Johnson's ability to serve as CEO of the post-Merger entity.

78.     On June 8, 2012, the Federal Energy Regulatory Commission conditionally approved the Merger, pending a joint compliance filing by pre-Merger Duke Energy and Progress.  This filing was made on June 25, 2012, at which time the Merger had effectively received final approval from the Federal Energy Regulatory Commission.

79.     On June 11, 2012, the start of the Class Period, Duke Energy disclosed to the public, via a Form 8-K filing with the SEC, that the Federal Energy Regulatory Commission had conditionally approved the Merger.  As this Commission's approval was widely viewed as the last, or one of the last, major hurdles to completion of the Merger, Duke Energy's June 11, 2012 SEC filing demonstrated that the Merger was going to proceed as planned.  Again, Defendants did not disclose that they had serious reservations about Johnson's ability to serve as CEO of Duke after the Merger, even though this was a material part of the Merger Agreement that Progress and Duke shareholders had approved.

80.     On June 25, 2012, pre-Merger Duke Energy and Progress represented to the North Carolina Utilities Commission that its approval was an emergency because under the Merger Agreement, the Merger had to be completed by July 8, 2012.  Based on this representation, the statements contained in the Merger Agreement and those in the Registration Statement, the North Carolina Utilities Commission reopened its hearings on June 25, 2012.  The Commission subsequently gave its approval on June 29, 2012.  At no time did the Defendants inform the

17

Commission or shareholders that the Duke Board had serious reservations about Johnson's ability to serve as CEO of the combined companies.

81.     In the two months leading up to the completion of the Merger on July 2, 2012, Duke Energy filed exactly twenty three (23) filings with the SEC.  Indeed, Duke Energy's last pre-Merger SEC filing was on June 29, 2012 – well after, as Rogers would later acknowledge, the pre-Merger Duke Energy Board of Directors had already secretly discussed replacing Johnson with Rogers.  *See infra*.  Worse, this last SEC filing occurred three days before the Merger was completed and before Duke Energy even knew the Merger could be completed, as the Company was still waiting for the approval of the South Carolina Public Services Commission.  Duke Energy had more than adequate time to notify the SEC, state and federal regulators, investors, and the general public of its deliberations (and likely, pre-Merger decision) that Rogers would replace Johnson.  Nevertheless, Duke Energy never disclosed this conduct until after completion of the Merger and after Johnson had already been forced to resign.

82.     Thus, in ***none*** of its SEC filings, nor in any other public statement, did Duke Energy or the Individual Defendants ever disclose that they were considering, or had already decided, to disregard all of their previous material statements and promises in favor of removing Johnson and reinstating Rogers as CEO of post-Merger Duke Energy.

83.     On the morning of July 2, 2012, the South Carolina Public Service Commission approved the Merger, based on the statements contained in the Merger Agreement and the Registration Statement.

84.     The Merger was completed on July 2, 2012 at 4:02 p.m. EDT.

E.       **Post-Merger: The Truth Emerges**

1.       **Events Immediately Following the Merger**

85.       On July 2, 2012, immediately after the Merger was completed, the post-Merger Duke Energy Board of Directors called its first meeting.  After a short while, the Board called for an executive session, at which time Johnson and Rogers were asked to leave.  During this executive session, the Board voted to ask Johnson to resign from his position as President and CEO of the Company.  The vote was 10-5, in favor of asking Johnson to resign.  All ten Individual Defendants voted in favor of the measure, while all five former Progress directors voted against it.  Approximately twenty minutes elapsed between the completion of the Merger and the vote to force Johnson to resign.  Before the end of that evening, Johnson had resigned, effective 12:01 a.m. on July 3, 2012.

86.       On July 3, 2012, the day after the Merger was completed and Johnson was forced to resign, Duke Energy filed a Post-Effective Amendment to the Form S-4 Registration Statement.  Remarkably, this Amendment makes no mention of what the Individual Directors conspired to do: violate the terms of the Merger Agreement, terminate Johnson, and reinstate Rogers as CEO.  Equally notable, this Post-Effective Amendment is signed by only eleven directors; the six Progress Directors did not sign the filing.

87.       Duke Energy also filed a Form 8-K with the SEC on July 3, 2012.  As an attached exhibit thereto, Duke Energy filed the pre-Merger, June 27, 2012 Employment Agreement it reached with Johnson.  Just five days before the Merger was completed – and in a filing made by Duke Energy the day after completion of the Merger – Duke Energy agreed that Johnson "shall be employed by Duke Energy as President and Chief Executive Officer."  Also filed as an

19

attached exhibit to the July 3, 2012 Form 8-K, Duke Energy filed a copy of the Separation and Settlement Agreement it reached with Johnson.

88.     In the same July 3, 2012 Form 8-K, Duke Energy disclosed its vague version of how Johnson had come to no longer be the CEO of post-Merger Duke Energy:

> On July 3, 2012, Duke Energy announced that Mr. Johnson has resigned from all of his positions at Duke Energy and will no longer serve as President and Chief Executive Officer of Duke Energy or as a member of Duke Energy's Board of Directors (the "Duke Energy Board"), effective as of 12:01 a.m. on July 3, 2012 (the "Effective Date").   Also, on July 2, 2012, the Board reappointed Mr. James E. Rogers as President and Chief Executive Officer of Duke Energy, effective as of 12:01 a.m. on July 3, 2012, in addition to his role as Chairman of the Board.   Mr. Rogers previously served as President and Chief Executive Officer of Duke Energy from the date of its merger with Cinergy Corp. in 2006 until the closing of Duke Energy's merger with Progress Energy on July 2, 2012.

89.     The actions of the Individual Defendants prompted the former Lead Director of Progress to write a scathing, revealing Letter to the Editor of the *Wall Street Journal* shortly after the Merger was completed.  The letter was published on July 5, 2012 and in it, John H. Mullin, III wrote:

> As the former Lead Director of Progress Energy, I feel compelled to speak out on behalf of the former shareholders, employees, customers and communities served by Progress who are now all part of or are served by the "new" Duke Energy.
>
> In negotiations with Duke leading to the merger our Board voted to accept a "semi-merger of equals" transaction with the explicit agreement that the Progress CEO, Bill Johnson, would become the CEO of the combined company upon consummation of the merger.   This was a critical element in the merger deliberations of our Board because we had confidence that Bill would successfully lead the combined companies to achieve the potential synergistic benefits of the combination. ***I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company.***
>
> After a long gestation period, the merger finally closed on July 2nd.  As stipulated in the Merger Agreement, Bill Johnson became the President and CEO of the newly combined companies – for approximately 20 minutes!

Following a short organizational meeting, the newly constituted board, which contains a majority of "old Duke" directors, went into executive session and voted to request the resignation of Bill Johnson and the retention of Jim Rogers as CEO of the newly combined company.  ***In my opinion, this can only be described as an incredible act of bad faith with regard to the undertakings of the Merger Agreement.  I think it was a clearly premeditated contravention of one of the most central tenets of our Agreement.***

***In my opinion this is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street and as a director of ten publicly traded companies and as a former Trustee of Putnam's numerous mutual funds.***

As a non-continuing director of the combined company I now, along with similarly situated former directors of Progress, find myself without a constituency and without an ability to mount a challenge to what I believe is ***one of the greatest corporate hijackings in US business history.***

Consequently, this letter is being written in hopes that what I believe to be a deceitful and pre-meditated contravention of good faith negotiations will not go un-noticed in the "court of public opinion."

[Emphasis added.]

90.     On July 6, 2012, *Bloomberg* published an article entitled "Ex-Progress Directors

Say Duke CEO Switch Was 'Deceit.'"  This article provides, in relevant part:

Three former Progress Energy Inc. board members say they would have voted against Duke Energy Corp. (DUK)'s takeover had they known that Duke's chief executive officer would remain in charge of the combined companies.

***"I wouldn't have voted for the deal,"*** James Bostic Jr., who served on Progress's board since 2002, said in a phone interview today.  "I believed that Bill Johnson would be able to run the combined companies in a more efficient manner and offer a much stronger return to shareholders."

* * *

The surprise decision to change CEOs as its takeover closed was deceitful, according to John H. Mullin, who also served on Progress's board.

***"I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company,"*** Mullin…wrote

21

* * *

> *"There was information that Duke didn't share with us, and it may have changed the outcome,"* Alfred Tollison, another former Progress Director, said in a phone interview today.  "Duke may have fulfilled the letter of the agreement, but they didn't fulfill the spirit," he said, referring to Johnson occupying the CEO position for one day.

[Emphasis added.]

91.     Mr. Mullin's letter and Mr. Bostic's statement confirm the obvious: Defendants breached the Merger Agreement and the Registration Statement was false and misleading in that it contained material misstatements and omissions.  Moreover, Mr. Mullin's letter confirms another obvious point: the decision to request Mr. Johnson's resignation was certainly premeditated and designed to circumvent the spirit of months of arms' length negotiations between the parties.

> **2.     The North Carolina Utilities Commission Investigation – Where the Details Emerge and Defendants Reveal the Extent of Their Pre-Merger Plan to Force Johnson to Resign.**

92.     North Carolina represents approximately 45% of post-Merger Duke Energy's business, a crucial portion of the Company's overall business.  The North Carolina Utilities Commission therefore has a vested interest in regulating Duke Energy's conduct and has authority to approve or reject the Merger.

93.     On July 6, 2012, the North Carolina Utilities Commission initiated an investigation "into why what the Commission understood was to occur based on the sworn testimony in the dockets did not occur, why the William D. Johnson's 'resignation' occurred within hours of the close of the transaction and what ramifications or repercussions might result from these unexpected and unanticipated events with respect to this Commission's continued jurisdiction over Duke."

94.     On July 10, 2012, Edward S. Finley, Jr., Chairman of the North Carolina Utilities Commission, gave his recollection of the events immediately preceding the Merger, from the Commission's perspective:

> The Commission reopened the hearings in the dockets on a limited basis on June 25, 2012.
>
> The Commission understood that the parties wished to close the business combination by July 1, 2012, and pursuant to the agreement between them that if the closing did not occur by July 8, 2012, either party was free to walk away from the transaction without financial penalty.
>
> In an effort to comply with the applicants' conveyed wishes, the Commission issued its Order approving the business combination, with conditions and code of conduct on June 29, 2012.
>
> At that time the Commission had not been made aware of any discussions or decisions concerning change in the representations with respect to the individual that would hold the position of president and CEO of The New Duke and issued its Order on the understanding, based on the sworn testimony it had received, that that individual would be William D. Johnson.

95.     After the Merger was completed, ToNola D. Brown-Bland, Commissioner of the North Carolina Utilities Commission, stated that Duke Energy had assured the Commission that "there were no changes justifying reopening the hearings."   Brown-Bland was specifically questioning Duke Energy's failure to notify the Commission regarding its concerns about Johnson and its ultimate decision to force his resignation.

96.     On July 10, 2012, the North Carolina Utilities Commission held a public hearing at which Rogers testified.  Rogers testified that the subject of who would assume the titles of President and CEO of post-Merger Duke Energy received significant discussion and attention during Merger negotiations.  He also testified that it was his understanding that Johnson was going to assume these titles.

23

97.     Rogers further testified that:

[T]he Duke Board somewhere in mid-May [2012] period based on – made the decision to enter into deliberations in executive session and excuse me from that executive session.

I was advised the nature and extent of the board's concerns with Mr. Johnson by the lead director on June 23 in a meeting the next day with the lead director and another member of the Duke Board. . . .  At that time they indicated that the board had doubts about Mr. Johnson's ability to lead the combined company, and asked me whether if the combined company's board were to make the decision to appoint me as CEO following the closing I would be willing to accept the position.  They said they had reached the preliminary view that Mr. Johnson was not the best person to lead the combined company, but that no decision had been made at that time.  In fact, no final decision could be made prior to the closing.

98.     As set forth above, Mr. Rogers' testimony simply strains credulity – as there is simply no way that the Individual Defendants could have made the decision to request Johnson's resignation in a short executive session taking place in the approximately 20 minutes after the Merger had closed.  Rather, common sense dictates that this decision was made well before the close of the Merger, and that the Individual Defendants failed to disclose this material change to a key term of the Merger Agreement in order to ensure the close of the Merger.

99.     Indeed, Rogers further testified that concerns regarding Johnson "emerged in May" of 2012.  "[I]t was then that my board excluded me from the deliberations, which is always uncomfortable for a CEO, and they went into their conversations about it without consulting me. It was those conversations that really led to them ultimately pulling me aside in late June, around June 23rd, and sharing with me their concerns."

100.     Rogers also testified as to the reasons why he believed the pre-Merger Duke Energy Board of Directors had concerns about Johnson's ability to serve as CEO.  He testified that the Board was "concerned about a lack of transparency in terms of the timing and flow of information. . . .  [I]t became obvious to our board that the leadership style, they felt his style was

24

autocratic and discouraged different points of view." He continued, "I would say that they also suggested to me that they had concerns about his ability to integrate the culture of the two companies. . . . [T]hey were concerned whether he would seek to impose the culture and leadership from Progress without finding the balance between the two cultures . . . ." These criticisms, as made clear by Johnson's testimony discussed *infra*, are baseless and unfounded as the pre-Merger Duke Energy Board of Directors did not have any opportunity to witness or critique Johnson's personal management style.

101.    Rogers also confirmed that Johnson received $44 million dollars in a severance package.  Thus, Johnson received $44 million dollars from Duke Energy for just a few hours of purported service as President and CEO.  Rogers stated that "I will assure that none of these dollars will be – they will all be paid by the investors and none will be charged to the customers of this state."

102.    The North Carolina Utilities Commission expects that the companies it regulates will conform to the Commission's long-held practice of giving the Commission information in advance when a significant event occurs within the Commission's jurisdiction.

103.    North Carolina General Statutes §62-326(b) provides, in relevant part: "[e]very person, firm or corporation operating under the jurisdiction of the Utilities Commission . . . who shall willfully withhold clearly specified and reasonably obtainable information from the Commission in any report, response, reply or statement filed with the Commission . . . or who shall fail or refuse to file any report, response, reply or statement required by the Commission . . . shall be guilty of a Class 1 misdemeanor."

104.    Rogers testified that the Board did not have time to tell the North Carolina Utilities Commission about its concerns with Johnson serving as CEO.  This testimony directly

25

contradicts Rogers' testimony that: (1) the pre-Merger Duke Energy Board of Directors had been considering replacing Johnson since at least mid-May 2012; and (2) at least two of the Individual Defendants, Gray and Browning, approached Rogers on June 23, 2012 about him replacing Johnson as CEO.  Rogers – as well as the other Individual Defendants – were plainly aware of Defendants' conduct at least six days before the North Carolina Utilities Commission approved the Merger and nine days before completion of the Merger.  It is, therefore, entirely possible that Defendants violated N.C. Gen. Stat. §62-326(b) in addition to the securities laws, as alleged herein.

105.    Some of the Commissioners now seriously question the integrity and credibility of the post-Merger Duke Energy Board of Directors.  For example, Commissioner Susan Rabon told Rogers: "I hope you can understand that I may not find your commitment as reassuring as I would have several weeks ago."

106.    On July 19, 2012, the North Carolina Utilities Commission held another public hearing, at which Johnson testified,[3] as well as McKee and Hyler.  As anticipated, the Commission asked Johnson many questions about the circumstances surrounding his forced resignation, as well as about the Merger generally.

107.    Johnson testified that he had no notice or indication that the post-Merger Duke Energy Board of Directors was going to force his resignation.  He confirmed, as made abundantly clear herein, that all parties understood that he was to serve as CEO after the Merger was completed.  As he put it, learning that he was being asked to resign "was a surprise."  He detailed the way he was informed of the Board's action.  ***Before*** the July 2, 2012 post-Merger Board meeting had ended, Defendant Gray called Johnson and told him that she wanted to meet

---

[3] All references and quotations to the testimony on July 19, 2012 and July 20, 2012 to the North Carolina Utilities Commission are to the live audio feed made available on the Commission's website.  To the extent that there are any slight misquotes, they will be corrected at a later date when a transcript of the proceedings becomes available.

with him after the executive session ended.   Johnson believed that Gray was going to congratulate him about having successfully completed the Merger.   Instead, Gray arrived with a lawyer from New York and told Johnson, "the board has decided you are not the right man. . . . The reason the board made this decision is your leadership. . . .   It's not the right style for Duke." Gray informed him that Rogers was the "right man" for the job.

108.    Johnson also testified that the Individual Defendants never voiced any concerns to him regarding his management or leadership style.   When asked about these criticisms, Johnson's response was unwavering.   "I disagree with them all."   He stated, "I am not autocratic."   The pre-Merger Duke Energy Board of Directors was given the opportunity to voice any concerns about the terms of the Merger Agreement, which opportunity they seized regarding other issues.   They did not, nor did they ever, voice any concerns about Johnson's management or leadership style before the Merger was completed.   Johnson testified that "[n]one of these concerns were expressed to me."   He also testified, "I never heard about any of these issues from anyone [at Duke Energy].   I am not a rookie."   He continued that if he had learned about these concerns, he would have taken steps to do something about them.

109.    In the same vein, and in stark contrast to Rogers' testimony, McKee testified that Johnson was "an outstanding communicator . . . and a very transparent person."   McKee explained that there was never any indication from the Duke Energy Board that there might be a problem with Johnson.   McKee confirmed that the Progress Board understood throughout all Merger-related negotiations that Johnson would be the CEO of the newly-created entity.

110.    McKee further testified as to what exactly transpired during the executive session of the post-Merger Duke Energy Board on July 2, 2012.   McKee testified that Gray said "they were going to ask for Mr. Johnson's resignation.   He was not a good fit for the new Duke. . . .

27

And they were prepared to be very generous with his severance because they knew this was a shock." McKee stated that she and the other former Progress Board members immediately questioned this decision. "Between each one of us, we kept asking, why? Why is he being removed? Ms. Gray kept saying, 'He isn't a good fit.'" McKee said that she or one of the other former Progress directors specifically asked Gray, of the decision to force Johnson's resignation, "Is this good governance?" Gray did not offer a response.

111. Hyler echoed McKee's testimony. First, he lauded Johnson's leadership and management style at Progress. He testified "I thought he was a great CEO," while noting that "I've known Bill for 20 plus years, we've worked together in community activities" and that Johnson was "very focused on people development." Hyler stressed that Johnson was a "strong leader" whose leadership style was "inclusive." Hyler further testified that the Progress Board of Directors never heard of any concerns on the part of the pre-Merger Duke Energy Board of Directors regarding one company's corporate culture over the other's culture. Instead, Hyler stated his understanding that the goal was to "draw the best from each" company's corporate culture.

112. Significantly, Hyler testified that "Bill being CEO [of the post-Merger Duke Energy Board of Directors] was very important to our Board." He stressed that this was one of the main aspects of the Merger for the Progress Board, and that this was understood by all parties to be a given, right from the commencement of Merger negotiations.

113. Hyler's recollection of the post-Merger executive session on July 2, 2012 was similar to McKee's. He explained that the Progress directors were "listened to, but not heard," by the Duke Energy directors, or in other words, "***clearly the decision had been made as to what was going to happen***" regarding Johnson. Hyler called the Duke Energy directors' conduct

"very troubling to me."  Hyler testified that he was caught totally off-guard by the vote to force

Johnson to resign.  Last, Hyler expressed his belief that the Duke Energy directors' decision to

force Johnson to resign, would make it much more difficult to integrate former Progress

employees into the post-Merger company.

[Emphasis added.]

114.    Contrary to Rogers' testimony, *supra*, Johnson noted that it was impossible for

the Duke Energy Board to have formed an opinion of his management and leadership style:

Johnson had not met with the Duke Energy Board since June 2011.  Thus, the Duke Energy

Board had no opportunity to form an opinion of Johnson's style.  Johnson continued, "I did not

meet with, see or speak to a Duke director, a Duke employee [or] a Duke manager, except for

Mr. Rogers."

115.    In fact, Johnson even testified that he tried to meet with members of the Duke

Energy Board in the months preceding the Merger.  "I kept offering to go to the Duke board,"

but Johnson was told, "No need to.  Everything's fine.  There's no need to come to the board."

116.    When pushed for his opinion of why Defendants forced his resignation, Johnson

opined: "I think it comes down to this: they [Duke Energy] wanted the Merger, they didn't want

it; then they couldn't get out of it.  Then they didn't want to get stuck with me as the person who

dragged them to it."  Johnson made express his belief that Defendants did everything they could

do, short of breaching the Merger Agreement, to get out of the Merger.  Johnson testified that

Progress was "having to drag them [Duke Energy] every step of the way."  When they realized

they could not do this, the next best thing, from Defendants' standpoint, was to eliminate

Johnson as CEO and replace him with their own candidate, Rogers.

29

117.    During Johnson's testimony, the North Carolina Utilities Commission again made clear that when it approved the Merger, it was relying on the statements in the Merger Agreement.  This was specifically brought up in the context of questioning about Defendants forcing Johnson to resign.

118.    On July 20, 2012, the North Carolina Utilities Commission held a final public hearing at which the Commission called upon Defendants Gray and Browning to testify.  Both directors' testimony made express that, at least several weeks before the Merger was consummated, the pre-Merger Duke Energy Board of Directors had substantially determined that it did not want Johnson to serve as the post-Merger CEO.  Moreover, both directors merely repeated concerns similar to those raised by Rogers regarding Johnson's leadership and management style, despite the fact that Defendants did not make any attempt to discuss their concerns with or even meet Johnson in the months leading up to the Merger.

119.    Gray made clear that, although the actual decision to force Johnson to resign was not reached until the vote at the post-Merger executive session on July 2, 2012, ***the pre-Merger Duke Energy Board had substantially determined that it did not want Johnson to serve as CEO by, at the latest, sometime in May 2012***.  Gray testified that she was the director who moved that Johnson be asked to resign and that Browning seconded her motion.  Apart from Browning speaking to second her motion, none of the other Defendants spoke during the executive session.  This further demonstrates that the Duke Energy Board had already determined, prior to the Merger, that it would immediately force Johnson to resign after completion of the Merger.

120.    When asked whether it would have made sense to allow Johnson some period of time to work as CEO before forming an opinion about his ability to serve in that capacity, Gray

30

opined that such an arrangement would be "harmful and inappropriate" and suggested "you can't remediate a vote of no confidence." ***Gray explained that this "vote of no confidence" in Johnson emerged sometime during the spring of 2012***.

121.    Browning's testimony is even more troubling.  He testified that by the time the two companies signed the Merger Agreement in January 2011, the Duke Energy Board already had concerns over whether Johnson was the right person to lead the post-Merger entity.  This revelation demonstrates that the pre-Merger Duke Energy Board of Directors entered into the Merger Agreement with serious doubts regarding what the Progress Board considered to be, as Hyler testified, a "very important" aspect of the Merger Agreement.

122.    Browning also testified that, for him personally, he knew that Johnson could not be the post-Merger CEO sometime before the Merger was commenced, approximating that his decision was made probably sometime during May 2012.  Browning opined that his personal decision would not have changed whether or not he had a personal conversation with Johnson regarding Browning's concerns.

### F.    Defendants Knew Well in Advance of the Merger that They Were Going to Force Johnson to Resign, yet Failed to Disclose this Material Fact.

123.    As made clear by the allegations set forth above, notably the testimony of Defendants Rogers, Gray, and Browning before the North Carolina Utilities Commission, Defendants had determined well before the Merger was completed that they were going to force Johnson to resign as CEO of the post-Merger entity.

124.    Browning testified, quite troublingly, that at the time Duke Energy entered into the Merger Agreement with Progress – an Agreement that clearly provided that Johnson would be the CEO and President of the post-Merger entity – Defendants already were questioning whether or not Johnson could or should serve in those capacities.

31

125.   Defendants Rogers, Gray, and Browning all testified that by May 2012, Defendants seriously questioned and/or did not believe that Johnson would be able to serve as CEO of post-Merger Duke Energy.  Gray's and Browning's testimony demonstrates that at some time during May 2012, Defendants were substantially certain that they did not believe that Johnson could serve in that capacity and that Defendants would force him to resign.

126.   Defendants Rogers, Gray and Browning also testified that the three dined together on June 23, 2012, at which time Gray and Browning asked, ostensibly with the authority of the entire pre-Merger Duke Energy Board of Directors, if Rogers would be willing to serve once again as CEO of the Company after the Board forced Johnson to resign.

127.   The circumstances of the executive session immediately following completion of the Merger further demonstrate that Defendants had determined in advance of the Merger that they would force Johnson to resign.  Gray testified that she went to Charlotte so that she could personally meet with Johnson to inform him of the news after the vote to force him to resign was taken.   In a carefully predetermined plan, Gray was the only Defendant director who spoke during the executive session other than Browning who seconded Gray's motion to vote to force Johnson to resign.

128.   The facts alleged herein demonstrate that Defendants knew in advance of the Merger that they were going to force Johnson to resign.

129.   Nevertheless, under the terms of the Merger Agreement, Defendants were required to maintain their charade and install Johnson, albeit for about an hour, as CEO of post-Merger Duke Energy.  Indeed, the Merger Agreement provides the following in the event that Duke Energy altered the terms of the Merger Agreement:

> Under certain circumstances involving a third-party acquisition proposal, a change in a board of directors' recommendation of the proposals contained in this document or a

32

termination of the merger agreement by the other party due to a breach of the merger agreement, Duke Energy or Progress Energy may be required, subject to certain conditions, to (i) reimburse the other party for its fees and expenses in an amount not to exceed $30 million and/or (ii) pay a termination fee of $675 million, in the case of a termination fee payable by Duke Energy to Progress Energy, or a termination fee of $400 million, in the case of a termination fee payable by Progress Energy to Duke Energy, provided that any termination fee payable will be reduced by the amount of any fees and expenses previously reimbursed by such party.

Thus, Defendants put themselves in a no-win situation: either they breach the terms of the Merger Agreement and pay Progress a substantial fee or fraudulently fail to disclose they had reached a decision in May 2012 to force Johnson to resign immediately after the Merger was completed, and, in so doing, violate federal securities laws.

130.    As a result of these disclosures, the price of Duke Energy common stock dropped from a closing price of $69.84 on July 2, 2012, the day before Johnson's forced resignation was announced, to $65.31 several trading days later on July 9, 2012, a decline of approximately 6% on an unusual volume of over ten million shares.  The decrease in the price of Duke Energy stock was a proximate result of the artificial inflation caused by Defendants' misleading statements and material omissions.

## CLASS ACTION ALLEGATIONS

131.    This is a class action on behalf of purchasers of Duke Energy common stock between June 11, 2012 and July 9, 2012, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of Duke, as well as their families and the families of Defendants. Class members are so numerous that joinder of them is impracticable.

132.    Common questions of law and fact predominate and include whether Defendants: (a) violated the 1934 Act; (b) omitted and/or misrepresented material facts concerning the merger of Duke Energy and Progress Energy; (c) knew or recklessly disregarded that their

33

statements and omissions were materially false and misleading; and (d) artificially inflated the price of Duke Energy common stock and the extent of and appropriate measure of damages.

133.    Plaintiffs' claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

134.    At all relevant times, the market for Duke Energy's common stock was an efficient market for the following reasons, among others:

a.  Duke Energy's stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b.  According to the Company's 2012 Form 10-K, as of February 28, 2012, there were over 1.3 billion shares of Duke Energy common stock outstanding.  During the Class Period, shares of Duke Energy common stock were traded on a daily basis, demonstrating an active and broad market for Duke Energy stock and permitting a very strong presumption of an efficient market;

c.  Once the truth regarding Defendants' scheme to oust Johnson had been revealed, millions of shares of Duke Energy common stock were traded permitting a very strong presumption of an efficient market;

d.  As a regulated issuer, Duke Energy filed periodic public reports with the SEC;

e.  Duke Energy regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and through other wide-

34

ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.   Duke Energy was followed by several securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

g.   Numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Duke Energy stock at all times during the Class Period; and

h.   Unexpected material news about Duke Energy was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

135.   As a result of the foregoing, the market for Duke Energy common stock promptly digested current information regarding Duke Energy from publicly available sources and reflected such information in Duke Energy's stock price.   Under these circumstances, all purchasers of Duke Energy common stock during the Class Period suffered similar injury through their purchase of Duke Energy common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

136.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any

35

forward-looking statements pleaded herein, Defendants are liable for those false, forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Duke Energy who knew that those statements were false when made.

## LOSS CAUSATION

137.    During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions by means of concealment and obfuscation of critical information concerning the Merger.  Specifically, Defendants failed to disclose their pre-Merger plan to force Johnson to resign immediately after completion of the Merger.  Moreover, Defendants engaged in a scheme to deceive the market.  This artificially inflated Duke Energy's stock price and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations, omissions, and fraudulent conduct became apparent to the market, Duke Energy's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of Duke Energy securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## FIRST CLAIM FOR RELIEF

(*Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants*)

138.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

139.    Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Duke Energy common stock,

knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to prevent the statements made from being misleading, in light of the circumstances under which they were made.

140.    During the Class Period, Defendants, and each of them, carried out a scheme, plan and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and in fact did, throughout the Class Period: (a) artificially inflate and maintain the market price of Duke Energy common stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (c) cause Plaintiffs and other members of the Class to purchase Duke Energy common stock at inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

141.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative, false, and misleading statements to the investing public, Defendants had a duty to promptly disseminate truthful information with respect to Duke Energy's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC so that the market price of the Company's securities would be based on truthful, complete, and accurate information.  SEC regulations S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

142.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

37

143.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Duke Energy common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Duke Energy common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements or omissions made knowingly or with deliberate recklessness by Defendants, or relying upon the integrity of the market in which the shares traded, Plaintiffs and other members of the Class purchased Duke Energy common stock during the Class Period at artificially high prices and were damaged thereby.

144.    Had Plaintiffs and the other members of the Class and the marketplace known of the material facts, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased, or otherwise acquired, their Duke Energy shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they actually paid.

145.    By virtue of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10b-5.

## SECOND CLAIM FOR RELIEF

*(Violation of Section 20(a) of the 1934 Act Against All Defendants)*

146.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

147.    The Individual Defendants acted as control persons of Duke Energy within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-

making of the Company, including the content and dissemination of the various statements which Plaintiffs and other members of the Class contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

148.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and, in fact, exercised that power.

149.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate cause of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the Class has an effective remedy;

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  July 30, 2012

LEWIS & ROBERTS, PLLC

 /s/ Gary V Mauney
Gary V. Mauney, N.C. State Bar No. 22190
*Attorney for Plaintiffs*
One Southpark Center
6060 Piedmont Row Drive South, Suite 140
Charlotte, NC 28287
Tel: (704) 347-8990
Fax: (704) 347-8929
garymauney@lewis-roberts.com

 /s/ James A. Roberts, III
James A. Roberts, III, N.C. State Bar No. 10495
*Attorney for Plaintiffs*
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612-5529
Tel:    (919) 981-0191
Fax:    (919) 981-0199
jimroberts@lewis-roberts.com

**Pending *Pro Hac Vice* Admission:**

SCOTT+SCOTT LLP
Joseph P. Guglielmo
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel.: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com

Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Tel.: (216) 229-6088
Fax: (216) 229-6092
gjohnson@scott-scott.com

Stephen J. Teti
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
steti@scott-scott.com

BURKE, HARVEY & FRANKOWSKI, LLC
Richard Frankowski
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, AL 35205
Tel: (205) 930-9091
Fax: (205) 930-9054
rfrankowski@bhflegal.com

*Attorneys for Plaintiff*

## **CERTIFICATION**

We, Dr. Michael William Sunner and Dr. Gladys Sunner ("Plaintiffs"), declare as to the claims asserted under the federal securities laws, that:

1. Plaintiffs have reviewed the foregoing Complaint and authorize its filing.

2. Plaintiffs did not purchase the security that is the subject of this action at the direction of Plaintiffs' counsel or in order to participate in any private action.

3. Plaintiffs are willing to serve as representative parties on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4. Plaintiffs' purchase and sale transaction(s) in the Duke Energy Corporation (NYSE: DUK) security that is the subject of this action during the Class Period is/are as follows (these numbers utilize DUK's 1 for 3 reverse stock split following the Merger):

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) or Acquired (A) | Sold (S) | Date | Price Per Share |
|---|---|---|---|---|---|
| Common stock | 3,566.67 | B | | 6/11/12 | $69.57 |
| Common stock | 31.67 | B | | 6/11/12 | $69.42 |
| Common stock | 400 | | S | 7/2/12 | $70.35 |
| Common stock | 480 | B | | 7/9/12 | $65.45 |
| | | | | | |

5.  Plaintiffs have complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.  During the three years prior to the date of this Certification, Plaintiffs have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.  Plaintiffs will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of July, 2012.


_____
Dr. Michael William Sunner


_____
Dr. Gladys Sunner


43

EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JAMES A. CRAIG, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>DUKE ENERGY CORPORATION, JAMES E. ROGERS, ANN MAYNARD GRAY, LYNN J. GOOD, STEVEN K. YOUNG, WILLIAM BARNET III, G. ALEX BERNHARDT, SR., MICHAEL G. BROWNING, DANIEL R. DIMICCO, JOHN H. FORSGREN, JAMES H. HANCE, JR., E. JAMES REINSCH, JAMES T. RHODES, AND PHILIP R. SHARP,<br><br>Defendants. | No. __:____-CV-___-__<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br>Fed. R. Civ. P. 23<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

*"You rarely get in trouble for telling the truth."*
Former Progress CEO William D. Johnson, before the
North Carolina Utilities Commission (July 19, 2012)

*"[The truth] was really nothing we could communicate to this Commission."*
Duke Energy CEO James E. Rogers, before the
North Carolina Utilities Commission (July 10, 2012)

### INTRODUCTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons who acquired the common stock of Duke Energy Corporation ("Duke" or the "Company") pursuant to and/or traceable to a misleading Prospectus and Registration Statement filed on Form S-4/A with the Securities and Exchange Commission ("SEC") on July 7, 2011, (the "Prospectus Materials") for Duke's merger with Progress Energy Inc. ("Progress") (the "Merger").  These claims are brought pursuant to §§11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") against Duke and/or the Individual Defendants (defined herein).

2.      This action is also brought on behalf of all persons who purchased or otherwise acquired Duke common stock between June 28, 2012 and July 9, 2012 (the "Class Period"), inclusive.  This claim is brought under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Duke and its Chief Executive Officer ("CEO"), James E. Rogers ("Rogers").

3.      Duke is an energy and utilities company based in Charlotte, North Carolina.  Prior to the Merger, Progress was an energy and utilities company headquartered in Raleigh, North Carolina.  Defendant Rogers, a former executive vice president of interstate pipelines at Enron Corporation, is Duke's CEO.  Before the Merger, Progress was headed by William D. Johnson ("Johnson").  This action involves a corporate takeover by Duke that was misleadingly represented to shareholders at various times as a Merger.

4.      On January 8, 2011, Progress and Duke executed an agreement to combine the two companies (the "Merger Agreement").  On July 7, 2011, Duke filed its Prospectus Materials with the SEC.  The Merger Agreement was attached to the Prospectus Materials as Annex A. The Merger Agreement represented that "Duke's Board of Directors shall cause [Mr. Johnson] to be appointed as the President and Chief Executive Officer of Duke."  The Registration Statement similarly represented that, after the Merger, "Mr. Johnson will serve as the president and chief executive officer of Duke Energy and Mr. Rogers will serve as the executive chairman of the board of directors of Duke Energy."

5.      In recommending the Merger to its shareholders, the Progress Board of Directors ("Progress Board") advised its shareholders that "Mr. Johnson will be the president and chief executive officer of the combined company."  The Duke Board of Directors ("Duke Board"), represented that it supported the Merger based on the "combined expertise" of the two companies, "*particularly among senior management of each company*," including Mr. Johnson, and that Mr. Johnson would be the CEO of the combined Company.[1]  Duke's representations about Mr. Johnson in the Prospectus Materials were misleading because they omitted material facts about Mr. Johnson – including the fact that Mr. Johnson's purported "leadership style" in the lead up to the Merger was a condition to him serving as CEO of the combined Duke.

6.      In a written statement to the North Carolina Utilities Commission ("NCUC") in July 2012, lead Duke Director, Ann M. Gray ("Gray"), admitted that, before the Prospectus Materials were even filed on July 7, 2011, (i) "at least one of the independent directors [had] expressed concerns" about Mr. Johnson's leadership abilities; and (ii) that the Duke Board had increasing, yet still undisclosed, "concern[s] [about Mr. Johnson]" as of June 20, 2011.  On July

---

[1]      All emphasis is added.

2

20, 2012, Duke Director Michael G. Browning ("Browning") similarly confirmed in testimony before the NCUC that, "[b]y the time we got to the point where we were going to sign the merger agreement [in January 2011], there was *clearly some concern* as to whether Bill [Johnson] was the right guy." None of these material facts were disclosed to the Progress Board or shareholders.

7.     At the time, Defendant Rogers was not a viable choice as CEO of the combined Company. Rogers' personal involvement in a major ethics scandal with the Indiana Utility Regulatory Commission in the summer of 2011 would have made shareholder and regulatory approval for the Merger far more difficult, if not impossible, to obtain had Rogers been proposed as CEO of the combined Company. Therefore, Defendants made Mr. Johnson the face of the Merger for as long as necessary for the Merger to go through.

8.     The Merger Agreement itself mandated that Progress could terminate the Merger "if Duke shall have breached or failed to perform in any material respect any of its representations…contained in this Agreement." Mr. Johnson serving as CEO was one such representation. The Merger Agreement also expressly established that it could "be terminated *at any time prior to the completion of the merger* [] by mutual written consent of Duke Energy and Progress Energy." Had Duke violated the Merger Agreement by revealing the true facts about Mr. Johnson's ouster and/or purported negative "leadership style," the Progress Board would have terminated the Merger and Duke would have been forced to pay a termination fee of *$675 million*.

9.     On May 3, 2012, the Duke Board met to discuss, among other things, how and when to oust Mr. Johnson. Defendant Gray has since testified that, as early as May 2012, Defendants "started to focus on the fact that perhaps *Bill was not going to be* – we should

seriously consider whether he's the right person to be CEO."  From May 4, 2012 through June 29, 2012, Duke nevertheless was cause to filed approximately ten prospectus updates on Forms 425 with the SEC that, in bold letters, "urge[d] investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement…because they contain important information."  Defendants therefore caused shareholders to rely upon a Registration Statement and Prospectus that, during this same time period, Defendants knew contained misleading statements and omitted material facts about Mr. Johnson's role as CEO of the combined Duke.  Defendants also failed to advise the Progress Board about any of these material developments at any time before the Merger closed on July 2, 2012.

10.    On June 27, 2012, Defendants, who by then knew Mr. Johnson's days were numbered, hurriedly presented Mr. Johnson with a new Employment Agreement that he in good faith executed.  On or about June 28, 2012, the first day of the Class Period, Defendant Rogers participated in a joint interview alongside Mr. Johnson with *The Charlotte Observer*.  The interview was carried in an article published on June 28, 2012 called "Duke Energy Execs Discuss What's Next."  In the interview, Rogers, who by then knew that Mr. Johnson would be fired just two business days later, failed to disclose Mr. Johnson's impending dismissal, but willingly offered that "we have to work to bring the two cultures [of Progress and Duke] together to become one culture."

11.    On June 29, 2012, Duke filed a press release on Form 8-K with the SEC representing, in pertinent part, "the North Carolina Utilities Commission approved the merger between Duke Energy Corporation and Progress Energy, Inc.," which included an exhibit that again "urge[d] investors and shareholders to read the Registration Statement, including the joint

4

proxy statement/prospectus that is a part of the Registration Statement, as well as other relevant documents filed with the SEC, *because they contain important information*."

12.     On July 2, 2012, minutes after the Merger closed, and after eighteen months of unequivocally assuring investors, regulators and others that Mr. Johnson would be the combined Duke's CEO, the newly constituted Rogers-led Board of the new Duke Energy Company abruptly ousted Mr. Johnson and installed Rogers as CEO.  *All five Progress Directors voted against Mr. Johnson's dismissal* and all ten Duke directors voted in favor.  Mr. Johnson has since stated that he was "stunned" by his termination.  On a July 3, 2012 conference call with investors following Defendants' announcement, Defendants Rogers and Gray refused to answer any questions about Mr. Johnson's ouster.

13.     The fallout from the Individual Defendants' disclosures was expectedly swift and severe.  In a published letter to the *Wall Street Journal* dated July 5, 2012, a former Progress director described the Individual Defendants' conduct as a "clearly premeditated contravention of *one of the most central tenets of our [Merger] Agreement*."  The same letter described Defendants' conduct as "*one of the greatest corporate hijackings in US business history*."  On July 6, 2012, the NCUC, which had earlier approved of the Merger based in significant part on Defendants' representations that Mr. Johnson would be the CEO of the combined Company, opened an investigation into these developments.

14.     On July 10, 2012, three Progress executives resigned, effective immediately: (i) Mark Mulhern, Progress's former Chief Financial Officer ("CFO"); (ii) John McArthur, Progress's Executive Vice President of Regulated Utilities; and (iii) Paula Sims, Progress's Chief Integration and Innovation Officer.  The same day, *TheStreet.com* reported that "the Rogers-

5

controlled board members *disregarded their fiduciary responsibilities to all shareholders*, including the former Progress shareholders."

15.     A *Wall Street Journal* article dated July 10, 2012 also reported that the "[Duke] board's action came only hours after Duke completed [its] $26 billion merger with Progress [] which Mr. Johnson had headed, surprising investors, regulators and employees."  A *Winston-Salem Journal* editorial published July 11, 2012, reported that the "management team shake-up at newly merged Duke Energy has Attorney General Roy Cooper and the N.C. Utilities Commission *appropriately questioning whether company officials misrepresented their plans to government agencies, stockholders of the former Progress Energy and the state's consumers*."

16.     In response to Mr. Johnson's dismissal, former Progress Directors have publicly (and forcefully) stated that they would not have voted to approve the Merger had they known the truth about Defendants' undisclosed plan to replace Mr. Johnson with Rogers.  One such former director – John H. Mullin, III – described Defendants' conduct as, "*the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street*."  Mr. Mullin's comments are worthy of attention; he has served or is serving as a director on the board of 14 publicly-traded companies, and was managing director of Dillon Read & Co. from 1969 through 1989.

17.     On July 12, 2012, after hearing Mr. Johnson's testimony before the NCUC, the NCUC issued an Order Scheduling Hearings and Requiring Production of Documents from the Defendants.  The Order stated, in relevant part, "[i]n the merger application and in testimony before the Commission by Johnson and Rogers, Duke [] represented to the Commission that effective upon the closing of the merger Johnson would be the President and CEO of the

6

combined company and Rogers would be the Executive Chairman of the Board of the combined company."  As alleged herein, various Defendants subsequently testified before the NCUC on July 19 and 20, 2012.  Their testimony was damning.

18.     In tandem with the NCUC's still-active investigation, North Carolina's Attorney General initiated an investigation regarding whether Duke lied about its future leadership in order to win Merger approval and a utility rate increase from regulators.  In addition, *Standard & Poor's Financial Services* put Duke on a negative watch because of the "abrupt change in executive leadership."

19.     As a result of Defendants' disclosures, the price of Duke common stock dropped approximately 6% in the days immediately following Mr. Johnson's termination on unusually high trading volume.  Plaintiff, a Progress shareholder who received Duke common stock in the Merger, was damaged thereby.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act, and §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act and §27 of the Exchange Act.

22.     This Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue herein within this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Duke conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

7

24.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

25.     Plaintiff James A. Craig acquired Duke common stock as set forth in the attached certification and was damaged thereby.

26.     Defendant Duke is an energy and utility company with its headquarters located in Charlotte, North Carolina.  Duke's common stock is traded under the symbol DUK on the New York Stock Exchange ("NYSE"), which is an efficient market.

27.     Duke's regulated utility operations consist of its U.S. franchised electric and gas segment, which serves approximately seven million customers located in five states in the southeast and midwest regions of the United States, representing a population of approximately 12 million people.   In its regulated electric operations, Duke owns approximately 58,000 megawatts of generating capacity for a service area of approximately 50,000 square miles.  For the year ended December 31, 2010, Duke had total revenues of $14.3 billion and net income of $1.3 billion.  Duke's consolidated assets as of December 31, 2010 were $59.1 billion.

28.     Defendant Rogers was Chairman, President, and CEO of Duke when the Prospectus Materials were filed.   Rogers signed the Registration Statement.

29.     Defendant Gray was a director of Duke when the Prospectus Materials were filed.  Gray signed the Registration Statement.

30.     Defendant Lynn J. Good ("Good") was the Group Executive and CFO of Duke when the Prospectus Materials were filed.  Good signed the Registration Statement.

8

31.     Defendant Steven K. Young ("Young") was the Senior Vice President and Controller of Duke when the Prospectus Materials were filed.   Young signed the Registration Statement.

32.     Defendant William Barnet III ("Barnet") was a director of Duke when the Prospectus Materials were filed.   Barnet signed the Registration Statement.

33.     Defendant G. Alex Bernhardt, Sr. ("Bernhardt") was a director of Duke when the Prospectus Materials were filed.   Bernhardt signed the Registration Statement.

34.     Defendant Browning was a director of Duke when the Prospectus Materials were filed.   Browning signed the Registration Statement.

35.     Defendant Daniel R. DiMicco ("DiMicco") was a director of Duke when the Prospectus Materials were filed.  DiMicco signed the Registration Statement.

36.     Defendant John H. Forsgren ("Forsgren") was a director of Duke when the Prospectus Materials were filed.  Forsgren signed the Registration Statement.

37.     Defendant James H. Hance, Jr. ("Hance") was a director of Duke when the Prospectus Materials were filed.  Hance signed the Registration Statement.

38.     Defendant E. James Reinsch ("Reinsch") was a director of Duke when the Prospectus Materials were filed.  Reinsch signed the Registration Statement.

39.     Defendant James T. Rhodes ("Rhodes") was a director of Duke when the Prospectus Materials were filed.  Rhodes signed the Registration Statement.

40.     Defendant Philip R. Sharp ("Sharp") was a director of Duke when the Prospectus Materials were filed.  Sharp signed the Registration Statement.

41.     The persons identified in paragraphs 28-40 above shall henceforth be referred to herein as the "Individual Defendants."  The Individual Defendants approved the Merger.

## BACKGROUND

42.     In May 2010, Duke and Progress commenced initial discussions concerning a possible business combination between the two companies.  By July 2010, Rogers personally contacted Mr. Johnson to express interest in meeting to explore a potential business combination of Duke and Progress.  Subsequently, between July 7, 2010 and January 7, 2011, Messrs. Rogers and Johnson met approximately twenty times to get to know each other and to discuss the possible merger of their respective companies.  The Duke Board also met with Mr. Johnson several times during this time period.  At no point during any of these discussions did Defendants, at least publicly or with Progress, raise any concerns with Mr. Johnson's "leadership style" or his ability to serve as CEO of the combined Company.

43.     On October 2, 2010, Messrs. Rogers and Johnson had moved far enough along in their discussions to establish that Mr. Johnson, not Rogers, would serve as the CEO of the combined Company.  On January 8, 2011, the Merger Agreement was executed between Duke and Progress, and a material provision therein required that Mr. Johnson would serve as CEO of the combined Company.  On August 23, 2011, the shareholders of both companies approved the Merger at a Special Meeting of the respective companies' shareholders.  The shareholder vote did not itself complete the Merger, however, as the Merger was subject to numerous other requirements and conditions precedent, including obtaining various regulatory approvals and Duke's compliance with representations and warranties about the Merger as set forth in the Merger Agreement.  According to the Merger Agreement, had either Progress's or Duke's shareholders voted against the Merger at any time before closing, the Merger would have terminated.

44.     On January 10, 2011, Duke and Progress publicly announced that the two companies intended to merge, and that Mr. Johnson would lead the combined Company as the

10

new CEO.  The Merger ultimately created the largest public electric utility in the United States.

The press release on Form 8-K announcing the Merger stated, in relevant part:

> Duke Energy (NYSE: DUK) and Progress Energy, Inc. (NYSE: PGN) announced today that both companies' boards of directors have unanimously approved a definitive merger agreement to combine the two companies in a stock-for-stock transaction.  The combined company, to be called Duke Energy, will be the country's largest utility.

45.    The leadership structure of the merged Company was a material term of the Merger.  Specifically, the press release stated:

> When the merger is completed, Rogers will become executive chairman of the new organization.  In this role, Rogers will advise the CEO on strategic matters, play an active role in government relations and serve as the company's lead spokesperson on energy policy.
>
> **Johnson will become president and chief executive officer of the new company.**

## THE PROSPECTUS MATERIALS WERE MATERIALLY
## FALSE AND MISLEADING

46.    On July 7, 2011, Defendants filed a Form S-4/A Registration Statement and Prospectus with the SEC in connection with the Merger.  The Registration Statement was a part of a Joint Proxy Statement/Prospectus filed the same day.  The Registration Statement and Prospectus stated:

> Duke Energy has filed with the SEC a registration statement to register the shares of Duke Energy common stock to be issued to Progress Energy shareholders in connection with the merger.  This document forms a part of that registration statement and constitutes a prospectus of Duke Energy, in addition to being a proxy statement of Duke Energy for its special shareholder meeting and of Progress Energy for its special shareholder meeting.

47.    The Registration Statement and Prospectus also contained a section entitled "Questions and Answers About the Merger and the Special Meetings" that included the following illustrative colloquy for the purported benefit of Duke's and Progress's shareholders:

> Q:    What will Jim Rogers' role be with Duke Energy following completion of the merger?  What will Bill Johnson's role be?

11

A:     Duke Energy and Progress Energy have agreed that Mr. Rogers will serve as executive chairman of the board of directors of Duke Energy and ***Mr. Johnson will serve as president and chief executive officer of Duke Energy following the completion of the merger***.

We provide additional information on the senior management of Duke Energy following the completion of the merger under the heading 'The Merger − Continuing Board and Management Positions,' beginning on page 112.

48.    The section referenced in the above answer entitled "The Merger – Continuing Board and Management Positions," stated in relevant part:

The merger agreement provides that ***Mr. Johnson will serve as the president and chief executive officer of Duke Energy*** and Mr. Rogers will serve as the executive chairman of the board of directors of Duke Energy, in each case as of the completion of the merger and subject to such individual's ability and willingness to serve. In the event either Mr. Johnson or Mr. Rogers is unable or unwilling to serve in such capacity, the parties agreed in the merger agreement to confer and mutually designate a replacement.

49.    The Prospectus omitted facts necessary to make the statements made therein not misleading, and was not prepared in accordance with applicable SEC rules and regulations. Specifically, the Prospectus failed to disclose that: (i) Rogers, not Mr. Johnson, would serve as the CEO of the combined Company after the Merger; (ii) Defendants had obtained approval for the Merger from the Progress Board and shareholders by failing to disclose that Rogers would act as the CEO of the combined Company and that Defendants had "serious concerns with Mr. Johnson;" and (iii) Defendants misled the NCUC and others to gain regulatory approval of the Merger by failing to disclose Mr. Johnson's ouster or Defendants reservations about Mr. Johnson to the NCUC and others.

50.    Between August 24, 2011, and June 28, 2012 (*i.e.*, the Friday before the Merger closed), Duke filed over two dozen prospectus updates on Forms 425 with the SEC urging "investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement…because they contain important

13

information," including misleading information related to Mr. Johnson's position as the CEO of the combined Duke.

51.     Defendants' representations about Mr. Johnson were misleading when made.  On July 17, 2012, lead Duke director and Defendant Ann Gray issued a written Statement to the NCUC in connection with Duke Energy Corporation's Motion in Objection to Order Scheduling Hearing, Docket No. E-7, Sub 1017.  The Statement admitted that "at least" one Duke director expressed concerns with Mr. Johnson as early as November 2010.  Gray also admitted that as early as June 2011, certain events related to Progress "caused us concern [about Mr. Johnson] over time, ***but*** we continued to believe in the strategic logic and long-term benefits of the merger."  In other words, as of June 2011, Defendants still wanted the Merger but not Mr. Johnson to lead the combined Company.  Defendants failed to advise shareholders, the NCUC, the SEC, Mr. Johnson or the Progress Board about these material, undisclosed, facts.

52.     On July 20, 2012, following Duke Energy's filing of a Motion in Objection to Order Scheduling Hearing, Gray reluctantly testified before the NCUC.  Her testimony, which characterized the NCUC's investigation as "regrettable," confirmed that, prior to Duke's announcement about the Merger on January 10, 2011, Duke directors were already seriously concerned about Mr. Johnson.  According to Mr. Johnson, these concerns intensified after the Federal Electric Utilities Commission issued its mitigation plan in January 2012.

53.     On May 3, 2012, the Duke Board held an executive session to discuss their plans to oust Mr. Johnson.  On May 4, 2012, Duke held an earnings conference call with analysts and investors for its first fiscal quarter of 2012.  While, Rogers participated on the conference call and answered questions about the Merger, he failed to disclose the Duke Board's undisclosed decision to fire Mr. Johnson immediately upon consummation of the Merger.

54.     On May 11, 2012, Duke filed a press release on Form 8-K that incorporated the Registration Statement by reference in Exhibit 99.2 to the 8-K.  On May 17, 2012, the Duke Board held a meeting with its lawyers from Wachtell, Lipton, Rosen & Katz to discuss Mr. Johnson.  Gray characterized the Duke Board's May 2012 meetings as a "vote of no confidence" for Mr. Johnson, and stated that "when you have a vote of no confidence, it's a huge...it's **not the type of shortfall that can be remediated**.  A vote of no confidence is really huge…you can't remediate a vote of no confidence in our opinion, so when the board felt that way, there really didn't appear to be a reason [to talk to Mr. Johnson] because we couldn't remediate it."

## POST MERGER EVENTS

55.     On July 2, 2012, minutes after the Merger was consummated, Mr. Johnson was fired and replaced with Rogers.  Notably, all ten Duke directors voted in favor of Mr. Johnson's ouster and all five Progress directors voted against his removal.

56.     On July 3, 2012, Duke issued a press release with the SEC on Form 8-K that stated in relevant part:

*Appointment of Principal Executive Officer of Duke Energy*

In connection with the Merger described in Item 2.01 of this Current Report on Form 8-K and pursuant to the terms of the Merger Agreement, effective as of the effective time of the Merger, **William D. Johnson**, the former Chairman, President and Chief Executive Officer of Progress Energy, **was appointed as the President and Chief Executive Officer of Duke Energy**.

\*     \*     \*

**Mr. Johnson subsequently resigned** as the President and Chief Executive Officer of Duke Energy.

\*     \*     \*

*Resignation of Mr. Johnson and Reappointment of Mr. Rogers*

On July 3, 2012, Duke Energy announced that Mr. Johnson has resigned from all of his positions at Duke Energy and will no longer serve as President and Chief

14

Executive Officer of Duke Energy or as a member of Duke Energy's Board of Directors [], effective as of 12:01 a.m. on July 3, 2012 []. *Also, on July 2, 2012, the Board reappointed Mr. James E. Rogers as President and Chief Executive Officer of Duke Energy*, effective as of 12:01 a.m. on July 3, 2012.

57.     On July 6, 2012, *Bloomberg* published an article entitled "Ex-Progress Directors

Say Duke CEO Switch Was 'Deceit.'" That article stated, in relevant part:

Three former Progress Energy Inc. board members said they would have voted against Duke Energy Corp. (DUK)'s takeover had they known that Duke's chief executive officer would remain in charge of the combined companies.

'*I wouldn't have voted for the deal*,' James Bostic Jr., who served on Progress's board since 2002, said in a phone interview today. '*I believed that Bill Johnson would be able to run the combined companies in a more efficient manner and offer a much stronger return to shareholders.*'

Duke announced on July 3 that Johnson, the chairman and CEO of Progress, had resigned and wouldn't take over as president and CEO of the combined companies as planned as the $17.8 billion transaction was complete. Duke Chairman and CEO James Rogers, who was supposed to be chairman after the merger, was asked by the board to continue as CEO.

Standard & Poor's put Duke, the largest U.S. utility owner by market value, on negative credit watch after 'the abrupt change in executive leadership.' *The surprise decision to change CEOs as its takeover closed was deceitful, according to John H. Mullin, who also served on Progress's board*.

'*I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company*,' Mullin, a former managing director for investment banker Dillon Read & Co., wrote in a July 5 letter to the *Wall Street Journal*.

Regulatory Review

The new Duke Board met without Rogers or Johnson and decided on the switch, Rogers said in a July 3 interview. Under terms of the merger, the board is composed of 11 Duke representatives and seven from Progress. Bostic and Mullin were among eight Progress directors who weren't added to the new board.

North Carolina opened an investigation into the merger to determine if Duke Energy made misstatements regarding the takeover, according to an e-mailed statement from Roy Cooper, the state's attorney general.

The North Carolina Utilities Commission, which approved the deal on June 29,

15

is considering what steps it might take in the wake of Johnson's exit, Sam Watson, general counsel for the agency, said in a phone interview today. The commission has the power to rescind any decision made by it, according to its rules.

'We do not comment on our board's deliberations,' Tom Williams, a spokesman for Charlotte, North Carolina-based Duke, said in an e-mail. The company said on July 3 it wouldn't comment further on Johnson's resignation, which it has said was done by 'mutual agreement.'

Johnson, who signed a non-disparagement agreement with Duke, didn't respond to voicemail message left at his North Carolina home.

'Work Together'

'***There was information that Duke didn't share with us, and it may have changed the outcome***,' Alfred Tollison, another former Progress Director, said in a phone interview today. 'Duke may have fulfilled the letter of the agreement, but they didn't fulfill the spirit,' he said, referring to Johnson occupying the CEO position for one day.

The merger was announced in January 2011 and completed on July 2 after receiving state and federal approvals. Progress's board unanimously recommended that shareholders vote in favor of the deal, according to a July 2011 regulatory filing.

'I don't really have any idea what would have happened,' said Bostic, a former vice president of Georgia-Pacific LLC. 'I expected that Johnson and Rogers were going to work together and they were going to make this a successful merger.'

Mullin's letter was reported earlier today by the New York Times and Wall Street Journal.

Duke fell 3.4 percent to $66.23 at the close in New York, the biggest decline since Aug. 10.

Johnson's appointment as CEO of the new company was '***a critical element in the merger deliberations***,' Mullin wrote in the letter. 'This is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street.'

58.     As a result of these and subsequent disclosures, the price of Duke common stock

dropped from a closing price of $69.84 on July 2, 2012, the day before Johnson's ouster was

revealed, to $65.31 several trading days later on July 9, 2012, a decline of nearly 6%. The

16

decrease in the price of Duke stock was a proximate result of the artificial inflation caused by Defendants' misleading statements and material omissions, and the removal of that inflation upon disclosure of adverse facts relating to Mr. Johnson's termination.

59.    On July 10, 2012, Rogers testified before the NCUC.  During the hearing, after noting the "magnitude" of the decision to remove Mr. Johnson, Commissioner Beatty tellingly asked Rogers, "***don't you see how that might affect the credibility at least of the company with this commission***?"  Rogers response was that "***[i]t was really nothing we could communicate to this Commission***."  *See* Exhibit B (attached hereto).  This statement was false.

60.    During the same hearing, Chairman Edward S. Finley, Jr. reminded Rogers that he had previously assured the Commission that "Mr. Johnson would lead the New Duke Energy, set the tone for the direction of the – the direction that the new company is going to take...."  When asked whether Rogers believed that Mr. Johnson knew he would be fired, Rogers testified that he was "not in a position to say what was in his [Johnson's] mind."  After being pressed by Chairman Finley, Rogers ultimately relented that he did not "have any reason to believe [Johnson] didn't think he would be [CEO]."

61.    The same day, *TheStreet.com* published an article aptly entitled "***Duke Deceives Investors***," which stated, in relevant part:

> One of the cardinal rules in the utility industry is don't surprise your friends. ***Duke Energy (DUK) Chairman and CEO James Rogers just violated that rule***.
>
> After Duke's successful acquisition of Progress Energy last Monday, shareholders expected that Rogers would become executive chairman of the board and that Progress Energy's Bill Johnson would become Duke's president and CEO. But at 12:01 a.m. EDT Tuesday morning, just minutes into his new role as Duke's CEO, Johnson was allegedly forced out of the company by a Rogers-friendly board, and Rogers retook full control of the new Duke.
>
> Apparently, the last-minute decision came as a complete surprise to Johnson. It was also a surprise for Progress Energy's leadership team.  ***Had Progress executives known about Rogers' plan for a management switch before the***

17

*merger closed, in all likelihood, they would've suspended final approvals*.

***It couldn't have been a surprise to Rogers***.  Duke is a big company and cannot spin on a dime.  Rogers' plans had to have been socialized with critical board members ***well before the merger***.  (The new board is composed of 11 former Duke and seven former Progress members.)

***It appears as though Rogers and his carefully selected board members were deceptive and withheld critical information from fellow board members, shareholders, executives and regulators.  Worse, it appears as though the Rogers-controlled board members disregarded their fiduciary responsibilities to all shareholders, including the former Progress shareholders.***

There is also the issue of corporate culture.  ***As the industry learned from one of Rogers' former employers, Enron, corporate culture starts from the top***.  If deceptive maneuvers and ambush tactics are adopted and rewarded by senior executives, that culture will find its way down the corporate ladder and become a fixture throughout Duke's organization.  ***That type of management style is not what most shareholders, regulators or the public expect of a nuclear utility***.

Public trust and confidence is an essential ingredient for successful utility operations.  The public's trust is imperiled when utility management is engaged in deceit.  It's further imperiled when a management team's reputation with state and federal regulators is soiled, and Rogers' coup d'état has already attracted unfavorable regulatory attention.

According to *Bloomberg*, North Carolina's Attorney General opened an investigation to determine if Duke lied to get merger approval and win a rate increase.  In addition, Standard & Poor's put Duke on negative credit watch after the firm learned about 'the abrupt change in executive leadership.'

Adding to the regulatory concerns are the outspoken concerns raised by Progress Energy's board members.  John Mullin was one of those members, and he writes in *The Wall Street Journal*:

> The surprise decision to change CEOs as its takeover closed ***was deceitful***.  I do not believe that a single director of Progress would have voted for this transaction with the knowledge that Jim Rogers would remain as the CEO of the combined company.

***Duke Energy is damaged. The question is how bad and can it be fixed.***

62.    On July 10, 2012, following Rogers' same day testimony before the NCUC, the

*Wall Street Journal* reported that:

The [Duke] board was also worried about disappointing earnings at Raleigh-based Progress, he [Rogers] said, and the poor performance of some company nuclear plants.

In his testimony, ***Mr. Rogers repeatedly implied that Duke was the better performer***.  But utilities are judged by their ability to earn an 'allowable return,' or the maximum profit permitted by regulators.  ***In 2011, Progress earned that amount in each of its states, while Duke didn't achieve that goal in any state where it operated.  Indeed, improving Duke's performance was one goal of the merger.***

63.     Although Defendants had never previously publicly raised ***any*** issue with Mr. Johnson's leadership style or abilities to lead the combined company prior to his removal on July 2, 2012, Defendants are now publicly attacking Mr. Johnson's character, and using long and well-known issues with the Crystal River nuclear plant as obvious and unseemly pretexts to justify their misconduct.

## DEFENDANTS ARE NOT ENTITLED TO THE PROTECTIONS OF THE PSLRA'S SAFE HARBOR PROVISION

64.     Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by the Private Securities Litigation Reform Act of 1995's ("PSLRA") safe harbor provision.  To fall within the protections of the PSLRA's safe harbor, forward looking statements must be accompanied by meaningful cautionary language tailored to the relevant risks.  To the extent Defendants' statements include purely forward looking statements, the forward looking statements were not accompanied by meaningful cautionary language tailored to the relevant risks created by Defendants' forward looking statements.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who acquired Duke common stock pursuant to the false and misleading statements and omissions, as alleged herein, and who were damaged

thereby (the "Class").  Excluded from the Class are Defendants, directors and officers of Duke and their families and affiliates.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the relevant time period, Duke had millions of shares outstanding, owned by thousands of persons.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (i) whether the federal securities laws were violated by Defendants' acts as alleged herein; (ii) whether statements made by Defendants to the investing public misrepresented material facts about the business, operations and management of Duke; and (iii) to what extent the members of the Class have sustained damages, and the proper measure of damages.

68.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

69.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

71.     At all relevant times, the market for Duke's common stock was an efficient market for the following reasons, among others:

20

(i)      Duke stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(ii)      As a regulated issuer, Duke filed periodic public reports with the SEC and the NYSE;

(iii)      Duke regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)      Duke was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

72.      As a result of the foregoing, the market for Duke's common stock promptly digested current information regarding Duke from all publicly available sources and reflected such information in Duke's stock price.  Under these circumstances, all purchasers of Duke's common stock during the Class Period suffered similar injury through their purchase of Duke's common stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### Violations of §11 of the Securities Act
### Against All Defendants

73.      Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, however, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

21

74.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

75.     The Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

76.     Duke is the registrant and, as such, is strictly liable to Plaintiff and the Class for the misstatements and omissions contained the Registration Statement.

77.     The Individual Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants named in this Count signed or authorized the signing of the Registration Statement.

78.     None of the Defendants named herein possessed reasonable grounds for the belief that the statements and omissions contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

79.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

80.     Plaintiff acquired Duke stock pursuant to the Registration Statement.

81.     Plaintiff and the Class have sustained damages.  At the time of their acquisition of Duke stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time Plaintiff filed this Complaint.  Less than three years elapsed since the stock upon which this Count is brought was *bona fide* offered to Plaintiff and the Class.

## COUNT II

### Violations of §12(a)(2) of the Securities Act
### Against Duke

82.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

83.     By means of the defective Prospectus, Duke assisted in the exchange of shares of Duke stock to Plaintiff and other members of the Class.

84.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Duke owed Plaintiff and the other members of the Class who acquired Duke stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Duke, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above and/or should have updated investors regarding material information about the Merger.

85.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Duke stock on July 2, 2012.

86.     By reason of the conduct alleged herein, Duke violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who acquired Duke stock pursuant to and/or traceable to the Prospectus sustained

23

substantial damages.  In addition, Plaintiff and the other members of the Class who hold such shares have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to Duke.  Class members who have sold their shares seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the Securities Act
### Against the Individual Defendants

87.     Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

88.     This Count is brought pursuant to §15 of the Securities Act against the Individual Defendants.

89.     Each of the Individual Defendants was a control person of Duke by virtue of his or her position as a director and/or senior officer of Duke which allowed each of these Defendants to exercise control over Duke and its operations.

90.     Each of the Individual Defendants was a participant in the violations of §§11 and 12 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and filing the Prospectus, and having otherwise participated in the process which allowed the Merger to be successfully completed.

## COUNT IV

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

91.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

24

92.     During the Class Period, Duke and Rogers disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     Duke and Rogers: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

94.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Duke common stock.  Plaintiff and the Class would not have purchased Duke common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Duke and Rogers' misleading statements.

95.     As a direct and proximate result of these Duke and Rogers' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Duke common stock during the Class Period.

## COUNT V

### Violations of §20(a) of the Exchange Act for the 10(b)
### Claims Against Duke and Rogers

96.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

25

97.     During their tenures as officers and/or directors of Duke, each of the Defendants named in this Count were controlling persons of Duke within the meaning of §20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Duke, Defendants had the power and authority to cause Duke to engage in the conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the content of the Registration Statement and the other solicitations described herein made by Duke, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

98.     The Individual Defendants participated in Duke Board meetings and conference calls, reviewed the Merger Agreement and voted to approve the Merger, signed the Registration Statement and solicited approval of the Merger through the Duke Board's recommendation to vote in favor of the Merger, which appeared in the Registration Statement.

99.     In their capacities as senior corporate officers and/or directors of Duke, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above. Indeed, these Defendants had access to non-public information regarding the circumstances surrounding the Merger.

100.     As a result, these Defendants, individually and as a group, were control persons within the meaning of §20(a) of the Exchange Act.

101.     As set forth above, Duke violated §10(b) of the Exchange Act. By virtue of their positions as controlling persons of Duke, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Duke is liable to Plaintiff and the other members of the Class.

102.     This claim is brought within the applicable statute of limitations.

103.    By reason of the foregoing, these Defendants violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable and injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  September 20, 2012

                                                            /s/ Dhamian A. Blue
                                                            Dhamian A. Blue
                                                            Daniel T. Blue, Jr.
                                                            Daniel T. Blue, III
                                                            BLUE STEPHENS & FELLERS LLP
                                                            205 Fayetteville Street, Suite 300
                                                            Raleigh, North Carolina 27601
                                                            dab@bluestephens.com
                                                            danblue@bluestephens.com
                                                            dtb3@bluestephens.com
                                                            Telephone: (919) 833-1931
                                                            Facsimile: (919) 833-8009
                                                            N.C. State Bar No. 31405 (DAB)
                                                            N.C. State Bar No. 5510 (DTB, Jr.)
                                                            N.C. State Bar No. 27720 (DTB, III)

27

Ramzi Abadou
Eli R. Greenstein
Stacey M. Kaplan
Jennifer L. Joost
Erik D. Peterson
KESSLER TOPAZ MELTZER
   & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
rabadou@ktmc.com
egreenstein@ktmc.com
skaplan@ktmc.com
jjoost@ktmc.com
epeterson@ktmc.com
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

- and -

Darren Check
KESSLER TOPAZ MELTZER
   & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
dcheck@ktmc.com
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Attorneys for Plaintiff*

EXHIBIT 4

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LESLEY C. RUPP, and RICHARD A. BERNSTEIN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C. A. No. 7705-CS |
| JAMES E. ROGERS, WILLIAM BARNET, III, G. ALEX BERNHARDT, SR., MICHAEL G. BROWNING, DANIEL R. DiMICCO, JOHN H. FORSGREN, ANN MAYNARD GRAY, JAMES H. HANCE, JR., E. JAMES REINSCH, JAMES T. RHODES, and PHILIP R. SHARP, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| DUKE ENERGY CORPORATION, | ) ) | |
| Nominal Defendant. | ) | |

## AMENDED DERIVATIVE COMPLAINT

Plaintiffs Lesley C. Rupp and Richard A. Bernstein, by their attorneys, derivatively on behalf of Duke Energy Corporation ("DUKE"), a Delaware Corporation, allege the following upon personal knowledge regarding Subparagraph 14 (a) as to Ms. Rupp and 14 (b) as to Mr. Bernstein, and upon information and belief with respect to all other allegations of this Complaint:

## INTRODUCTION AND OVERVIEW OF ACTION

1.   Nature of Action. This suit challenges the breach of fiduciary duties of loyalty and care by eleven members of the DUKE Board of Directors.

2.   Planned Merger. On January 10, 2011, DUKE and Progress Energy, Inc. ("PROGRESS"), two large utilities companies, both with headquarters and

1

heavy customer concentration in North Carolina, announced that they had entered into an agreement to merge ("The Merger Agreement"), with DUKE to be the surviving entity (the "Merger "). The Merger Agreement, approved by the Boards of both corporations, was subject to approval by shareholders of both companies and approval of certain regulatory authorities, including the Federal Energy Regulatory Commission ("FERC"), the North Carolina Utilities Commission ("NCUC"), and utilities regulatory authorities of several other states. Both DUKE and PROGRESS generate electric power, each from several nuclear plants and other sources.

3.    <u>Johnson to Be CEO Post-Merger</u>. All declarations of both companies -- press releases, petitions to the NCUC and other utilities regulators to approve the Merger, testimony to the NCUC, Securities & Exchange Commission ("SEC") filings, proxies soliciting shareholder approval, and the Merger Agreement, promised that, upon the Merger's completion, William D. Johnson ("Johnson"), the Chief Executive Officer ("CEO") of PROGRESS, would become the CEO of DUKE, and James E. Rogers ("Rogers"), the pre-merger CEO of DUKE, would become its executive chairman. This was a material term, as the parties agreed and announced that the combined companies' strategy was to concentrate on the regulated delivery of power to consumers, where PROGRESS was strongest, rather than energy trading, a DUKE specialty; in the Merger Agreement, the parties explicitly agreed that as CEO, Johnson would lead the implementation of that strategy.

4.   <u>The Post-Merger Board</u>.   Under the Merger Agreement, the post-merger Board was to be comprised of 11 directors chosen by DUKE and 7 by PROGRESS.   DUKE then chose all 11 pre-merger DUKE directors, including Rogers, and PROGRESS chose Johnson and six other PROGRESS directors.   These 18 comprised the Board upon the Merger; then, between July 3, 2012 and July 27, all but Johnson remained on the Board.

5.   <u>Delays</u>.   Based on delays in regulatory approvals, the Merger did not close until July 2, 2012, at 4:02 p.m., 18 months after the original announcement.

6.   <u>The Conspiracy</u>.   Some weeks before closing, the Director Defendants decided that, upon completion of the Merger, they would fire Johnson and re-install Rogers as CEO of the combined entities.   They kept their plot secret from all their constituencies – the NCUC (which holds life-and-death power over DUKE), other utilities regulators, the shareholders of both companies, PROGRESS, and its Board.

7.   <u>Eleventh Hour Huggermugger</u>.   After they decided to fire Johnson as CEO upon the completion of the Merger (the "Closing"), but before the Closing, the DUKE directors (a) signed Johnson to a new employment agreement on June 27, 2012, including his severance deal, and (b) asked the NCUC to hurry its final approval of the Merger but without telling the NCUC of the plot to switch CEOs; the NCUC complied.

8.   <u>The One-Minute Manager</u>.   At 4:30 p.m., right after the Closing, the Board of the combined entity held its first meeting, 17 attending (one PROGRESS director was unavailable), went into executive session, fired Johnson, and re-

3

installed Rogers as CEO.  The meeting was over the phone, audio only, not even videoconference where they could have been able to look at each other.  The vote to fire Johnson as CEO and reinstall Rogers carried 10-5, with all pre-merger DUKE Board members voting "yes" and all five pre-merger PROGRESS directors voting "no." Though the 11 Director Defendants planned this firing in advance, neither the NCUC, nor other regulatory bodies, nor the SEC, nor the shareholders of either company, nor any PROGRESS director, knew of either the secret plot to switch CEOs or the cabal to do so in a boardroom ambush.

9.   <u>The Silence of the Sheep</u>.  After the new Board disposed of ministerial business, 20 minutes into the meeting, DUKE's "Lead Director" Ann Maynard Gray ("Gray") asked for executive session, got Rogers and Johnson to hang up, and moved to fire Johnson as CEO and replace him with Rogers.  The only reason Gray gave at the meeting was that Johnson was "not a good fit," a mantra she kept repeating. Stunned, the PROGRESS legacy directors tried to dissuade her.  So great was the impact of this sucker-punch that PROGRESS legacy director, E. Marie McKee, testified to the NCUC that she "didn't know whether to cry or throw up." ***Not one continuing DUKE Director said as much as one word until the roll-call vote, when each said "yes."*** Rogers and Gray later made up other pretexts for the firing, but the only one offered at the meeting was management style, that Johnson was "not a good fit" to head up the combined company.  Gray broke the news to Johnson that night and gave him the same one and only one reason, that he was "not a good fit."

10.   <u>On the Steps of the Roman Capitol</u>.  Even Julius Caesar had more notice.  In the 18 months between Merger Agreement and Closing, the Director Defendants never sought to communicate to Johnson or the PROGRESS Board any problem with Johnson's leadership or performance.

11.   <u>The Nuclear Hailstorm</u>.  The reaction was fast, fierce, furious, and foreseeable.  The NCUC, whose commissioners stated that they had been misled by this obvious act of bad faith, called public hearings, which are ongoing.  The former lead PROGRESS Board member who had negotiated the Merger stated, in a widely publicized letter to the Wall Street Journal ("WSJ"),  "I do not believe that a single director of PROGRESS would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as CEO of the combined company."  Securities fraud class action cases have been filed against DUKE beginning on July 24, 2012; regardless of merit, such suits were a foreseeable result of the wrongdoing alleged here.  The Standard & Poors Bond Rating Service ("S&P") on July 3 put its rating for DUKE on negative watch because of the "sudden shift in management," and on July 25, 2012 S&P downgraded DUKE's debt.  The Attorney General of North Carolina and the Florida Public Service Commission have begun investigations.  Then, on July 27, 2012, two PROGRESS legacy directors quit the Board in protest, demanding that Rogers be replaced.

12.  <u>Damages</u>.  Damages to DUKE proximately caused by defendants' bad faith and breach of fiduciary duty are enormous and are pled herein.  Plaintiff seeks redress for and on behalf of DUKE from the defendants named herein.

## PARTIES

13.  <u>DUKE</u>.  Nominal Defendant DUKE is a Delaware corporation with its principal place of business at 550 South Tryon Street, Charlotte, North Carolina 28202.  Its common shares are publicly traded on the New York Stock Exchange ("NYSE") under the symbol "DUK."  DUKE's core business is generating, transmitting, distributing and selling electrical power, both through nuclear and coal-fired plants, and selling the power primarily for commercial and residential consumption in DUKE's regulated service areas.  Since the Merger on July 2, 2012, it includes PROGRESS, which is now a wholly owned subsidiary of DUKE.  Most of DUKE's business is heavily regulated, at both the federal and state level.

(a)  <u>DUKE Pre-Merger</u>.  Pre-merger, DUKE's primary service areas were, in order of volume and revenue, central and western North Carolina, western South Carolina, central and southern Indiana, and northern Kentucky, covering 50,000 square miles, four million customers, and 12 million people.  In 2011, DUKE achieved operating revenues of $14.6 billion and net income of $1.7 billion.  DUKE also operates in the more risky though less regulated wholesale energy trading business.  Pre-merger, DUKE's reported business segments were as follows:

(i)  *U. S. Franchised Electric & Gas* ("USDE&G") is primarily the regulated generation and delivery of electricity and gas, dominantly electricity, to

6

residences and businesses in the United States.  In the first quarter of 2012, the USDE&G segment comprised 73.1% of DUKE's total revenues and at March 31, 2012, 80.4% of the assets owned by the three reporting segments;

(ii)    *Commercial Power* is primarily the energy trading business, i.e., the generation, procurement, and wholesale marketing of primarily electrical power.  It is not nearly as regulated as USDE&G.  In the first quarter of 2012, the *Commercial Power* segment comprised 15.9% of DUKE's total revenues and at March 31, 2012, 11.6% of the assets owned by the three reporting segments.  The *Commercial Power* segment is risky and volatile, as it enjoyed earnings before interest and taxes ("EBIT") of $225 million in the fiscal year ended December 31, 2011, but suffered a negative EBIT of (minus) $229 million the previous year (2010) and only $27 million of positive EBIT the year before that (2009); and

(iii)    *International Energy* is the generation and marketing of electrical power outside the United States.  In the first quarter of 2012, the *International Energy* segment comprised 11.0% of DUKE's total revenues and at March 31, 2012, 8.0% of the assets owned by the three reporting segments.

(b)    <u>PROGRESS Pre-Merger</u>.    Pre-merger, PROGRESS was a North Carolina corporation headquartered in Raleigh, NC.  PROGRESS's service areas were, in order of volume and revenue, portions of North Carolina, portions of South Carolina, and portions of Florida, covering three million retail customers.  In 2011, PROGRESS achieved operating revenues of $8.9 billion and net income of $582 million.  Its reporting segments break down geographically, as materially all of its

operating income came from the regulated utilities business, similar to DUKE's USDE&G.

(c)   <u>DUKE Post-Merger</u>.   DUKE is now the nation's largest utilities company both in revenues and power generation capacity.   Per the segment data figures pled *supra*, most of its business, approximately 80-85%, is heavily regulated. At his testimony before the NCUC on July 19, 2012, Johnson estimated that about 87% to 88% of the combined companies' earnings will come from the regulated utilities business.   State utilities commissions' rate-setting proceedings are crucial to DUKE's economic well being, as they were to both DUKE and PROGRESS pre-merger.   Of these, NCUC is by far the most important state utilities commission, as 45% of Post-Merger DUKE's rate-regulated revenues are from customers in North Carolina.   To understate the obvious, relationships with the NCUC are highly material to DUKE, the more so since DUKE and PROGRESS agreed in the Merger Agreement to change strategic focus to an emphasis on the regulated energy business, away from energy trading.

14.   <u>Plaintiffs</u>.

(a)   <u>Plaintiff Lesley C. Rupp</u> is a shareholder of DUKE and has been continuously since 2009.   Ms. Rupp resides in Alabama.   Before her marriage about two years ago, Ms. Rupp's name was Lesley C. Dicaire.

(b)   <u>Plaintiff Richard A. Bernstein</u> is a substantial shareholder of DUKE and has been continuously for approximately a quarter century.   He held 8,289 shares up until the recent one-for-three reverse split effective at the time of the

Merger and 2,762 after the reverse split. Mr. Bernstein holds his shares directly and not in street name, having been throughout these years in the DUKE dividend reinvestment program. He has never sold any DUKE shares. Mr. Bernstein resides in New York State.

15.   <u>Rogers</u>.   Defendant James E. Rogers ("Rogers"), 64, is a director of DUKE and has been continuously since its merger with Cinergy Corp. in 2006 and Chairman of the Board of Directors of DUKE since 2007. Rogers was CEO of DUKE continuously from 2006 to date, except for the evening of July 2, 2012. Between 1994 and 2006, Rogers served as CEO of Cinergy Corp., an energy firm.

16.   <u>Non-Executive Director Defendants</u>.   The following served on DUKE's Board of Directors before and up to the time of the Merger and continue to serve on DUKE's Board of Directors:

(a)   Defendant William Barnet, III ("Barnet") is a director of DUKE and has been since 2005. He is President and CEO of Barnet Development Corporation, a real estate development firm, and until 2011 was Chairman and CEO of Barnet Company, Inc., an investment firm.

(b)   Defendant G. Alex Bernhardt, Sr. ("Bernhardt") is a director of DUKE and has been since 1991. He is Chairman and past CEO of Bernhardt Furniture Co.

(c)   Defendant Michael G. Browning ("Browning") is a director of DUKE and has been since 1990. He is Chairman and President of Browning Investments, a real estate development company.

(d)     Defendant Daniel R. DiMicco ("DiMicco") is a director of DUKE and has been since 2007.  DiMicco is Chairman and CEO of Nucor Corporation, a major firm that manufactures steel and steel products.

(e)     Defendant John H. Forsgren ("Forsgren") is a director of DUKE and has been since 2009.  Until his retirement in 2004, Forsgren was Executive Vice President and Chief Financial Officer ("CFO") of Northeast Utilities, a large utilities and electrical power company operating in the New England states.

(f)     Defendant Ann Maynard Gray ("Gray") is a director of DUKE and has been since 1997.  Gray has served as DUKE's "Lead Director" since 2004.  Gray is retired past President, Diversified Publishing Group, a business unit of ABC, Inc.

(g)     Defendant James H. Hance, Jr. ("Hance") is a director of DUKE and has been since 2006.  He is the retired former CFO of Bank of America Corp.

(h)     Defendant E. James Reinsch ("Reinsch") is a director of DUKE and has been since 2009.  He is a past Senior Vice President and Partner of Bechtel Group and past President of Bechtel Nuclear.

(i)     Defendant Dr. James T. Rhodes ("Rhodes") is a director of DUKE and has been since 2001.  Until his retirement in 2001, he was Chairman and CEO of the Institute for Nuclear Power, and previously served as CEO of Virginia Electric and Power Company.

(j)     Defendant Dr. Philip R. Sharp ("Sharp") is a director of DUKE and has been since 2007.  He was a Congressman from Indiana for 20 years.  Sharp is

currently President of Resources for the Future, a non-profit organization that conducts research into energy, environmental issues, and resource economics.

17.   <u>Continuing DUKE Directors</u>.   Barnet, Bernhardt, Browning, DiMicco, Forsgren, Gray, Hance, Reinsch, Rhodes, and Sharp are hereinafter sometimes collectively referred to as the "Outside Director Defendants."  The Outside Director Defendants plus Rogers are collectively referred to as the "Director Defendants."

## DESCRIPTION OF SOME NON-PARTIES MENTIONED IN COMPLAINT

18.   <u>Johnson</u>.   Johnson, 58, was President of PROGRESS from 2005 until his promotion to Chairman and CEO of PROGRESS in 2007 and served in those positions until July 2, 2012.  Johnson served as CEO and a member of the Board of Directors of DUKE for a few hours on July 2, 2012.  Between 1999 and his elevation to President of PROGRESS in 2005, he served in various top management positions at PROGRESS, all with a great deal of visibility to, and interaction with, the PROGRESS Board, including General Counsel, Executive Vice President, Corporate Secretary, and president of PROGRESS's core business units.

19.   <u>Mullin</u>.   John H. Mullin III was member of the Board of PROGRESS from 1999 until July 2, 2012 and served as PROGRESS's lead director at all relevant times until completion of the Merger.  He was not one of the PROGRESS directors that served on the DUKE Board upon completion of the Merger.

20.   <u>PROGRESS Board Members Who Moved to DUKE Board</u>.   Per the Merger Agreement, DUKE nominated all eleven of its then-current directors, listed above as the Director Defendants, and all eleven continue to serve.  PROGRESS

nominated Johnson, who resigned from the Board on the night of July 2, 2012, and further nominated the following, who served on the PROGRESS Board up until the Closing:

(a)     John D. Baker II ("Baker"), who served on the PROGRESS Board since 2009.  Baker joined the DUKE Board at the Closing and resigned from the DUKE Board on July 27, 2012, in protest of the facts pled herein;

(b)     Harris E. DeLoach, Jr. ("DeLoach"), who served on the PROGRESS Board since 2006.  DeLoach joined the DUKE Board at the Closing and continues to serve on the DUKE Board;

(c)     James B. Hyler ("Hyler"), who served on the PROGRESS Board since 2008.  Hyler joined the DUKE Board at the Closing and continues to serve on the DUKE Board;

(d)     E. Marie McKee ("McKee"), who served on the PROGRESS Board since 1999.  McKee joined the DUKE Board at the Closing and continues to serve on the DUKE Board;

(e)     Carlos A. Saladrigas ("Saladrigas"), who served on the PROGRESS Board since 200.  Saladrigas joined the DUKE Board at the Closing and continues to serve on the DUKE Board; and

(f)     Theresa M. Stone ("Stone"), who served on the PROGRESS Board since 2005.  Stone joined the DUKE Board at the Closing and resigned from the DUKE Board on July 27, 2012, in protest of the facts pled herein.

21.   <u>New Directors of DUKE</u>.  Baker, DeLoach, Hyler, McKee, Saladrigas, and Stone are collectively referred to as the "PROGRESS Legacy Directors."  The six PROGRESS Legacy Directors plus Mullin had at least a combined 57 years experience working closely with Johnson as a top PROGRESS executive and a combined 32 years of serving on the PROGRESS Board while Johnson was its CEO.

## CURRENT COMPOSITION OF THE DUKE BOARD

22.   <u>DUKE Board Composition</u>.  As of the date of this Complaint, the Board of Directors of DUKE consists of 15 members, being the 11 Director Defendants and four of the six PROGRESS Legacy Directors, namely DeLoach, Hyler, McKee and Saladrigas.  All of the Director Defendants have served on the DUKE Board for more than three years, since before the negotiations leading to the Merger began.

## FACTS

### A.   Distribution of Customers by State

23.   The four million retail utilities customers that DUKE served before the Merger and continues to serve break down by state as follows:

1.9 million are in North Carolina (47.5%);

540,000 are in South Carolina (13.5%);

690,000 are in Ohio (17.25%);

790,000 are in Indiana (19.75%); and

140,000 are in Kentucky (3.5%).

The source is DUKE's website at http://www.duke-energy.com/pdfs/de-factsheet.pdf.

13

24.     Following the Merger, the DUKE combined entity served 7.1 million retail utilities customers, and the distribution of customers by state is as follows:

3.2 million are in North Carolina (45%);

715,000 are in South Carolina (10%);

690,000 are in Ohio (9.7%);

790,000 are in Indiana (11.1%);

140,000 are in Kentucky (1.97%); and

1.6 million are in Florida (22.5%).

The source is DUKE's website at http://www.duke-energy.com/pdfs/de-factsheet.pdf.

25.     It is a very bad business practice, through false statements or material intentional omissions, to deceive or mislead or antagonize the regulatory agency that has control over the economics of one's business.   Such actions can never gain protection of the Business Judgment Rule.   It is a an even worse business practice for DUKE's fiduciaries to intentionally mislead and antagonize the NCUC, and to publicly embarrass the NCUC, the agency that controls 45% of DUKE's business, amounting to several billion dollars in revenues and several hundreds of millions of dollars in net income each year, and whose actions are bound to influence the state utilities commissions that control the other 55%.   Yet, as pled herein, that is exactly what the Director Defendants did.   Furthermore, the Director Defendants misled the NCUC's counterpart agencies in other states that were asked to, and did, approve the Merger on the representation that Johnson would become the CEO of the combined entity.

14

B.     History Leading Up to Merger Agreement

26.    In late June 2010, the DUKE Board, in a two-day strategic retreat, considered a possible business combination of DUKE with PROGRESS, and the DUKE Board, comprised of all 11 Director Defendants, explicitly authorized DUKE management to explore with PROGRESS such a business combination.

27.    On July 6 or 7, 2010, Rogers phoned Johnson and proposed a meeting to explore a business combination between DUKE and PROGRESS.  The two CEOs discussed the strategic rationale for such a combination. In that first conversation, Rogers said that in the contemplated merger, Johnson would be CEO of the combined entity and Rogers would become its Executive Chairman, and Johnson reported the conversation to his Board.

28.    On July 8, 2010, the chief legal officers of the two companies began work on a confidential disclosure agreement ("CDA") so that information looking toward a possible merger might be exchanged.

29.    On July 14, 2010, the Board of PROGRESS weighed a potential combination with DUKE against a proposed combination with another utility company ("Utility A").  The PROGRESS Board decided that a combination with DUKE was preferable to one with Utility A, and authorized Johnson to explore strategic rationale for the deal with DUKE.

30.    On July 18, 2010, Rogers and Johnson held a personal meeting and discussed strategic aspects of a proposed merger.  At that meeting, Rogers told Johnson that DUKE could be receptive to the greater emphasis on the regulated

utilities business that the combination would bring to DUKE, and the two CEOs discussed regulatory matters and efficiencies related to the two companies' interconnected North Carolina and South Carolina utilities.  At that meeting, Rogers told Johnson that Rogers would be receptive to Johnson becoming CEO of the combined companies, with Rogers becoming Executive Chairman.  Following the July 18, 2010, meeting, Mullin, PROGRESS's lead director, authorized Johnson to meet with the DUKE Board to further discussions but not to negotiate deal terms.

31.    Based on the progress of the discussions between DUKE and PROGRESS, on July 19, 2010, Johnson phoned the CEO of Utility A and told him that the PROGRESS Board at that time was no longer interested in pursuing a combination with Utility A but would revisit the question in September 2010.  In mid to late September 2010, Johnson confirmed to the CEO of Utility A that PROGRESS had made a final decision not to proceed further to explore a combination with Utility A.

32.    On July 29, 2010, DUKE and PROGRESS entered into a mutual CDA with an 18 month standstill provision.

33.    On July 29 and August 2, 2010, Johnson met separately with groups of members of the DUKE board.  According to the registration statement on SEC Form S-4, Amendment 5, filed on July 7, 2011 jointly by both DUKE and PROGRESS ("the S-4"), "[F]or members of the Duke Energy Board of Directors, *these meetings provided an opportunity for the directors to get to know Mr. Johnson* . . . " [emphasis supplied], but there was no discussion of deal terms.  Thus,

the Director Defendants' process of "getting to know Mr. Johnson" began two years before the boardroom coup, the last minute nature of which caused so much damage to DUKE.  The S-4 is the document that solicited approval of the Merger of the shareholders of both companies.

34.   In early August, 2010, the two companies began exchanging financial information.

35.   The S-4, at p. 49-50, states the following:

> Members of the Progress Energy board of directors noted that they
> viewed the strategic emphasis on the regulated utility business as
> critical to the value of the potential transaction, that the corporate
> governance and organizational structure of the combined company
> created by the combination of Duke Energy and Progress Energy
> would have to support that strategy, and that they viewed having
> Mr. Johnson as the chief executive officer of the combined company as
> an important element in ensuring implementation of that strategy.

Thus, the Director Defendants plainly knew that to PROGRESS, Johnson becoming CEO was a material term of the Merger Agreement.  The presence of the above quoted passage in the S-4, dated a year before the boardroom bushwhacking, and signed by each and every one of the Director Defendants, establishes this *scienter*. It was also clear from the above quoted passage that PROGRESS regarded Johnson as adept at directing the combined entity's crucial regulatory affairs, a trait that Rogers has lately manifestly lacked.

36.   Intensive negotiations and due diligence ensued in August and September 2010.  These included, among other things, Board meetings of both entities, exploration of regulatory issues, exploration of management issues,

17

telephonic and personal meetings between Rogers and Johnson, and initial discussion of a possible exchange ratio in a stock-for-stock merger.

37.     On October 2, 2010, Rogers and Johnson met and discussed DUKE's proposed deal outline, including (a) the exchange ratio, (b) that Johnson would serve as CEO and Rogers Executive Chairman of the combined companies, (c) that the headquarters would be in Charlotte, NC, not Raleigh, NC, but (d) that there would continue to be "a significant presence in Raleigh."  The issue of "a significant presence in Raleigh" was important to one or more Commissioners of the NCUC.

38.     Throughout October and into mid-November 2010, negotiations and due diligence continued as to all financial, management, and regulatory aspects of the transaction.   On November 15, 2010, the two CEOs and the two lead directors -- Rogers, Johnson, Gray, and Mullin -- held a meeting to discuss strategy and management design of the combined company.

39.     On November 19, 2010, the DUKE Board met and discussed many aspects of the proposed deal, including the proposed management roles of Rogers and Johnson.  Following the meeting, the Director Defendants met with Johnson. On November 20, Johnson met with key members of DUKE management in Charlotte and Rogers met with key members of PROGRESS management in Raleigh.

40.     Detailed negotiations continued throughout the remainder of November and into December 2010.  On December 18, Rogers and Johnson met again to discuss a revised term sheet, including a compromise in the exchange ratio,

18

the relative roles of Rogers and Johnson, a proposal as to the composition of the Board of the combined entity, which was to include 11 DUKE designees (including Rogers) and seven PROGRESS designees (including Johnson), and other material terms.  Numerous conversations between Rogers and Johnson continued throughout December and into January 2011.

41.    Following extensive deliberations and input from numerous outside advisors, and after various news outlets got wind of and prematurely reported a possible merger agreement, the Board of DUKE by unanimous vote approved the Merger Agreement on January 8, 2011, and the Board of PROGRESS by unanimous vote approved it later that day.  The Merger Agreement was executed following the two meetings, and the two companies issued a joint press release announcing the Merger Agreement on January 10, 2011.

### C.  Certain Material Provisions of Merger Agreement

42.    Under the Merger Agreement, each share of PROGRESS was effectively converted into a right to receive 2.6125 shares of DUKE common stock before giving effect to a one-for-three reverse stock split of DUKE common stock. This heavily negotiated exchange ratio represented a premium of approximately 7.1% over the closing price of PROGRESS common stock on January 5, 2011, the last trading day before various news outlets reported on a possible deal.  The value of the consideration given to PROGRESS shareholders, measured at the market price at the time of the Merger Agreement, was approximately $13.7 billion.

43.     Under the Merger Agreement, the Merger could not be completed without the approval of the shareholders of both DUKE and PROGRESS.

44.     Under the Merger Agreement, Johnson was to become CEO of the combined entity and Rogers was to become its Executive Chairman.

45.     Under the Merger Agreement, corporate headquarters were to be in Charlotte, NC, but the corporation was to maintain a "significant presence in Raleigh, North Carolina."

46.     Under the Merger Agreement, the obligation to complete the Merger was conditioned upon receiving approval of, among others, the Federal Energy Regulatory Commission ("FERC"), the Nuclear Regulatory Commission ("NRC"), the NCUC, the South Carolina Public Service Commission ("SCPSC"), and the Kentucky Public Service Commission ("KPSC").

47.     Under the Merger Agreement, it was a condition to either party's obligation to close that none of the required regulatory approvals would, if effected, either (a) require a party to conduct its business in such a way as would have a material adverse effect ("MAE") on that party's expected benefits of the Merger, or (b) require a party to agree to an order or condition that would cause an MAE on that party's expected benefits of the Merger (either or both are referred to hereinafter as "Burdensome Regulatory Effect").

48.     Under the Merger Agreement, if the Merger failed to close by the anniversary date, January 8, 2012, either party could terminate the Merger Agreement without penalty (the "Walk Away Date"), except that if the sole reason

20

for failure to close the Merger by that date was one or more regulatory approvals that were a condition to the Merger remained pending, then either party could extend the Walk Away Date by an additional six months, to July 8, 2012, after which either party could walk away without penalty.

49.     Under certain defined circumstances in the Merger Agreement, if one party terminated the Merger Agreement, that party must pay the other a termination fee (the "Termination Fee"); if DUKE were the terminating party, the Termination Fee was to be $675 million; and if PROGRESS were the terminating party, the Termination Fee was to be $400 million.

50.     If the Board of either company failed to complete the Merger or changed its mind with (a) no events causing a material adverse effect ("MAE") on that company and (b) no material conditions unmet, then that company would be liable to pay the Termination Fee to the other.

51.     There were no MAEs between the Merger Agreement and the Closing, and before completion of the Merger neither company ever contended that there was one.

### D.  Events Following Execution of Merger Agreement

52.     Upon execution of the Merger Agreement, DUKE and PROGRESS formed an integration team to deal with the major aspects of combining the two organizations and realizing planned synergies (the "Integration Team").  Rogers and Johnson were titular co-heads of the Integration Team, but as planned CEO of the combined entity, Johnson spearheaded this effort, and Rogers took what he has

described as a "hands-off approach."  Under Johnson's leadership, the PROGRESS side of the Integration Team was headed by Paula Sims, Corporate Chief Integration and Innovation Officer of PROGRESS.

53.     On April 4, 2011, DUKE and PROGRESS filed an application with the NCUC for a business combination transaction, essentially a petition to have the NCUC approve the Merger Agreement and the Merger.  In that and subsequent filings in mid 2011, DUKE and PROGRESS represented that the Merger would result in savings of about $650 million, which would result in lower rates (or lesser rate increases) for North Carolina utilities consumers.

54.     On May 20, 2011, Rogers and Johnson filed written testimony with the NCUC.  On September 20, 2011, Rogers and Johnson testified together as a panel. On each of these three occasions, they represented or swore that Johnson would be CEO of the new combined companies and in that role would ensure implementation of the strategies agreed to in the Merger Agreement.  Specifically, they testified on September 20, 2011, that "Johnson would lead the New Duke Energy," and "would set the tone for the direction . . . that the new company is going to take."  Although the NCUC public hearings closed on September 22, 2011, the NCUC held final approval in abeyance pending FERC approval of the transaction.

55.     On August 2, 2011, the KPSC approved the Merger based on all the representations in the Merger Agreement.

56.    Based on such representations made in the S-4, the shareholders of DUKE approved the Merger at a special meeting on August 23, 2011, and the shareholders of PROGRESS approved the Merger on the same day.

57.    On September 30, 2011, FERC conditionally approved the Merger subject to DUKE and PROGRESS filing a mitigation plan that would reduce the combined market power of the combined companies in certain markets and subject further to FERC's approval of the mitigation plan.   FERC's concern related to the wholesale electric trading, thus affecting the pre-merger businesses of DUKE but not PROGRESS.   FERC's Order specified that mitigation plan could or should include the formation of a regional transmission organization ("RTO") to help co-ordinate the transmission of electricity, the sale of DUKE power plants, the transfer of rights to generated electricity, and/or construction of new transmission lines to improve access by and to competitive electricity wholesalers.

58.    On October 17, 2011, DUKE and PROGRESS filed a mitigation plan with FERC ("the First Mitigation Plan").

59.    On December 14, 2011, FERC rejected the First Mitigation Plan.  At http://professional.wsj.com/article/BT-CO-20111215-717052.html?mg=reno64-wsj, the WSJ reviewed the status of required approvals on December 15, 2012, at as follows:

> FERC said in its order that Duke and Progress failed to demonstrate that their plan to "virtually divest" power generation resources through short-term sales would prevent the combined company from controlling power supplies and driving up prices.

The Electric Power Supply Association, some North Carolina cities and the Florida Municipal Power Agency opposed Duke and Progress's market-mitigation plan, saying it would not prevent the companies from wielding undue influence over the power market.

In addition to FERC, the companies are awaiting approvals from utility regulators in North Carolina and South Carolina. They've obtained approvals from their shareholders and the Department of Justice, the Nuclear Regulatory Commission, the Federal Communications Commission and the Kentucky Public Service Commission.

60.    From that point on, in mid-December 2011, although FERC gave DUKE and PROGRESS the opportunity to file a new or amended mitigation plan, Rogers and the Outside Director Defendants soured on the Merger and tried to wriggle out of it without paying the $675 million Termination Fee.  These events followed the FERC Order of December 15, 2011, resulting in a deterioration of the relationship between Johnson and Rogers:

(a)    Right after the FERC Order of December 13, 2011, Rogers told Johnson that "we're going to put our pencils down," meaning that the Integration Team should stop, and as a result the Integration Team stopped virtually all work except the prosecution of regulatory approvals until June, 2012;

(b)    In an article in late December 2011 by a highly respected industry reporter, John Downey, the Charlotte Business Journal reported that Rogers stated that PROGRESS took a lower exchange-rate premium in exchange for Johnson being CEO.  The statement must have been made by Rogers to Downey and is false;

(c)     Rogers told Johnson in December 2011, or January 2012, that if DUKE could not get an RTO, the parties would have to renegotiate the deal. Johnson replied that PROGRESS was not going to renegotiate the deal;

(d)     Rogers told Johnson that the cost of a mitigation plan that might be acceptable to FERC was $200 million, an estimate several times what PROGRESS estimated;

(e)     At a meeting on April 2, 2012, (a meeting that did not include representatives of PROGRESS), Rogers and DUKE CFO Lynn Good told two securities analysts specializing in electric utilities, Mark Beckwith of Wellington and Jim von Riesemann of UBS, that (a) DUKE is better off without the Merger, (b) that the Merger would be difficult to close, and (c) that the FERC requirements represented a Burdensome Regulatory Effect. Thenceforth, published analyses of DUKE stock analyzed DUKE and estimated earnings as though the Merger was not going to close; and

(f)     After Rogers met alone with utilities securities analyst Greg Gordon of Investment Strategy Investment Group ("ISI"), Rogers and Johnson met with Gordon together on April 13, 2012. Two days later, Gordon published two reports, one on DUKE and the other on PROGRESS. Gordon advised his readers to sell PROGRESS, stating that the downside of not closing the Merger is great, but to buy DUKE, saying that the "merger now faces several regulatory hurdles and may not close." The reports then stated that ISI was henceforth estimating earnings on the assumption that the Merger would not close.

61.    From and after December 14, 2011, when FERC issued its Order rejecting the First Mitigation Plan, the DUKE Board soured on the Merger, and, led by Rogers, tried to get out of it based on an MAE or, more specifically, a Burdensome Regulatory Effect, without paying the Termination Fee.  Yet, they never asserted either an MAE or a Burdensome Regulatory Effect to PROGRESS. Johnson kept the heat on, wherever possible forcing active solicitation of regulatory approvals as required in the Merger Agreement.

62.    At about this time, PROGRESS retained special litigation counsel to enforce the Merger Agreement and advised the DUKE Board, through Rogers, that it had done so.  Looming in the foreground was the fast-approaching date on which either side could walk away from the Merger Agreement without penalty, July 8, 2012.

63.    On March 26, 2012, DUKE and PROGRESS filed a new mitigation plan with FERC (the "Second Mitigation Plan").

64.    Anticipating favorable action by FERC on the Second Mitigation Plan, on May 8, 2012, DUKE and PROGRESS filed a separate supplemental stipulation with the NCUC to reopen hearings on an emergency basis, reminding the NCUC of the deadline and advising the NCUC that the two companies wanted to close the Merger by July 1, 2012.  Neither then, nor at any time until July 3, 2012, did Rogers or the Director Defendants advise the NCUC or anyone else of the plan to switch CEOs.

65.     On June 8, 2012, exactly one month before the walk-away date, FERC approved the Second Mitigation Plan ("FERC June Order").  The FERC approval required certain further conditions, including the filing of a supplemental stipulation, but no further formal action of FERC was required.  The NCUC was immediately advised of this, advised of the walk-away date of July 8, 2012, and advised that the parties wished to close the Merger on July 1, 2012.

66.     Each and every one of the Director Defendants knew of the status of each of the vital regulatory approvals as soon as they occurred, and each knew what had been represented to these regulatory bodies regarding top management structure of the combined entities.  Each of these events were widely reported in the trade press, the daily press, on the Internet, and indeed in an SEC Form 8-K filed on the day of each approval, conditional approval, or rejection of each regulatory body.  Yet, as pled *infra*, in a parallel universe, the Director Defendants, without telling the NCUC or anyone else, were already planning to dump Johnson instantaneously after the Merger closed and replace him with Rogers.

67.     On Friday, June 11, 2012, the NCUC issued an order setting a fast-track schedule to hear responses to the pending June 2012 FERC Order and its conditions.

68.     On Sunday, June 13, 2012, DUKE, PROGRESS, and the NCUC Public Staff, entered into an agreement not to oppose the FERC June Order and the DUKE and PROGRESS stipulation as to how they planned to comply.  The NCUC Public Staff is the arm of NCUC that is established to advocate for and protect

consumer interests.  DUKE and PROGRESS said they could live with the FERC June Order, and the NCUC Public Staff filed testimony indicated that they were satisfied with the DUKE and PROGRESS public comments.

69.    On June 18, 2012, another advocacy group called "NC-WARN" brought a motion opposing the final NCUC approval, asking for the opportunity to cross-examine DUKE and PROGRESS and Public Staff witnesses, saying developments at the PROGRESS Crystal River 3 plant, among other things, had changed since the NCUC public hearings closed on September 22, 2011.  DUKE and PROGRESS indicated that nothing had changed in the Crystal River 3 plant or otherwise that merited a reopening of the hearing.

70.    On June 25, 2012, DUKE and PROGRESS represented to the NCUC (a) that NCUC approval was now an emergency because if the Merger did not close by July 8. 2012, under the terms of the Merger Agreement, either party could walk away, and (b) that the parties wished to close on July 1, 2012.  Based on this representation, the NCUC reopened the hearings on June 25, 2012.  As NCUC Chairman Edward S. Finley, Jr. later correctly stated at the outset of the hearing commencing the Investigation on July 10, 2012:

> The Commission reopened the hearings in the dockets on a limited basis on June 25, 2012.

> The Commission understood that the parties wished to close the business combination by July 1, 2012, and pursuant to the agreement between them that if the closing did not occur by July 8, 2012, either party was free to walk away from the transaction without financial penalty.

> In an effort to comply with the applicants' conveyed wishes, the Commission issued its Order approving the business combination, with conditions and code of conduct on June 29, 2012.
>
> At that time the Commission had not been made aware of any discussions or decisions concerning change in the representations with respect to the individual that would hold the position of president and CEO of The New Duke and issued its Order on the understanding, based on the sworn testimony it had received, that that individual would be William D. Johnson.

In fact, according to NCUC Commissioner Brown-Bland, DUKE then assured the Commission "there were no changes justifying reopening the hearings."

71.     In light of the NC-WARN position, and to go the extra mile to give due process and to protect their upcoming final order approving the Merger from possible appeals, the NCUC granted emergency hearings, and the NCUC held a limited and well-attended hearing on June 29, 2012.

72.     Leading to the June 29, 2012, hearing, the NCUC and many in its staff worked round-the-clock to accommodate the parties' plea for speed.  They issued their Final Order approving the Merger on June 29, 2012, a Friday.  The Order was approximately 150 substance-laden pages, single spaced.

73.     The Closing was set for the next work day, Monday, July 2, 2012, but the timing within that day was left open, as the two companies still needed the approval of SCPSC, which had been awaiting NCUC final action.

74.     SCPSC approved the Merger at approximately 12 Noon, EDT, on July 2, 2012, removing the final material condition to either party's obligation to complete the Merger.  The Merger was then scheduled for 4:02 p.m., EDT, that day, right after the close of the financial markets.

### E.  Events In the Parallel Universe

75.    Johnson met with the DUKE Board only twice, in December 2010 before the Merger Agreement was signed and in June 2011.  Except for non-business occasions, for example a phone call Johnson placed to a DUKE Director to offer condolences when his mother died, and one dinner that Gray may have had with Johnson late in 2011, not one of the Outside Director Defendants had any meeting with Johnson.  Thus, in the 12+ months before the CEO switch, none of the Director Defendants except Rogers had an opportunity to assess Johnson's management style or to question him about any of the pretexts they later used to remove him as CEO.

76.    Moreover, before the Closing, not one of the Outside Director Defendants ever expressed concern to Mullin, or to Johnson, or to any of the PROGRESS Legacy Directors, or to any PROGRESS Director serving to the time of the Merger, about Johnson's management style or about any of the pretexts they later used to remove Johnson as CEO.  In particular, after June 2011, not one of the Outside Director Defendants ever expressed concern to Johnson, or to any of the PROGRESS Legacy Directors, or to any PROGRESS Director serving to the time of the Merger, about the Crystal River 3 plant, or about processing insurance claims based on the Crystal River 3 plant, or about the condition of the PROGRESS Nuclear Fleet, or about Johnson's alleged autocratic style, or about PROGRESS's financial results, or about blending the cultures of the two companies and whether Johnson was the right person to do so.

30

77.     Several weeks before the Merger, and not later than mid May 2012, the Director Defendants planned the firing of Johnson as CEO upon completion of the Merger.  They agreed to do so without even seeking the input of their soon-to-be fellow directors at PROGRESS who knew most about Johnson's effectiveness.

78.     The Director Defendants knew that they had represented to the SEC, to the NCUC, to the SCPSC, to several other regulatory bodies, as well as to their own shareholders, that upon completion of the Merger, Johnson would become CEO and Rogers Executive Chairman of the combined entity.

79.     The Director Defendants knew that by omitting to advise the SEC, NCUC, SCPSC, and numerous other regulatory bodies, as well as their own shareholders, that they had changed their minds about top management appointments, they were materially misleading these bodies.

80.     The Director Defendants knew that the identity of the CEO to lead the combined entity was a material term of the Merger Agreement, and not only because the Merger Agreement says that is so and says why that is so.  Gray's written testimony filed with the NCUC on July 17, 2012, concedes this, stating "I will note that the selection of a CEO is one of the most important responsibilities entrusted to any board . . . ".

81.     On May 3, 2012, the Board of DUKE, i.e., the Director Defendants, went into executive session to discuss the possibility of not having Johnson serve as CEO of the combined entity; between May 3, 2012 and May 17, 2012, Gray discussed this with each Director Defendant.    With the full knowledge,

participation, and acquiescence of every Director Defendant, between May 3, 2012 and May 21, 2012, Gray engaged outside counsel, engaged a communications firm, and chaired a Board Governance Committee meeting, all to choreograph the CEO switch.  (The Governance Committee consists of Gray, Browning, and DiMicco.)  On May 30, 2012, the Outside Director Defendants, in executive session, further planned the CEO switch, discussing and dismissing the options of discussing the matter with the PROGRESS Board and delaying the firing of Johnson.  Gray testified on June 20 that "in the middle of May [2012] and then again in the middle of June," Gray had individual phone discussions with each of the nine other Outside Director Defendants about replacing Johnson.

82.  Rogers knew of this plan and co-conspired with the other Director Defendants; indeed, Gray testified that as early as May 3, 2012, she told Rogers that the Board had "concerns of this nature."

83.  From May 2012 on, the Director Defendants contemplated or planned firing Johnson as CEO upon completion of the Merger and replacing him with Rogers.  They agreed among themselves to do so without even seeking the input of their soon-to-be fellow directors at PROGRESS who knew most about Johnson's effectiveness.

84.  Rogers has testified before the NCUC that on June 23, 2012, and again on June 24, 2012, Director Defendants Gray (on June 23) and Browning (with Gray on June 24) advised Rogers that the DUKE Board had concluded that Johnson was not the best person to lead the combined company.  Gray and Browning asked

32

Rogers if he would accept the position of CEO if they acted on that "preliminary view." Rogers replied that he would be willing to do so.

85.     Each and every one of the Director Defendants knew by June 25, 2012, of the planned CEO switch, and each and every one of the Director Defendants knew that neither the NCUC, nor any other regulatory agency, had been made aware of it. *A fortiori,* each and every one of the Director Defendants knew by June 29, 2012, of the planned CEO switch, and each and every one of the Director Defendants knew that neither the NCUC, nor any other regulatory agency, had been made aware of it.  This represents intentional wrongdoing and deceit which has brought DUKE into disrepute.  Furthermore, it is a violation of law.

86.     It is a violation of the laws of North Carolina to "give false information" to the NCUC or to "willfully withhold clearly specified and reasonably obtainable information" from the NCUC.  N.C.G.S.A. § 62-326.  It is a breach of the duty of loyalty for a fiduciary to lead his corporation into illegal acts, even if the fiduciary thinks he or she is doing so for the benefit of the corporation.

87.     The Director Defendants also concealed their intentions from the investing public.  As late as June 29, 2012, they caused DUKE to release a press statement and file a Form 8-K with the SEC, trumpeting the approval of the NCUC, but the 8-K omitted to disclose the planned CEO switch, clearly a material fact.  Numerous other SEC filings concerning the Merger were made after the Director Defendants planned the boardroom coup, but it was not disclosed to the public until

after the fact.  These omissions violate SEC regulations.  Plaintiffs certainly do not allege securities fraud, but good faith practices would have required disclosure.

88.    The Outside Director Defendants never sought the view of any of the PROGRESS Legacy Directors about the effect the planned removal of Johnson immediately after the Merger would have on the various regulatory bodies that control DUKE's destiny.  Indeed, Rogers testified that the question of what the reaction of the regulatory agencies might be came up in discussion among the DUKE Board members; thus, the Director Defendants knew that what they were concealing was material.

89.    The objective facts pled herein compel the following inferences, and Plaintiffs so plead:

(a)    At least from the time FERC rejected the First Mitigation Plan, Rogers simply wanted to get out of having to complete the Merger and convinced the Outside Director Defendants that they should too;

(b)    The Director Defendants explored three avenues: (i) an MAE; (ii) a Burdensome Regulatory Effect; and (iii) running out the clock and getting past the July 8, 2012 walk-away date; and

(c)    The Director Defendants could not find an MAE that passed the Hee Haw Test; once FERC accepted the Second Mitigation Plan, they had no further colorable argument that there was a Burdensome Regulatory Effect; and with Johnson pressing to close the Merger, there was no longer any chance of running

out the clock.   Unwilling to pay the $675 million Termination Fee, they had no choice but to close the deal.

90.      As Johnson aptly summarized in his testimony at the NCUC on July 19, 2009, "they wanted the merger, then they didn't want it,  then they couldn't get out of it, then they didn't want to be stuck with me as the person who dragged them into it."

**F.  The Night of the Closing**

91.      At 4:02 p.m., EDT, the Closing took place and the Merger was completed.   The new DUKE Board, with membership as pled above, was constituted.

92.      Between 4:02 and 4:30 p.m., there were congratulations and back-slapping.   Rogers congratulated Johnson on becoming CEO.   Rogers and Johnson were together in Charlotte at the DUKE headquarters, but the other directors of the newly constituted DUKE Board were not present.

93.      Just before 4:20 p.m., Rogers told Johnson that that they need to call into the telephonic Board Meeting, Rogers saying that Johnson cannot be late for his election as CEO.

94.      At 4:30 p.m., EDT, the first Board meeting of the newly constituted DUKE Board was convened.

95.      Between 4:30 p.m. and 4:50 p.m., the Board met telephonically. Seventeen (all but Baker) were present; Baker was in Africa and could not obtain a

telephone hookup.  It was a phone call, not a video teleconference, so that the Board members could not see one another.  The following took place:

(a)   Rogers and Johnson were together in the DUKE Board Meeting Room in Charlotte, and no other directors were there but were scattered around the country on the phone.  For example, McKee was in Corning, New York.  Although Gray was in Charlotte, she did not come to headquarters but instead phoned in from across the street at a lawyer's office;

(b)   The Board handled various housekeeping matters and passed appropriate resolutions, including the election of Johnson, who had just become a DUKE Board member, as CEO, and Rogers as Executive Chairman; and

(c)   At 4:50 p.m., EDT, Gray stated that, in accordance with usual practice, the Board would now go into executive session and that Rogers and Johnson should leave the call.  They hung up, whereupon Rogers left, and Johnson was in the process of leaving to go back to his pre-merger home in Raleigh when he received an email from Gray.

96.   At 4:53 p.m., EDT, Johnson was entering an elevator in the DUKE headquarters building when he saw that he had just received an email from Gray. The email asked him to wait for Gray, that she wanted to speak with him before he left.  Johnson jumped off the elevator before the doors closed, complied, and waited, not suspecting what was afoot.

97.   At approximately 4:50 p.m., Gray convened and chaired the executive session and, reading from a prepared script, immediately introduced a motion to

36

remove Johnson as CEO and to install Rogers in that role. Browning seconded. Gray asked for discussion. Although it was DUKE's invariable practice to provide written material on any important Board decision, there was no notice, no information packets, no emails, and no board books distributed in advance of the meeting to advise the Board members of the proposed CEO switch. And there was no written information on this subject distributed at the meeting, either in person, or by email, or by fax, or otherwise; Gray and the other Outside Director Defendants could have offered to do so, for example by email, but did not do so. Gray testified that although she has been on many boards for many years, she could not recall any situation where she was ever asked to vote on any important matter without such information.

98. Except for Browning seconding Gray's motion, not one of the Outside Director Defendants said one word until the vote, when each said "yes."

99. Each of the five PROGRESS Legacy Directors attending, surprised and stunned, tried to persuade Gray and the other Outside Director Defendants not to take this action. The reasons they pressed on their fellow directors are correctly summarized in Stone's letter of resignation, presented *infra*. When asked for her reasons, Gray simply kept repeating that Johnson was not a good fit to lead the combined company, citing his "style." On this Board Meeting phone call, Gray never once mentioned the pretexts that she and Rogers later gave to the NCUC, such as alleged problems with the Crystal River 3 nuclear plant (specifically, that Johnson's actions foreclosed the option of retiring rather than repairing the plant),

37

failure to communicate to DUKE regarding insurance claims respecting Crystal River 3, the alleged condition of the PROGRESS nuclear fleet, or disappointments in PROGRESS's financial results.  Gray estimated in her testimony that this went on for an hour and a half, and McKee estimated in hers that it was one hour.

100.   McKee testified on July 19, 2012, that she "didn't know whether to cry or throw up."  Even Gray testified that each of the PROGRESS Legacy Directors was "shocked."

101.   Finally, one of the PROGRESS Legacy Directors said, in effect, "it is obvious that you have the votes, so let's vote and get this over with."  The vote was ten to five in favor of Gray's motion, with each of the Outside Director Defendants voting "yes" and each of the five PROGRESS Legacy Directors in attendance voting "no."  Thereupon, the executive session adjourned.

102.   Within the next hour, Gray went to DUKE headquarters with a lawyer and advised Johnson of the decision and asked for his resignation, promising to give him what he was entitled to under his severance package.  Johnson, shocked, told her that she would have his decision by 7:00 a.m. the next morning.  Then, after flying back to his pre-merger home in Raleigh, Johnson resigned as CEO and as a director of DUKE, effective at 12:01 a.m. on July 3, 2012, and at 7:00 a.m., DUKE announced to the world in a press release and Form 8-K that they had completed the Merger, that Johnson was out, and that Rogers was reinstalled as CEO; this was the first any regulatory agency or the public was advised of the switch in CEOs.

103.    The NCUC was still not told and did not learn of this decision before Rogers ineptly attempted to phone NCUC Chairman Finley after the executive session that evening.  Rogers even botched the process of very belatedly "informing" the NCUC, mistakenly leaving a voice message on the wrong cell phone.  As the NCUC has made clear in the hearings to date, it expects its regulated companies to follow a long-standing practice of giving the NCUC a heads-up when a significant event is about to take place within the NCUC's purview.  The Director Defendants knew this, but from May 2012 on knowingly failed to live up to this reasonable expectation.

### G. The Pretexts

104.    Despite that Gray gave only one reason at the Board meeting in support of her motion, that Johnson was not a "good fit" to run the combined entity because of his "style," she and Rogers later gave additional reasons.  These additional reasons are pretexts and made up now as self-justification for their wrongdoing.  They are as follows:

105.    <u>Crystal River 3</u>.  This PROGRESS nuclear facility in Florida has been closed since 2009, and the facts surrounding it were public and well known in this, the most transparent industry in the nation.  Rogers testified that between the Merger Agreement and the Merger, Johnson was spending PROGRESS money to repair it, and Rogers's complaint was that this compromised Duke's "repair versus retire" decision.  This is obviously a pretext for the following reasons:

(a)     There was a "delamination" in 2009, industry-speak for a breach in the containment of a nuclear reactor, long before the Merger Agreement, and the plant has not been in production since 2009;

(b)     Gray testified that a problem was that Crystal River 3 was behind schedule in getting back to production, a story at odds with Rogers's "repair versus retire" concern;

(c)     After the DUKE Board expressed to Johnson in 2011 that it was concerned with co-opting the "repair versus retire" decision, Johnson prepared a plan to repair the facility (the PROGRESS Board's preferred course), stopped committing PROGRESS money to repair it, but did not implement the plan so that the "repair versus retire" option might be preserved until the Merger;

(d)     Gray further testified that her problem was that Johnson was a few weeks dilatory in reporting back to the DUKE Board regarding an insurance claim arising from Crystal City 3, but neither she nor the other Outside Director Defendants ever made a request to Johnson or to the PROGRESS Board in this respect, but left the matter to Rogers;

(e)     Gray admitted that she was getting all her information in this respect from Rogers, and thus she intentionally disregarded her duty of care;

(f)     Gray did not give this as a reason when she presented the reasons for her motion to fire Johnson at the executive session, and neither did the silent Director Defendants, and they cannot be heard to do so now; and

(g)     Perhaps most important of all, these are matters of policy, boards set policy, and the Director Defendants could have caused the DUKE Board to instruct Johnson that there was a new policy respecting Crystal River 3.

106.   <u>Condition of the PROGRESS Nuclear Fleet</u>.  Both Rogers and Gray indicated that the condition of the PROGRESS "Nuclear Fleet" was a reason for Johnson's termination.  For the reasons that follow, this is plainly a pretext:

(a)     As Johnson testified, apart from Crystal River 3, the PROGRESS production of nuclear energy in its "nuclear fleet" in 2011 set a record for output;

(b)     As Johnson testified, the Institute for Nuclear Power Operations ("INPO") is an industry organization that evaluates nuclear plants and rates them based on an index of ten indicators such as radiation exposure, forced loss-rate, and others.  From 2011 to the end of June 2012, INPO scores for the PROGRESS "nuclear fleet" increased by nine percentage points, a highly significant improvement;

(c)     DUKE had its own pre-merger counterparts to Crystal River 3, including its Catawba nuclear plant in South Carolina.  After a pre-merger programming error at DUKE, on April 4, 2012, backup generators lost power coming into the plant, power that is needed to operate the cooling systems that enable generators to operate safely.  NRC began an investigation pre-merger.  On July 26, 2012, NRC issued a "yellow" finding, meaning that the problem has substantial safety significance, and that an additional 200 hours of inspections will be required to ensue resolution of the safety problem; and

(d)    Gray did not give this as a reason when she presented the reasons for her motion to fire Johnson at the executive session, and neither did the silent Director Defendants, and they cannot be heard to do so now.

107.    <u>PROGRESS Financial Results</u>.  Although Gray and Rogers gave this as a contributing reason for dismissing Johnson as and when they did, this too is made up after the fact, a mere pretext.  In all of 2011, PROGRESS fell short by only $6 million of the net income it had estimated in projections it had given DUKE; this is plainly not material.  Furthermore, Gray did not give this as a reason when she presented the reasons for her motion to fire Johnson at the executive session, and neither did the silent Director Defendants, and they cannot be heard to do so now.

108.    <u>Johnson's Style</u>.  The principal pretext for the boardroom coup was that Johnson's style was too "autocratic," that he was "not a good fit," and that he was therefore not the right man to combine the two cultures.  Every PROGRESS representative who has spoken out since, including at least Mullin, McKee, Hyler, Johnson, and three others who served as directors of PROGRESS until the Merger and did not join the DUKE Board, namely Mullin, James Bostic, Jr. and Alfred C. Tollison, Jr., emphatically disputed this.  All seven stated, either in testimony or to the press, that likeability, openness, candor were at the core of Johnson's strength.  Like Mullin, Tollison said he would never have voted for the merger if he knew that Rogers rather than Johnson would lead it.  Of additional significance are the following:

(a)     None of the Director Defendants except Rogers, who obviously had some skin in the game, had any opportunity to observe Johnson's style;

(b)     Even Gray testified to the NCUC that she should not have used the word "autocratic," and

(c)     None of the Director Defendants raised the issue before the Merger with any of the members of the PROGRESS Board, who were in the best position to assay Johnson's style.

109.     As to all four of these pretexts, none of the Outside Director Defendants requested a meeting with Johnson or any other PROGRESS Legacy Director to seek corrective action.  Raising these issues now is itself bad faith and constitutes intentional wrongdoing.

### H.  The Reaction

110.     What did they expect?   Rogers and the other Director Defendants publicly embarrassed the NCUC.   Of course, the reaction to the Defendant Directors' actions was foreseeable and extremely damaging to DUKE.  The NCUC came under fierce public criticism for being so easily fooled.  The expected unfolded.

111.     Three of the five top PROGRESS executives that DUKE had hoped to retain resigned immediately as a result of the DUKE Board's actions; they are Executive Vice President John McArthur, Chief Integration and Innovation Officer Paula Sims, and Chief Administration Officer Mark Mulhern.  Their severance rights are in negotiation, and will one way or another cost DUKE substantial

money.  Moreover, Ms. Sims was to have played a central role in the integration of the two companies, a value now lost to DUKE.

112.   Mullin, who up until the moment of the Merger was lead director of PROGRESS, wrote a letter dated July 5, 2012, to the WSJ, reported in both the WSJ and the New York Times, and subsequently widely quoted in many major financial news sources, aptly stating the following:

> In negotiations with Duke leading to the merger our Board voted to accept a "semi merger of equals" transaction with the explicit agreement that the Progress CEO, Bill Johnson, would become the CEO of the combined company upon consummation of the merger. This was a critical element in the merger deliberations of our Board because we had confidence that Bill would successfully lead the combined companies to achieve the potential synergistic benefits of the combination. *I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as CEO of the combined company.*

> After a long gestation period, the merger finally closed on July 2nd.  As stipulated in the Merger Agreement, Bill Johnson became President and CEO of the newly combined companies -- for approximately 20 minutes!

> Following a short organizational meeting, the newly constituted board, which contains a majority of "Old Duke" directors, went into executive session and voted to request the resignation of Bill Johnson and the retention of Jim Rogers as the CEO of the newly combined company. In my opinion, this can only be described as an incredible act of bad faith with regard to the undertakings of the Merger Agreement.  *I think it was a clearly premeditated contravention of one of the most central tenets of our Agreement.*

> *In my opinion, this is the most blatant example of corporate deceit that I have witness during a long career* on Wall Street and as a director of ten publicly traded companies . . .

> As a non-continuing director of the combined company I now, along with similarly situated former directors of Progress, find myself

without a constituency and without an ability to mount a challenge to what I believe is one of the greatest corporate hijackings in US business history.

Consequently, this letter is being written in the hopes that what I believe to be a deceitful and pre-meditated contravention of good faith negotiations will not go un-noticed [sic] in the "court of public opinion."

[Emphasis added.]  Unfortunately for DUKE, it did not "go un-noticed."

113.   On July 3, 2012, S&P placed DUKE's debt on "watch for a possible downgrade" because of the "abrupt change in executive leadership."  S&P stated that it was placing DUKE's "A-" rating on "CreditWatch Negative."  DUKE had hoped that pre-existing PROGRESS debt that DUKE assumed in the Merger would be upgraded by the rating agencies, but S&P negatively changed its outlook on a possible upgrade of the debt of PROGRESS and its subsidiaries from "positive" to "developing," again based on the "sudden shift in management."  Such negative action and statements by either of the two large rating agencies results in higher cost of borrowing, and this was a plainly foreseeable result of the boardroom coup.

114.   By its Order of July 6, 2012, the NCUC began a formal, public and highly publicized investigation.  As of the date of this Complaint, Rogers, Johnson, McKee, Hyler, Gray, and Browning have testified.  At least Rogers and Gray have filed public testimony.  The NCUC has declared that its investigation is ongoing.  The Attorney General of North Carolina, Roy Cooper, has intervened in the NCUC investigation and has begun his own investigation.

115.   Chairman Finley stated the following on the record during Rogers' testimony on July 10, 2012:

> Nevertheless, during this time period, this Commission was holding hearings, deliberating, working on issuing an Order on the time lines that you are requesting us to do to try to get an Order out on June 29, 2012.  And we are clearly operating on an assumption based on sworn testimony that you and others gave that Mr. Johnson would be president and CEO.  And it appears that there was serious consideration going on within Duke that that might not be the case; is that right?

116.    Chairman Finley's comment quoted in the foregoing paragraph is too charitable.  It is obvious that the Director Defendants had come to this conclusion well before June 29, 2012, almost two months before, and simply decided not to tell the NCUC (or others).   Indeed, Rogers testified that the question of what the reaction of the regulatory agencies might be came up in discussion among the DUKE Board members.

117.    The crux of the matter is NCUC Commissioner Beatty's rhetorical question, asked of Rogers on July 10, 2012, as follows:

> But if Duke makes a representation to this Commission and you know you are not going to fulfill that beyond the closing, that as soon as the closing occurs, he's out, don't you see how that might affect the credibility at least of the company with this Commission?

118.    On July 25, 2012, an action was filed in federal court alleging violation of the federal securities laws.

119.    On about July 25, 2012, the Florida Public Service Commission announced that it has begun an investigation of the facts pled herein.

120.    On July 25, 2012, S&P dropped the other shoe, officially lowering DUKE's credit rating from A- to BBB+ with a negative outlook, based on heightened regulatory risk in North Carolina and Florida.

46

121.   On July 27, 2012, Baker and Stone resigned as members of the Board of Directors of DUKE in protest over the actions of the Board following the Merger on July 2, 2012.  Both letters were published by DUKE in a Form 8-K filed that day. Both letters called for the Board to replace Rogers.  Baker's letter stated, in part:

> As a result of these corporate governance issues, Duke is now under tremendous scrutiny by the media, markets and regulators.  I believe that Duke needs to take immediate action to rectify these issues by thoroughly assessing its corporate governance practices and addressing any deficiencies.  I also believe the Board should take a leadership role in the development and execution of the Company's strategy in dealing with the myriad problems caused by the actions taken at the July 2, 2012 meeting and after.  Finally, I believe that the Board should immediately identify and adopt a process for selecting a new CEO, and institute that process as soon as possible.  Only after taking these immediate steps will the Board be able to work together for the best interests of Duke's shareholders.

122.   Stone's letter aptly summarizes this matter, and it is stated here in its entirety:

> Dear Mr. Rogers and Ms. Gray:
>
> **My resignation from the Board of Directors**
>
> I am deeply disappointed in the corporate governance practices of Duke Energy Corporation (the "Company") as evidenced by the meeting of the Company's Board of Directors on Monday, July 2, 2012 (the "Meeting"), and the ensuing events.  I do not believe that I can contribute effectively as a Director in this environment.  Therefore, I believe it is in the best interests of shareholders that I resign from my position on the Board of Directors of the Company and as a member of each of the committees of the Board of Directors of which I am a member, in each case effective immediately, in accordance with Section 3.05 of the Company's By-Laws.  In light of the extensive publicity and public hearings surrounding the events related to the Meeting, I feel a responsibility to outline briefly my principal concerns regarding the Company's corporate governance practices in the hope that the Company will make needed changes for the benefit of its shareholders.

**Conduct of the July 2 Meeting.**

On the afternoon of the July 2 closing of the merger between Duke Energy and Progress Energy, the Board of Directors of the newly merged Duke Energy met via telephone to cover a pre published agenda of ministerial and organizational matters. These matters were addressed based on written materials provided in advance and they included the election, pursuant to the merger agreement, of Bill Johnson as CEO and of Jim Rogers as Executive Chairman of the combined company. At the conclusion of this full Board session, which took about 20 minutes, the Company's Lead Independent Director called for an executive session of the Board. She opened the executive session by stating that she would introduce a motion to remove Bill Johnson as CEO and appoint Jim Rogers as CEO.

No notice had been given to the six Progress independent directors who had joined the combined company Board that a change in the CEO position would be an agenda item at that Meeting; and no written materials had been, or were, provided at the Meeting to support removing Bill; nor were any materials provided to support the election of Jim. In response to numerous comments and questions by the Legacy Progress Directors on the reasons for Bill Johnson's removal, the sole reason, given repeatedly by Ms. Gray was Bill's leadership style.

During this executive session, the Legacy Progress Directors commented forcefully and positively on their experience with Bill's effectiveness at Progress as well as his leadership roles in key utility industry organizations and on their confidence in his strong qualifications for the CEO position in the combined company. The Legacy Progress Directors also expressed strong concerns that the precipitous CEO switch would create significant negative fallout among shareholders, regulators, rating agencies, employees and the recently elected impressive combined senior management team which had been chosen by mutual agreement of Progress and Duke. Concern was also expressed about the likely negative perception that would be created of Duke's corporate governance processes. Although the executive session lasted for well over an hour, no Legacy Duke Director other than Ms. Gray spoke about the Legacy Duke Directors' rationale for their actions nor did any Legacy Duke Director engage in any discussion of the points raised by the Legacy Progress Directors. Although Ms. Gray did speak, she did not engage in a dialogue on the comments, and eventually called for a vote.

48

It would be difficult not to conclude that the Legacy Duke Directors had come to the Meeting having made a decision to remove Bill and that Ms. Gray was going through the technical requirement to execute the decision to remove Bill by bringing the matter to a vote knowing that the Legacy Duke Directors would carry the vote through their majority position.

### Stated rationale for the removal of Mr. Johnson as CEO.

The Legacy Duke Directors, with Ms. Gray as their spokesperson, gave no reasons other than perceived leadership style. Subsequent to the announcement of Bill's removal, additional concerns about Bill have been expressed by Legacy Duke Board members. However, none of those concerns was raised for discussion with the Legacy Progress Board Directors either in the eighteen months between the signing of the merger agreement and its closing or in the Meeting of July 2 where he was removed.

### Stated rational for the appointment of Mr. Rogers as CEO.

From the outset of the merger negotiations, it was understood between Progress and Duke that Mr. Rogers should not be the CEO of the combined company. It was surprising, therefore, that there was no discussion at the Meeting of why Mr. Rogers was now a good fit as CEO of the combined company or whether alternatives to appointing him as CEO had been discussed once the Legacy Duke Directors concluded that they were not going to move forward after the closing with Mr. Johnson as CEO.

### Possible next steps for consideration to restore trust and confidence.

In light of the negative reaction among important constituencies to the corporate governance issues raised by the events described, I believe that the Company faces, major hurdles in restoring trust and confidence. I believe the Company needs to review its corporate governance and to take steps to address any deficiencies. I believe that an in depth review of complex and sensitive operational areas of both Legacy Progress and Legacy Duke should be completed and discussed promptly by the combined Board to arrive at a shared Board understanding of these issues. I would urge that the Board assume an active role in guiding the Company's approach to restoring the trust of regulators, rating agencies, investors, customers and employees. One step that would, in my view, go a long way to addressing the firestorm of concerns which have resulted from the actions of July 2 would be the

immediate announcement of a well designed, formal CEO search process.

Sincerely yours,
/s/Theresa M. Stone

123.    For the same reasons as given by Ms. Stone, other PROGRESS Legacy Directors are still considering whether or not to remain on the DUKE Board.

124.    Knowing public deceit of an agency of government is a breach of the duty of loyalty.  How much worse is it if the agency deceived through a material and intentional omission is one that has life and death power over the economics of the corporation.   Each and every one of the Director Defendants knew that this was the result of his action and inaction.

125.    In North Carolina, DUKE has sought a one percentage point increase in the rates it charges, from a 10.5% return on equity from operations that it performs in the state to an 11.5% return.  An article in Reuters dated July 11, 2012, reported that DUKE "could face a cold reception" when it seeks new power rates in North Carolina later this year.  Many articles in the media have made the same prediction.  According to Robert Gruber, Executive Director of NCUC's public staff, the NCUC could impose a penalty short of undoing the Merger.  According to a Reuters article, Gruber stated that "a percentage point or two [in rates in North Carolina] could easily top $100 million for Duke's earnings."

126.    It is likely that the Director Defendants' bad faith actions and omissions as pled herein will thwart, or at least delay, planned petitions for rate increases in North Carolina and other states in which the combined entity operates.

127.   The   Director   Defendants'   conspiracy   and   tactics   have   had   a devastating effect on DUKE's credibility.  As NCUC Commissioner Susan Rabon asked Rogers on July 10, 2012, "Have we as the Commission been misled, or as others have said, duped in this process to get approval of this merger?".  Further, Commissioner Rabon stated to Rogers, "I hope you can understand that I may not find your commitment as reassuring as I would have several weeks ago."

128.   The   National   Legal   and   Policy   Center   ("NLPC"),   a   non-profit organization that promotes corporate ethics, referred to Rogers representations that he had no knowledge of the planned CEO switch before May 2012, and stated, "If you  believe  that,  then  Rogers  has  a  $3.3  billion,  scandal-ridden,  carbon  dioxide-capturing  power  plant  in  Edwardsport,  Indiana  [a  DUKE  power  facility]  that  I'm sure he'd love to sell you."

129.   Based on the objective facts pled herein, there is a compelling basis to believe, as Mullin stated, that the CEO switch was premeditated, deceitful, in bad faith, and in contravention of the Merger Agreement.

## I.   Director Defendants' Bad Faith

130.   By the actions pled herein, the Director Defendants manifested their bad faith and consequent breach of the duty of loyalty in the following ways:

(a)   Conspired to breach the Merger Agreement and to conceal the breach until after the Closing;

(b)   Conspired to vote to oust Johnson without hearing any input from the PROGRESS Legacy Directors, as well as the PROGRESS Directors who did not join

the DUKE Board in the Merger, who had the best opportunity to observe Johnson's effectiveness;

    (c)    Acted illegally under North Carolina law;

    (d)    Failed to advise the SEC and the investing public of facts material in light of other disclosure regarding the Merger;

    (e)    Recklessly placed DUKE at risk by publicly embarrassing the regulatory agencies with control over DUKE's economic future;

    (f)    Concealed from their soon-to-be fellow directors, the PROGRESS-DUKE Directors, their conspiratorial intentions;

    (g)    Placed DUKE in ill repute, subjected it to widespread ridicule, and befouled its good name; and

    (h)    Injured DUKE's standing and ratings with the credit rating agencies.

**J.    Damages**

131.    Damages to DUKE as a result of the Director Defendants' breach of fiduciary duty include, *inter alia*, the following:

    (a)    Loss of prospective revenue through denial or delay of rate increases;

    (b)    Increase in the cost of money based on the comments, actions, possible future downgrades of, and failure to obtain upgrades from, the rating agencies;

    (c)    The cost of Johnson's severance package;

    (d)    Cost of possible severance packages of McArthur, Sims, and Mulhern;

    (e)    The cost of Rogers's severance package if the DUKE Board fires him without cause;

(f)     Cost of defense of the Investigation, the investigation of the North Carolina Attorney General, and possible other investigations, regulatory actions, and litigations in North Carolina and other jurisdictions; and

(g)     Legal and settlement costs of possible future related litigation.

## COUNT ONE

## BREACH OF FIDUCIARY DUTY IN ACTIONS PRECEDING THE MERGER

132.    Plaintiff alleges all of the foregoing allegations as if fully set forth herein.

133.    Each Director Defendant failed to act in good faith and breached his or her fiduciary duties of loyalty and care by each of the following acts or omissions before completion of the Merger:

(a)     conspiring to breach the Merger Agreement and to conceal it until the Merger was complete;

(b)     knowingly permitting DUKE to conceal the planned switch in top management positions from the NCUC and from other governmental and regulatory bodies;

(c)     knowingly violating the laws of North Carolina and other laws;

(d)     concealing the planned switch in top management from soon-to-be fellow directors;

(e)     failing, through fear, sloth, cronyism, misplaced collegiality, or other insupportable motives, to resolve at an earlier date, any issues or misgivings that they had with Johnson's prospective leadership; and

53

(f)      conspiring to vote to oust Johnson without even listening to what the PROGRESS Legacy Directors had to say.

134.    Director Defendants' actions and inactions preceding the Merger manifested a conscious and knowing disregard of their fiduciary duties of loyalty and care.

## COUNT TWO

## BREACH OF FIDUCIARY DUTY IN ACTIONS FOLLOWING THE MERGER

135.    Plaintiff alleges all of the foregoing allegations as if fully set forth herein.

136.    Each Director Defendant failed to act in good faith and breached his or her fiduciary duties of loyalty and care by each of the following acts or omissions immediately after completion of the Merger:

(a)      knowingly disregarding their fiduciary duties by shutting off any input from their new colleagues and fellow directors regarding Johnson;

(b)      knowingly breaching the Merger Agreement in furtherance of the conspiracy pled in COUNT ONE;

(c)      knowingly violating its representations to DUKE's shareholders, including but not limited to the recent shareholders of PROGRESS;

(d)      knowingly violating its representations to the NCUC and its counterpart utilities agencies in other states;

(e)     knowingly and recklessly jeopardizing DUKE's standing and reputation with the NCUC and its counterpart utilities agencies in other states, causing probable future delays or denials of rate increases;

(f)     knowingly and recklessly provoking negative actions of the credit rating agencies;

(g)     knowingly incurring liability for severance pay; and

(h)     recklessly incurring public opprobrium, injuring the public reputation of DUKE, and subjecting it to public ridicule.

137.    As a proximate result of the these breaches of fiduciary duty, pled in COUNT ONE and COUNT TWO, DUKE has incurred and will continue to incur enormous damages, including those pled in Subsection I. of the FACT section of this Complaint.

## DEMAND EXCUSAL

138.    Plaintiffs did not make a pre-suit demand on the DUKE Board of Directors to bring this suit because such a demand would have been futile.  Demand under Court of Chancery Rule 23.1 is excused, for the reasons that follow.

139.    Eleven of the seventeen directors now serving on the DUKE Board of Directors are defendants herein.   Each of the Director Defendants faces a substantial likelihood of liability. This Complaint pleads particularized facts supporting a reasonable inference that a majority of the Board of DUKE serving on this day is subject to a nonexculpated claim for breach of fiduciary duty.

140.    Plaintiff alleges that COUNT ONE as well as COUNT TWO involves Board action, and demand excusal is governed by <u>Aronson v. Lewis</u>, 473 A.2d 805 (Del. 1984).   Under the "second prong" of the rule in <u>Aronson</u>, demand is excused if the challenged Board action is "so egregious on its face that Board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."   <u>Aronson</u>, 473 A.2d at 815.   Based on the allegations of this Complaint, taken as true, the eleven Director Defendants face a substantial likelihood of liability.

141.    Moreover, the eleven Director Defendants are not disinterested in this litigation under the "first prong" of <u>Aronson</u> because the allegations in the Complaint "raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board." <u>Aronson</u>, 473 A.2d at 814-815.

142.    Here, among several other manifestations of actions not in good faith and consequent breach of the fiduciary duty of loyalty, this Complaint makes particularized allegations that the Director Defendants caused DUKE to act or fail to act in such a way as to violate the law.   "Under Delaware Law, a fiduciary may not manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." <u>Metro Comm. BVI v. Advanced Mobilecomm</u>., 854 A.2d 121,131 (Del .Ch. 2004).   Intentionally withholding material information from the NCUC that prior material representations were no longer true, while pressing it to issue final approval of the Merger, can never gain the

protection of the Business Judgment Rule.  The allegations herein easily clear this hurdle, as "plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment." <u>Aronson</u>, 473 A.2d at 815.

143.   Alternatively, if Plaintiff is wrong in deeming COUNT ONE and the bad faith actions, inactions, and conspiracy pled therein to constitute "board action," demand is nonetheless excused under the rule in <u>Rales v. Blasband</u>, 634 A.2d 927 (Del. 1993).  Here, a majority of the Board is incapable of objectively considering a demand to bring a suit because, under the facts of this Complaint, taken as true, the Director Defendants face substantial likelihood of personal liability.  <u>Id</u>. at 936.

144.   Also, for entirely understandable reasons, the PROGRESS Legacy Directors remaining on the DUKE Board should not be asked to render an objective decision as to whether to press this suit.  After all, they were the ones who were ambushed, and as pled above, they are justifiably angry at the defendants who ambushed them.


**WHEREFORE, Plaintiff demands judgment as follows:**

A.   Directing the Director Defendants to account to DUKE for, and to pay to DUKE, all damages sustained or to be sustained by them by reason of the wrongs alleged herein;

B.      Directing Defendants to pay interest at the highest rate allowable by law on the damages sustained by DUKE as a proximate result of the Director Defendants' culpable conduct;

C.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

D.      Granting such other and further relief as the Court may deem just and proper.

PRICKETT JONES & ELLIOTT, P.A.


By: /s/ Ronald A. Brown, Jr.
     Ronald A. Brown, Jr. (DE Bar No. 2849)
     Marcus E. Montejo (DE Bar No. 4890)
     1310 King Street
     Wilmington, Delaware  19801
     (302) 888-6500
     Attorneys for Plaintiff

OF COUNSEL:

John W. Haley
Bruce J. McKee
HARE WYNN NEWELL & NEWTON LLP
2025 Third Avenue North, Ste. 800
Birmingham, Alabama  35203
(205) 328-5330

Frank P. DiPrima
LAW OFFICE OF FRANK DiPRIMA, P.A.
3 Carriage Hill Drive
Morristown, New Jersey 07960
(973) 656-0251

Dated:  July 30, 2012

## CERTIFICATE OF SERVICE

I, Ronald A. Brown, Jr., do hereby certify on this 30th day of July, 2012, that I caused a copy of the foregoing Amended Derivative Complaint and Verifications of Plaintiffs to be served by hand by Brandywine Process Servers, Ltd., special process server, to each of the defendants as follows:

James E. Rogers
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

William Barnet, III
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

G. Alex Bernhardt, Sr.
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

Michael G. Browning
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

Daniel R. DiMicco
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

John H. Forsgren
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

Ann Maynard Gray
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

James H. Hance, Jr.
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

E. James Reinsch
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

James T. Rhodes
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

1

Philip R. Sharp
Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

Duke Energy Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

/s/ Ronald A. Brown, Jr.
Ronald A. Brown, Jr. (DE Bar No. 2849)