UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDWARD TANSEY, Derivatively on Behalf of DUKE ENERGY CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| JAMES E. ROGERS, MICHAEL G. BROWNING, G. ALEX BERNHARDT, SR., ANN MAYNARD GRAY, JAMES T. RHODES, JAMES H. HANCE, JR., WILLIAM BARNET, III, PHILIP R. SHARP, DANIEL R. DIMICCO, JOHN H. FORSGREN, E. JAMES REINSCH, LYNN J. GOOD, and STEVEN K. YOUNG, | ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 1:12-cv-01049-RGA (Consolidated) |
| Defendants, | ) ) | |
| -and- | ) ) | |
| DUKE ENERGY CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Joel Friedlander (Bar No. 3163)
Christopher P. Quinn (Bar No. 5823)
FRIEDLANDER & GORRIS, P.A.
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500
jfriedlander@friedlandergorris.com
cquinn@friedlandergorris.com

*Liaison Counsel for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................ ii

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................... 2

STATEMENT OF FACTS ........................................................................................ 6

    A.   Duke and Progress Explore the Possibility of a Merger in the Wake
         of Duke's Fallout with Regulators ........................................................ 6

    B.   Duke's Board Approves the Merger Agreement and Announces
         that Johnson Will Be CEO of Post-Merger Duke. ................................ 7

    C.   Defendants Reiterate in the Proxy Statement that Johnson
         Would Be the CEO of Post-Merger Duke. ........................................... 7

    D.   Johnson Refuses Rogers' Request to Renegotiate the Deal,
         and Defendants Cement Their Plan to Remove Johnson
         upon Completion of the Merger. ........................................................... 9

    E.   Johnson "Resigns" Within Hours of the Merger Closing. .................. 10

    F.   Post-Merger Fallout; Damages to Duke .............................................. 10

ARGUMENT ........................................................................................................... 11

    I.   THE COMPLAINT STATES CLAIMS AGAINST DEFENDANTS. ....... 11

         A.   The Legal Standard .............................................................. 11

         B.   The Complaint States a Claim for Violations of Section 14(a). ........... 11

             1.   The Proxy Statement Contained Material
                 Misrepresentations and Omissions. ..................................... 12

             2.   The Complaint Adequately Pleads Transaction and Loss Causation. ........... 14

         C.   The Complaint States a Claim for Contribution Pursuant to Section 21D. ......... 15

             1.   The Contribution Bar Does not Apply to this Derivative Action. ........... 18

             2.   The Section 21D Claim Was "Ripe" When Filed. ......................... 19

         D.   The Complaint States a Claim for Breach of Fiduciary Duty. .............. 21

    II.   PRE-SUIT DEMAND UPON THE DUKE BOARD IS EXCUSED AS FUTILE. .... 23

         A.   Demand Is Excused Because a Majority of the Board
             Faces a Substantial Likelihood of Liability for Misleading
             Stockholders and Regulators in Order to Obtain Approval of the Merger. .......... 23

         B.   Demand Is Excused Under *Aronson*'s Second Prong
             Because a Majority of the Board Failed to Act in Good Faith. .............. 25

    III.   COLLATERAL ESTOPPEL DOES NOT BAR PLAINTIFFS' CLAIMS. ................. 26

CONCLUSION ....................................................................................................... 28

- i -

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*Abrams v. Wainscott*,
  2013 U.S. Dist. LEXIS 161556 (D. Del. Nov. 13, 2015) ....................................... 27

*Affiliated Ute Citizens v. U.S.*,
  406 U.S. 128 (1972) ................................................................................................. 17

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ................................................................................... 23, 24

*Asbestos Workers Local 42 Pension Fund v. Bammann*,
  2015 WL 2455469 (Del. Ch. May 22, 2015) ........................................................... 28

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................... 14, 18

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ........................................................................................ 23

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .................................................................................... 12

*Chen v. Howard-Anderson*,
  87 A.3d 648 (Del. Ch. 2014) ............................................................................. 25, 26

*City of Moses Lake v. United States*,
  472 F. Supp. 2d 1220 (E.D. Wash.  2007) .............................................................. 20

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................. 18

*Frommer v. Yogel*,
  50 F. Supp. 2d 227 (SW.D.N.Y 1999) ..................................................................... 17

*Gen. Elec. Co. v. Cathcart*,
  980 F.2d 927 (3d Cir. 1992) .............................................................................. 12, 15

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003) .................................................................................. 22

*Hampshire Grp., Ltd. v. Kutner*,
  2010 WL 2739995 (Del. Ch. 2010) .................................................................... 22, 24

*In re Affiliated Comp. Srvcs., Inc. S'holders Litig.*,
  2009 WL 296078 (Del. Ch. Feb. 6, 2009) ............................................................... 24

*In re Am. Int'l Group, Inc., Cons. Deriv. Litig.*,
   976 A.2d 872 (Del. Ch. 2009) ........................................................................ 21, 24

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996) ............................................................................... 23

*In re China Agritech, Inc. S'holder Deriv. Litig.*,
   2013 WL 2181514 (Del. Ch. May 21, 2013) ........................................................ 24

*In re Citigroup S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ............................................................................... 22

*In re Cornerstone Therapeutics Inc, S'holder Litig.*,
   115 A.3d 1173 (Del. 2015) ............................................................................. 22, 24

*In re Countrywide Fin. Corp. Derivative Litig.*,
   2008 U.S. Dist. LEXIS 40754 (C.D. Cal. May 14, 2008) ..................................... 19

*In re EZCorp Inc. Consulting Agreement Derivative Litigation*,
   130 A.3d 934 (Del. Ch. 2016) ............................................................................... 27

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   725 F. Supp. 712 (S.D.N.Y. 1989) ........................................................................ 14

*In re J.P. Stevens & Co. S'holders Litig.*,
   542 A.2d 770 (Del. Ch. 1988) ............................................................................... 26

*In re Pittsburgh & L. E. R. Co. Sec. & Antitrust Litig.*,
   543 F.2d 1058 (3d Cir. 1976) ................................................................................ 19

*In re Reliance Securities Litigation*,
   135 F.Supp.2d 480 (D. Del. 2001) ........................................................................ 25

*In re the Walt Disney Co. Deriv. Litig.*,
   906 A.2d 27 (Del. 2006) ................................................................................. 22, 24

*In re Tyco Int'l. Ltd.*,
   2004 U.S. Dist. LEXIS 4131 (D.N.H. Mar. 16, 2004) .......................................... 21

*In re VeriSign, Inc., Derivative Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ................................................................. 15

*In re Wilmington Trust Securities Litigation*,
   29 F. Supp. 3d 432 (D. Del. 2014) ........................................................................ 11

*In re Zoran Corp. Derivative Litig.*,

{FG-W0406346.}

511 F. Supp. 2d 986 (N. D. Cal. 2007) ................................................................... 19

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964)................................................................................................ 14

*Kreiger v.* Johnson,
2014 NCBC LEXIS 13 (N.C. Super. Ct. Apr. 30, 2014)................................... 5, 26

*Langer v. Monarch Life Ins. Co.*,
966 F.2d 786 (3d Cir. 1992).................................................................................. 19

*Malone v. Brincat*,
722 A.2d 5 (Del. 1998) ......................................................................................... 25

*Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ................................................................................ 17

*McClure v. Borne Chem. Co.*,
292 F.2d 824 (3d Cir. 1961).................................................................................. 19

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970) ......................................................................................... 12, 14

*New York City Emples.' Ret Sys. v. Jobs*,
593 F.3d 1018 (9th Cir. 2010) .............................................................................. 15

*Nieman v. Duke Energy Corporation*,
2013 WL 4004274 (W.D.N.C. July 26, 2013)............................................... 2, 3, 13

*Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*,
2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006) .......................................... 20

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008)................................................................................... 11

*Ray v. Citigroup Global Markets, Inc.*,
2004 WL 1794927 (N.D. Ill. Aug. 4, 2004) .......................................................... 16

*SC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)............................................................................................... 18

*Seinfeld v. Slager*,
2012 WL 2501105 (Del. Ch. June 29, 2012)......................................................... 25

*SEPTA v. Orrstown Fin. Servs., Inc.*,
2015 U.S. Dist. LEXIS 80584 (M.D.Pa. Jun. 22, 2015)........................................ 12

- iv -

*Shaev v. Saper*,
  320 F.3d 373 (3d Cir. 2003) ....................................................................... 13, 19

*South v. Baker*,
  62 A.3d 1 (Del. Ch. 2012) ........................................................................... 22

*State v. Summers*,
  528 S.E.2d 17 (N.C. 2000) ........................................................................... 27

*Stone v. Ritter*,
  911 A.2d 362 (Del. 2006) ............................................................................ 23

*Teamsters Local 445 v. Dynex Capital*,
  531 F.3d 190 (2d Cir. 2008) ........................................................................ 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................... 18

*Voit v. Wonderware Corp.*,
  977 F. Supp. 363 (E.D. Pa. 1997) ................................................................ 25

*Wilson v. Great Am. Indus.*,
  855 F.2d 987 (2d Cir. 1988) ........................................................................ 12

*Wood v. Baum*,
  953 A.2d 136 (Del. 2008) ............................................................................ 22

*Zirn v. VLI Corp.*,
  681 A.2d 1050 (Del.1996) ........................................................................... 25

## RULES AND STATUTES

15 U.S.C. § 78u-4(f) .......................................................................................... 18

15 U.S.C. § 78u-4(f)(10)(A)(i)-(ii) .................................................................... 15

15 U.S.C. § 78u-4(f)(10)(C)(i) ......................................................................... 15

15 U.S.C. § 78u-4(f)(2)(A) ............................................................................... 16

28 U.S.C. § 1331 ............................................................................................... 1

28 U.S.C. § 1332 ............................................................................................... 1

Fed. R. Civ. P. 15(a)(2) ................................................................................... 28

Fed. R. Civ. P. 8 .............................................................................................. 12

**OTHER AUTHORITIES**

H.R. REP. NO. 104-369 (1995) (Conf. Rep.) ............................................................................... 18

Plaintiffs Edward Tansey and Warren Pinchuck (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this brief in opposition to Defendants'[1] Motion to dismiss Plaintiffs' Verified Consolidated Amended Shareholders' Derivative Complaint (the "Motion").

## NATURE AND STAGE OF THE PROCEEDINGS

On August 17, 2012, Plaintiff Tansey filed his shareholder derivative complaint on behalf of Duke Energy Corporation ("Duke" or the "Company") with this Court (D.I. 1), alleging federal question jurisdiction arising under 28 U.S.C. § 1331 and diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff Pinchuck filed a similar complaint on October 26, 2012, alleging jurisdiction arising under 28 U.S.C. § 1331 (*Pinchuck* D.I. 1). Plaintiffs' complaints assert claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for dissemination of a materially misleading proxy statement (the "Proxy Statement"), contribution claims under Section 21D of the Exchange Act for a violation of Section 10(b) of the Exchange Act, and state law claims for breach of fiduciary duty. On November 19, 2012, Defendants moved to stay Plaintiffs' actions in favor of a related securities class action that was then pending in the Western District of North Carolina, *Nieman v. Duke Energy Corporation, et al.*, No. 3:12-cv-00456-MOC-DSC (the "Securities Class Action"), on the grounds that Plaintiffs' complaints asserted "*exactly the same allegations that underlie the [Securities Class Action]*." (D.I. 26 at 8 (emphasis added)). Plaintiffs' actions were later consolidated into the present action. (D.I. 62).

---

[1] "Defendants" refers collectively to James E. Rogers, Michael G. Browning, G. Alex Bernhardt, Sr., Ann Maynard Gray, James T. Rhodes, James H. Hance, Jr., William Barnet, III, Philip R. Sharp, Daniel R. DiMicco, John H. Forsgren, E. James Reinsch, Lynn J. Good, and Steven K. Young.

On May 17, 2013, this Court granted Defendants' motion and entered an Order staying this action pending a final decision on the then-pending motion to dismiss the Securities Class Action complaint for failure to state a claim and for failure to plead sufficiently any false or misleading statement in the Proxy Statement, among other things.  On July 26, 2013, Magistrate Judge Cayer issued a memorandum and recommendation denying in its entirety Defendants' motion to dismiss the Securities Class Action.  (D.I. 64; *Nieman v. Duke Energy Corporation*, 2013 WL 4004274, at *7 (W.D.N.C. July 26, 2013)).  Defendants initially objected to Judge Cayer's recommendation but opted to withdraw their objections to engage in settlement discussions.  (D.I. 69 at 1).  On August 12, 2015, the Securities Class Action settled for more than $146 million, and an entry of final judgment was entered in that case on November 2, 2015. (D.I. 74).

On December 2, 2015, this Court lifted the stay in light of the entry of final judgment in the Securities Class Action.  (D.I. 76).  Plaintiffs filed their Verified Consolidated Amended Derivative Complaint (the "Complaint") on December 21, 2015.  (D.I. 77).  Defendants moved to dismiss the Complaint on February 19, 2016.  (D.I. 82).  This is Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss.

## SUMMARY OF THE ARGUMENT

This action arises from the July 2, 2012 merger of Progress Energy, Inc. ("Progress") with and into Duke (the "Merger").  As detailed in the Complaint, the Duke board of directors (the "Board") agreed as part of the merger agreement with Progress to designate William Johnson, the Progress Energy CEO, to become the CEO of the combined company.  William Rogers, the then-CEO of Duke, had a tarred reputation as a result of activities regarding a Duke plant in Indiana, and a new CEO was needed to obtain approval of the Merger by regulators. Johnson attended two Duke Board meetings before the Proxy Statement was disseminated.  The

Board meetings went so poorly that Johnson was not invited back to meet with the Duke Board until the merger closed well over a year later, at which time Johnson was fired.  The Complaint alleges that, from the very beginning, there was substantial opposition by Defendants to Johnson serving as CEO of post-merger Duke.  Those allegations permit the strong inference that the Board had decided before the dissemination of the Proxy Statement to remove Johnson immediately upon the closing of the Merger.  Nevertheless, Defendants falsely represented in the Proxy Statement that Johnson was to become the CEO of post-merger Duke.

Defendants' Motion should be denied for the following reasons:

1.      Defendants' Motion is simply a rehash of their earlier failed attempt to dismiss the Securities Class Action.  As Defendants previously claimed in this Court, in their own words, this action asserts "*exactly the same allegations that underlie the [Securities Class Action].*"  The Magistrate Judge in the Securities Class Action denied Duke's motion in its entirety in language that is directly applicable to the instant Motion because Plaintiffs here pled the same facts.  In sustaining the Section 11 claim under the Securities Act of 1933 (the "Securities Act"), in connection with the critical factual allegations that Defendants falsely represented that William Johnson would lead the combined company, the Court ruled:

> Plaintiffs allege ample facts, many supported by documentation and/or testimony, establishing that Defendants' statements regarding Johnson's role as CEO were false when the Registration Statement was initially filed [March 17, 2011]. Plaintiffs have pled facts establishing that Defendants had mounted significant yet undisclosed opposition to Johnson prior to July 2011. Plaintiffs have also sufficiently pled Defendants' determination that Johnson's position as CEO was transitory and necessary only to gain the merger's approval.

*Nieman v. Duke Energy Corporation*, 2013 WL 4004274, at *7 (W.D.N.C. July 26, 2013).

Furthermore, in sustaining the fraud claims asserted under Section 10(b) of the Exchange Act in the Securities Class Action, Judge Cayer ruled:

{FG-W0406346.}

> Plaintiffs have alleged in detail the Defendants' false and misleading statements, including the speaker, timing and context of each statement.   Plaintiffs have also alleged facts and 'circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible.'
>
> *   *   *
>
> Plaintiffs' allegations in this case support a cogent inference that Defendants concealed from investors their plan to remove Johnson as CEO from investors. The allegations in the Complaint include the May 3, 2012 Duke board meeting where Defendants worked with outside counsel on the plan to remove Johnson; Defendants' retention of a public relations firm to deal with the anticipated fallout from Johnson's ouster; Defendants' Gray and Manly's May 17, 2012 meeting with outside counsel about removing Johnson; the May 30, 2012 board meeting where Defendants confirmed their plans; as well as numerous internal communications in May and June 2012 evidencing that Johnson's ouster was planned in advance.
>
> The Complaint also alleges facts showing that Defendants were aware that they would jeopardize the merger and subject themselves to a $675 million penalty if their plan to oust Johnson was made public.

*Id.* at *15.  Thus, contrary to Defendants' conclusory arguments, the Complaint's numerous and specific allegations regarding the times, places and statements made by Defendants directly connected to their wrongdoing more than satisfy any pleading requirements relating to the federal securities claims (Sections 14(a) and 21D of the Exchange Act) and state law breach of fiduciary duty claims that are asserted in the Complaint.

The bar order in the final judgment of the Securities Class Action does not preclude Plaintiffs' Section 21D contribution claim because all derivative claims are specifically excluded from the release contained in the same final judgment.

2.    Contrary to Defendants' opening salvo and overarching theme, this action does not challenge the Defendants' exercise of business judgment to replace a company's CEO. Plaintiffs do not contest Defendants' right to remove Johnson as that is an act properly within the

Board's business judgment.  Plaintiffs do contest that *after* Defendants had already determined that Johnson would be appointed and then immediately removed as head of the merged company upon the closing of the merger, Defendants continued to knowingly make materially false and misleading representations to the effect that Johnson would be the long-term leader of the combined company.  Defendants' statements to that effect violated the federal securities laws and were in breach of their fiduciary duties under Delaware law.

The Complaint alleges sufficient facts to demonstrate that making a demand on the post-merger Duke board would have been futile and, therefore, should be excused.  The numerous and specific allegations of Defendants' knowing violations of positive law (*e.g.*, false representations regarding Johnson leading the combined company) make clear that each Defendant faces a substantial likelihood of personal liability.  Here, Plaintiffs attack the actions of the pre-merger Duke Board in disseminating a materially false Proxy Statement, and subsequently issuing a stream of additional false statements, thereby subjecting Duke to class action liability under Section 10(b) of the Exchange Act.  Given the allegations of the obvious violations of law committed by Defendants, as previously sustained by the Magistrate Judge in the Securities Class Action, Defendants are not entitled to any presumption of business judgment.

3.      Contrary to Defendants' mischaracterization of the facts in a North Carolina State Court derivative action, *Krieger v. Johnson*, 2014 NCBC LEXIS 13 (N.C. Super. Ct. Apr. 30, 2014), that action was based entirely on allegations that the severance package awarded to Johnson upon his resignation was excessive.  The overlap of background facts in the two cases is meaningless, as the instant Complaint expressly disclaimed any attempt to litigate the propriety of Johnson's post-termination compensation.

{FG-W0406346.}

## STATEMENT OF FACTS[2]

### A.   Duke and Progress Explore the Possibility of a Merger in the Wake of Duke's Fallout with Regulators.

In June 2010, the Duke Board authorized management to explore a possible merger with Progress.  ¶57.  In July 2010, Rogers approached Johnson to discuss a potential transaction.  ¶¶57-58.  Shortly thereafter, Progress entered into negotiations with Duke.  *Id.*

At the time, Duke was feeling the blowback from an increasingly public scandal arising from Duke's offer to employ an Administrative Law Judge for the Indiana Utility Regulatory Commission ("IURC"), while that judge was presiding over Duke's petition to the IURC to increase the rates Duke could charge its customers.  ¶¶50-56.  The scandal ultimately resulted in the firing and indictment of the Chairman of the IURC, the termination of two Duke employees, and the forced resignation of Duke's then-Chief Operating Officer.   ¶¶51, 54.  A subsequent investigation revealed that Rogers signed off on the hiring of the judge.  ¶56.

In light of the resulting damage to Duke's credibility with regulators, Progress was adamant that its CEO, Johnson, be appointed CEO of the post-merger company.  ¶¶1, 61.  The Duke Board acceded to Progress's demand in order to win the support of Progress stockholders and regulators.  ¶1.

From the very beginning, however, there was opposition to Johnson serving as CEO of the combined company.  On November 19, 2010, during the first of the two Duke Board meetings that Johnson would attend prior to the merger, Johnson "describe[d] himself as being

---

[2] The facts set forth herein are drawn from the allegations in the Complaint, many of which were based upon documentary evidence and sworn testimony adduced in proceedings before the North Carolina Utility Commission ("NCUC").  All "¶_" or "¶¶_" references are to the Complaint.

an individual who likes to learn, but not be taught." ¶77. As one Defendant would later testify, "[t]hat was an expression that stayed with our board." *Id.* Indeed, that meeting prompted discussion among members of the Duke Board about the prospect of removing Johnson post-merger. *See id.* ¶78 ("I have to tell you I was very disturbed by the view if it doesn't work out with Bill [Johnson] we will make the change in 2 years or so. This needs to be done right from the beginning—he is either the right guy or he is not.").

### B.    Duke's Board Approves the Merger Agreement and Announces that Johnson Will Be CEO of Post-Merger Duke.

On January 8, 2011, the Boards of Duke and Progress approved the Merger Agreement. ¶59. Despite the directors' mounting concerns that Johnson was not suited to run the post-merger company, *see* ¶60 ("by the time we got to the point where we were going to sign the merger agreement, there was clearly some concern as to whether Bill [Johnson] was the right guy"), the Board agreed in the Merger Agreement to "cause [Johnson] to be appointed as the President and Chief Executive Officer of Duke." ¶¶76-80. And in spite of those mounting concerns, Duke unequivocally stated in its January 10, 2011 press release announcing the Merger that "[w]hen the merger is completed, . . . Johnson will become president and chief executive officer of the new company." ¶64. The Merger Agreement also provided that Progress could terminate the deal at any time "if Duke . . . breached or failed to perform in any material respect any of its representations. . . ." ¶143. Accordingly, the failure to appoint Johnson as CEO would subject Duke to a $675 million termination penalty. *Id*.

### C.    Defendants Reiterate in the Proxy Statement that Johnson Would Be the CEO of Post-Merger Duke.

On March 17, 2011, Duke filed a registration statement Form S-4 (the "Proxy Statement") that was signed by each of the Duke Director Defendants. ¶¶67, 69. The Proxy Statement reiterated that Johnson would "serve as president and chief executive officer of Duke

following the completion of the merger."   ¶67.   It also stated that "having Mr. Johnson as the chief executive officer of the combined company [w]as an important element in ensuring implementation of [a strategic emphasis on the regulated utility business]."   ¶68.   The Proxy Statement did not contain any disclosure that would even suggest that the Duke Board had any concerns—let alone mounting concerns—about whether Johnson was the right person to lead post-merger Duke as its CEO.

On June 20, 2011, Johnson attended a second meeting of the Duke Board.   The meeting did not go well for Johnson.   During this meeting, Duke's directors expressed significant concerns that Johnson and "the Progress team [were] trying to impose Progress practices, systems and everything else, on the Duke process."   ¶81.   There also was "an exchange between [Johnson] and [one of the Defendants] that some directors reacted not positively to."   *Id.*   The meeting resulted in even greater opposition to Johnson serving as CEO of post-merger Duke.   The June 20, 2011 meeting was the ***last time*** that Johnson would meet with the Duke Board prior to his ouster on July 2, 2012.   ¶82.   Indeed, despite Johnson's repeated offers to meet with the Duke Board as late as June 2012, a few weeks before the Merger closed, Defendant Rogers assured him, "No need to. Everything's fine.   There's just no reason to come to the board [meeting]."   *Id.*

On July 7, 2011, Duke and Progress filed the definitive Proxy Statement.   It stated that: (i) "Mr. Johnson will serve as the president and [CEO] of Duke;" (ii) Johnson had "a  three-year term of employment commencing upon the completion of the merger;" (iii) Johnson's appointment was subject only to his "ability and willingness to serve;" and (iv) "[i]n the event [Mr. Johnson] is unable or unwilling to serve in such capacity, the parties agreed in the merger agreement to confer and mutually designate a replacement."   ¶¶70-72.   The Proxy Statement also forecast that Johnson would have a long-term role at Duke, including "developing the strategic

8

plan for Duke Energy, developing and communicating the vision and mission for Duke Energy, . . . driving the strategic financial and operational results of Duke Energy and representing Duke Energy to the public and investors." *Id.*

The Duke Board's substantial opposition to Johnson was nowhere reflected in the Proxy Statement.  ¶84.  Based on these misrepresentations, Duke and Progress shareholders approved the merger on August 23, 2011.  ¶75.

### D.   Johnson Refuses Rogers' Request to Renegotiate the Deal, and Defendants Cement Their Plan to Remove Johnson upon Completion of the Merger.

Following shareholder approval of the Merger, in early 2012, Rogers approached Johnson "to renegotiate this deal.  And [Johnson] said we're not renegotiating the deal.  That's [$]675 million."  ¶82.  Progress hired litigation counsel to "make sure [the] deal got done."  ¶92. Unable to change the terms of the merger without paying a significant termination fee (and facing a backlash from investors and regulators), Defendants held a series of meetings to execute a long-determined plan to remove Johnson immediately following the Merger.  ¶98.

In May 2012, Defendants engaged outside counsel and a public relations firm, specializing in, among other things, "crisis communications."  *Id.*  On June 23 and 24, 2012, Defendants Gray and Browning officially secured Rogers' agreement to replace Johnson as CEO.  ¶101.  Defendants then conducted a "dry run" and "test call" of the Duke board meeting at which Johnson would be removed.  *Id.*

Even as they implemented the final details of their plan, Defendants continued to issue false and misleading prospectus materials, regulatory filings and public statements assuring investors that Johnson would be CEO.  ¶¶102-03.  On June 28, 2012, Rogers and Johnson sat for an interview with the Charlotte Observer, discussing and promoting the merger, while Johnson's impending ouster remained under wraps.  *Id.*

9

### E.   Johnson "Resigns" Within Hours of the Merger Closing.

On July 2, 2012, at approximately 4:02 p.m., the Merger became effective.  Notably, Defendant Rogers continued to deceive Johnson until the very end.  As Johnson testified: "Rogers came to my office.  We chatted about the merger, politics, all these things.  At about 4:20 [p.m.], he said we have to go to the 4:30 [p.m.] board meeting.  We can't be late for your election."   ¶104.  The meeting lasted approximately twenty minutes: "I'm elected CEO.  Handshakes, pats on the back, congratulations all around."  *Id.*

Less than two hours after the Merger became effective, and after eighteen months of unequivocally assuring investors and regulators that Johnson would serve as CEO of post-merger Duke, the newly constituted Board of the new Duke abruptly voted to demand Johnson's resignation and re-install defendant Rogers as CEO.  ¶105.  The vote was entirely predetermined.  All ten Duke directors voted in favor of terminating Johnson.  All five Progress directors voted against.  *Id.*  For over an hour, Defendant Gray provided the Progress board of directors with a single vague reason for the change:  Johnson's "leadership style." *Id.*  According to legacy Progress director E. Marie McKee, "[Gray] never elaborated further than '[H]e is not a good fit' for one hour. . . .  I couldn't believe it.  I – I didn't know whether to cry or throw up."  (*Id.*).

### F.   Post-Merger Fallout; Damages to Duke

The regulatory, public, and investment community reaction to the Board's termination of Johnson and reinstatement of defendant Rogers as CEO was outrage.  ¶12.  The NCUC, one of the Company's primary regulators, launched an investigation after concluding that it had been "duped" by the Board.  *Id.*  Standard & Poor's Rating Services ("S&P") downgraded Duke's credit rating from A- to BBB+ on July 26, 2012, pointing to the Board's decision to force Johnson to resign as a significant risk factor.  *Id.*  In addition, Duke was forced to settle the

[FG-W0406346.]

Securities Class Action for approximately $150 million, of which Duke paid $25 million.  ¶11.
None of Duke's directors who voted to oust Johnson paid a penny.  *Id.*

The total monetary loss cannot be fully calculated at this time but is likely in the range of
hundreds of millions of dollars.  ¶14.  Further, the Company has been and will continue to be
harmed due to its loss of credibility with the utility regulators, who felt they were deceived by
Defendants' actions.  *Id.*  This loss of credibility with regulators who have life-and-death power
over energy companies in the form of whether to grant rate increases and by what amounts, has
already directly translated into more contentious and less generous rate increases going forward,
costing Duke in the range of hundreds of millions of dollars.  *Id.*

ARGUMENT

## I.     THE COMPLAINT STATES CLAIMS AGAINST DEFENDANTS.

### A.     The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court "***must*** accept all well-pleaded factual
allegations in the complaint as true, and view them in the light most favorable to the plaintiff."
*In re Wilmington Trust Securities Litigation*, 29 F. Supp. 3d 432, 444 (D. Del. 2014) (citing
*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).  "The court's determination is
not whether the non-moving party 'will ultimately prevail' but whether that party is 'entitled to
offer evidence to support the claims.'"  *Wilmington*, 29 F. Supp. 3d at 443.  A court may only
consider the pleadings, public record, orders, exhibits attached to the complaint, and documents
incorporated into the complaint by reference.  *Id.*

### B.     The Complaint States a Claim for Violations of Section 14(a).

The allegations of the Complaint are more than sufficient to state a claim that Defendants
violated Section 14(a).  To prevail on a Section 14(a) claim, a plaintiff must show that "(1) a
proxy statement contained a material misrepresentation or omission which (2) caused the

11

plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970))).

Plaintiffs' Section 14(a) claim is not subject to any heightened pleading requirement, as Defendants claim. The courts have repeatedly held that the standard of liability pursuant to Section 14(a) of the Exchange Act is simple negligence. *Wilson v. Great Am. Indus.,* 855 F.2d 987, 995 (2d Cir. 1988). Accordingly, Plaintiffs' Section 14(a) claim is to be judged under the lenient standards of Rule 8 of the Federal Rules of Civil Procedure, as opposed to Rule 9(b), because no fraud is alleged and because Plaintiffs carefully segregated the claims in the Complaint and advised the Court which legal standard applied to which claim. *SEPTA v. Orrstown Fin. Servs., Inc.*, 2015 U.S. Dist. LEXIS 80584, at *35 (M.D.Pa. Jun. 22, 2015) ("However, if the allegations are pled separately and plaintiffs expressly premise Securities Act claims on negligence rather than fraud, Rule 9(b) is inapplicable."). And because Plaintiffs' Section 14(a) claim does not allege fraud, the heightened pleading standards of the PSLRA do not apply. *See Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004).

### 1.     The Proxy Statement Contained Material Misrepresentations and Omissions.

There can be no dispute that the Proxy Statement contained material misrepresentations and omissions. The Proxy Statement, signed by each Defendant, pronounced that Johnson would "serve as president and chief executive officer of Duke following the completion of the merger" and forecast that Johnson would have a long-term role at Duke. ¶¶67, 70-72. But the Proxy

Statement failed to disclose that there was immediate and substantial opposition to Johnson becoming the CEO of post-merger Duke and that, prior to the dissemination of the Proxy Statement, Defendants had already determined that Johnson would be appointed and then immediately removed as CEO of Duke upon the closing of the merger. *See* Section C, *surpa*. By the Proxy Statement's own terms, the omitted information was material. *See id.* ¶68 ("[H]aving Mr. Johnson as the chief executive officer of the combined company [w]as an important element in ensuring implementation of [a strategic emphasis on the regulated utility business].")*; see also See Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003) ("Only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law."). Those allegations are more than sufficient to demonstrate that the Proxy Statement contained material misrepresentations and omissions.

Indeed, when presented in the Securities Class Action with "exactly the same allegations"[3] at issue here, Magistrate Judge Cayer had no trouble finding that the Proxy Statement was false:

> Plaintiffs allege ample facts, many supported by documentation and/or testimony, establishing that Defendants' statements regarding Johnson's role as CEO were false when the [Proxy] Statement was initially filed [on March 17, 2011]. Plaintiffs have pled facts establishing that Defendants had mounted significant yet undisclosed opposition to Johnson prior to July 2011. Plaintiffs have also sufficiently pled Defendants' determination that Johnson's position as CEO was transitory and necessary only to gain the merger's approval.

*Nieman v. Duke Energy Corporation*, 2013 WL 4004274, at *7 (W.D.N.C. July 26, 2013). The Court should reach the same conclusion on this Motion.

---

[3] In support of their motion to stay this action, Defendants themselves argued that Plaintiffs' original complaints asserted "exactly the same allegations that underlie the [Securities Class Action]." (D.I. 26 at 8).

[FG-W0406346.]

It is no answer for Defendants to claim, as they have, that the Proxy Statement was not materially misleading simply because "the Board did not have the authority to terminate Johnson before the merger closed on July 2, 2012." Mot. at 21 and n.15. The Supreme Court has squarely rejected the argument that directors' deliberations are not material until the board takes official action. *Basic, Inc. v. Levinson*, 485 U.S. 224, 233, (1988) (rejecting a proposed bright-line test that preliminary merger discussions do not become material until 'agreement-in-principle as to the price and structure of the transaction has been reached); s*ee also In re Gulf Oil/Cities Serv. Tender Offer Litig*., 725 F. Supp. 712, 747 (S.D.N.Y. 1989) (events still contingent upon board approval may be sufficiently material to warrant disclosure). Defendants' argument thus fails.

## 2. The Complaint Adequately Pleads Transaction and Loss Causation.

The Supreme Court has repeatedly upheld derivative Section 14(a) liability for a false Proxy Statement used to effect a merger. *See, e.g.*, *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381-82 (1970). Thus, where a merger is effected by a materially false and misleading Proxy Statement, liability will attach.

Remarkably, Defendants contend that, since the Proxy Statement did not ask the Duke shareholders to approve the Merger, there is no transaction causation. But a quick examination of the Proxy Statement makes clear that the Duke shareholders were requested and urged to approve the transactions which would approve the Merger:

> Duke Energy and Progress Energy will each hold a special meeting of shareholders to consider the proposed merger. We cannot complete the merger unless the shareholders of both Duke Energy and Progress Energy approve the respective proposals related to the merger. Your vote is very important, regardless of the number of shares you own.

Affidavit of Susan W. Waesco in Support of Defendants' Motion to Dismiss ("Waesco Aff."), Ex. A at 3. The Proxy Statement then proceeds in 123 additional pages to describe the two

companies, the Merger, the effects of the Merger, the consequences of the Merger, regulatory issues and a host of other matters all related to the Merger.   It is beyond dispute that the shareholders of both companies were given a referendum on the approval or disapproval of the Merger.   The Duke shareholders were given the right to vote on the Merger and approve it or reject it.

Unlike the Merger transaction at issue, the cases cited by Defendants for the claimed lack of causation have no bearing on the instant action.   *See General Electric Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) (generalized complaints not tied to a merger rejected); *New York City Emples.' Ret Sys. v. Jobs*, 593 F.3d 1018 (9th Cir. 2010) (option backdating claim not tied to specific request for shareholder action); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007) (no causation between the reelection of directors and the issuance of backdated options).

Plaintiffs' Complaint clearly demonstrates causation and damages to Duke flowing directly from the false Proxy.   *See* Section F, *supra*.   Accordingly, the Court should deny Defendants' motion to dismiss the Section 14(a) claim.

### C.   The Complaint States a Claim for Contribution Pursuant to Section 21D.

To state a claim under Section 21D, a "covered person"[4] must have made "an untrue statement of a material fact, with actual knowledge that the representation is false, or omits to state a fact necessary in order to make the statement made not misleading" or had "actual knowledge of the facts and circumstances that make the conduct of that covered person a violation of the securities laws."   15 U.S.C. § 78u-4(f)(10)(A)(i)-(ii).   A plaintiff must also allege

---

[4] A "covered person" is defined by the PSLRA as any defendant in a private action arising under Chapter 2B.   15 U.S.C. § 78u-4(f)(10)(C)(i).   Each of the Defendants is a covered person.

{FG-W0406346.}

an underlying Section 10 violation.  *Ray v. Citigroup Global Markets, Inc.*, 2004 WL 1794927, at *2-3 (N.D. Ill. Aug. 4, 2004).  Plaintiffs have done so here.

As set forth in Section I.A.1, *supra*, the Complaint more than sufficiently alleges that the Proxy Statement was materially misleading.  It also contains particularized factual allegations establishing that Defendants *knew* that the Proxy Statement was materially misleading.  Each Defendant reviewed and signed the Proxy Statement.  ¶69.  Defendants at all times were required to, and did, review the Company's disclosures in SEC filings, including through the Board's Audit Committee, Corporate Governance Committee, and Compensation Committee.  ¶¶45-49, 208-216.  And Defendants were aware of the importance of designating Johnson as CEO of the post-merger Company to stockholders and regulators, as evidenced by their own statements in the Proxy Statement, *see* ¶68 ("having Mr. Johnson as the chief executive officer of the combined company [w]as an important element in ensuring implementation of [a strategic emphasis on the regulated utility business]"), and by their decision to engage litigation counsel and a public relations firm specializing in "crisis communications" in the months before the Merger had closed.  ¶98.  These allegations are more than sufficient to demonstrate that Defendants knew that they were required but failed to disclose that they had determined that Johnson would be appointed and then immediately removed as CEO of Duke upon the closing of the Merger.

In any event, Defendants ignore the provisions of Section 78u-4(f), which also provide for contribution for reckless conduct.  As the court held in *Ray v. Citigroup Global Mkts.*, 2004 WL 1794927, at *7 (N.D. Ill. Aug. 4, 2004):

> The PSLRA also contains provisions dealing with claims for contribution; it provides that a defendant can only be jointly and severally liable for a violation if it acted knowingly. *15 U.S.C. § 78u-4(f)(2)(A)*. If the defendant did not act knowingly, then it is liable "solely for the portion of the judgment that

> corresponds to the percentage of [its] responsibility." *Id. § 78u-4(f)(2)(B)*. This would seem to eliminate joint and several liability for defendants found to have acted recklessly, as opposed to knowingly.   To the extent that Defendants made no affirmative statements they had the affirmative obligation to tell the truth and failed to do so.  Accordingly, under *Affiliated Ute*, they are liable for their failure to disclose.

Thus, recklessness limits contribution to proportionate liability, but does not extinguish it.

Similarly, Defendants' citation of *Frommer v. Yogel*, 50 F. Supp. 2d 227, 235-36 (SW.D.N.Y 1999) does not aid Defendants.  Contrary to Defendants' claim that Plaintiffs must prove that Duke was an adjudicated tortfeasor, or that it has admitted liability, the case states:

> The definition of a joint tortfeasor is fairly broad.  A finding of liability is not required.  Therefore, the fact that the *Restifo* action settled, making an ultimate determination of liability unavailable, does not preclude a contribution action.

*Id.* at 234 (citations omitted).

Plaintiffs easily satisfy the heightened PSLRA standard, as Magistrate Judge Cayer so found in the Securities Class Action.  Proof that Defendants violated Section 10(b) of the Exchange Act is proof that Duke has done so, since the scienter of its executives is imputed to Duke.  *Teamsters Local 445 v. Dynex Capital*, 531 F.3d 190, 195-196 (2d Cir. 2008).  A plaintiff pleads a Section 10(b) claim by alleging:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *See Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

Where, as here, a defendant has an obligation to disclose all material facts and fails to do so, liability will attach to such omission.  *See Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 152-54 (1972) ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.").  A strong inference of scienter is

alleged if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The only cogent inference arising from the Complaint's allegations is that Defendants knew, but deliberately concealed from investors, their plan to remove Johnson as CEO the moment the Merger closed, a scheme that Defendants orchestrated.

To plead loss causation, a plaintiff need only "provide a defendant with *some* indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs have far exceeded their burden. *See* Section F, *supra*.

Whether an omission or misstatement is material is a mixed question of law and fact. *SC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976). Defendants are not entitled to dismissal because they claim otherwise. To the extent that Defendants contend that they needed to keep their plot against Johnson secret is not a defense to a violation of the securities laws. *Basic*, 485 U.S. at 234. Rather it is further proof of the wrongful scheme.

Defendants' Motion to dismiss the Section 21D claim should be denied.

### 1.    The Contribution Bar Does not Apply to this Derivative Action.

Plaintiffs are not barred from asserting a contribution claim under Section 21D. The statute establishing the contribution bar, 15 U.S.C. § 78u-4(f), was enacted by Congress to solve a specific issue wherein partial securities fraud settlers would run the risk of being drawn back into the action by the continued litigation by non-settling defendants seeking contribution from those which settled. H.R. REP. NO. 104-369 (1995) (Conf. Rep.). Accordingly, the statue sets a bar to allow partial settlements to proceed without the fear that the case will be continued.

[FG-W0406346.]

That is not the case here.   Indeed, the final judgment in the Securities Class Action expressly exempts this action, a crucial fact that Defendants ignore.   *See* Waesco Aff., Ex. F at 4-5 ("Notwithstanding the foregoing, 'Settled Claims' does not include claims asserted in any derivative action based on similar allegations or any claims relating to the enforcement of the Settlement.").   Defendants agreed to exempt this action, and they should be estopped from arguing otherwise.

### 2.        The Section 21D Claim Was "Ripe" When Filed.

Contribution claims asserted under Section 10(b) have commonly been brought derivatively against recreant officers and directors, and have been upheld in the face of motions to dismiss.   *See, e.g.*, *In re Countrywide Fin. Corp. Derivative Litig.*, 2008 U.S. Dist. LEXIS 40754 (C.D. Cal. May 14, 2008) (upholding claims brought derivatively against corporate executives under Section 10(b) for false SEC filings); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986 (N. D. Cal. 2007) (derivative Section 10(b) claim upheld); *see also Shaev v. Saper*, 320 F.3d 373 (3d Cir. 2003) (vacating dismissal of derivative suit based on violations of Section 14(a) of the Exchange Act); *In re Pittsburgh & L. E. R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1066 (3d Cir. 1976) (noting with disapproval technical standing arguments which could "defeat, in a federal court, the derivative assertion of a cause of action based on alleged violations of federal law."); *McClure v. Borne Chem. Co.,* 292 F.2d 824 (3d Cir. 1961) (holding that plaintiffs who assert Section 10(b) claims derivatively should not be hampered by state security for expenses statute).

Defendants' suggestion that contingent claims for contribution asserted by a corporation must be dismissed as unripe because no judgment has yet been entered is not the law in this Circuit.   *See Langer v. Monarch Life Ins. Co.*, 966 F.2d 786 (3d Cir. 1992).   *Langer* involved a suit by a physician against his employer, Presbyterian, for disability benefits.   Upon being sued,

Presbyterian initiated a contingent action against insurance carrier Monarch. Thus, as summarized by the Circuit Court: "Presbyterian claimed, in a companion case, *that if it is found liable to Langer*, then Monarch is liable over to it under various equitable and legal theories." *Id.* at 789. On appeal, in assessing Presbyterian's right to have asserted these claims contingently, this Court ruled:

> Rule 8(e)(2) specifically countenances pleading in the alternative: "A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency . . . ." *Presbyterian is certainly correct that it is entitled, under the Federal Rules, to pursue third-party liability-over claims while contesting the underlying claim.* This is so even though the Langer and Monarch actions are separate suits that have been consolidated, so that Rule 8(e)(2) does not even technically come into play.

*Id.* at 802 (emphasis added). There is thus little doubt that the corporation, directly or through the vehicle of a derivative suit, is entitled to assert its hypothetical contribution claims before judgment is rendered.

The Third Circuit rule is not unique, and has been routinely applied where allowing the hypothetical claim can lead to judicial efficiency by avoiding *seriatim* proceedings. *See, e.g.*, *City of Moses Lake v. United States*, 472 F. Supp. 2d 1220, 1231-32 (E.D. Wash. 2007) ("[I]t is this court's intention to do everything possible to insure there is a single liability trial determining the liability of all the parties at one time. The court certainly wants to avoid a situation where there is an initial liability trial …and then subsequently, there is a second liability trial involving contribution claims…"); *Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, 2006 U.S. Dist. LEXIS 45510, at *34 (D.N.J. June 21, 2006) ("In the case at hand, the Committee is not requesting a premature adjudication of the merits but rather permission to bring an adversary proceeding on a contingent claim. But because a claim is

contingent does not mean it that it cannot be alleged."); *In re Tyco Int'l. Ltd.*, 2004 U.S. Dist. LEXIS 4131, at *13 (D.N.H. Mar. 16, 2004) (contribution claim brought by corporate defendant against former CEO was ripe: "Tyco currently faces multiple lawsuits for extraordinary damages stemming, arguably, from Kozlowski's alleged breach of fiduciary duties. The facts underlying Kozlowski's alleged liability for contribution will be developed in the present litigation and Tyco and Kozlowski are clearly adverse parties. With this in mind, Tyco's contribution claim against Kozlowski is fit for judicial review.").

While there are cases going both ways on the issue of ripeness, the most critical issue is the one which Defendants do not discuss: their attempt to assert the bar Order against Plaintiffs' 21D claim. Absent the filing of that claim by Plaintiffs at the time it was filed, there would be no carve out in the Securities Class Action for Plaintiffs' derivative claims, including the Section 21D claim. Congress could not have enacted legislation only to find that it was read out of the existence by its own provisions. Thus, the Section 21D claim had to be filed when it was filed, before any judgment is entered in a companion class case, or the claim would have been extinguished. Accordingly, Defendants' claim of unripeness fails.

### D.     The Complaint States a Claim for Breach of Fiduciary Duty.

The Complaint more than adequately alleges that Defendants breached their duty of loyalty. As alleged in the Complaint, Defendants knowingly caused Duke to issue false and misleading statements and to withhold material information from stockholders, the investing public and regulators in order to effect the Merger. Defendants' conduct caused the Company to violate the federal securities laws. By knowingly causing Duke to violate positive law, Defendants breached their duty of loyalty as a matter of Delaware law. *See, e.g.*, *In re Am. Int'l Group, Inc., Cons. Deriv. Litig.*, 976 A.2d 872, 896, n.48 (Del. Ch.) ("[O]ne cannot act loyally as

a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); *Hampshire Grp., Ltd. v. Kutner*, 2010 WL 2739995, at *3 (Del. Ch. 2010) ("[B]y consciously causing the corporation to violate the law, [Defendant] breached his duty of loyalty and is responsible for the corporation's costs of . . . rectifying the misconduct."); *In re the Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66-67 (Del. 2006) (hereinafter, "*Disney II*," stating "where the fiduciary acts with intent to violate applicable positive law," he does not act in good faith).   Liability for breaches of the duty of loyalty is non-exculpable.   *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015).   Plaintiffs have therefore stated a claim for breach of fiduciary duty that cannot be dismissed on this pleadings-stage Motion.

Defendants' arguments to the contrary are based on a factual scenario not alleged in the Complaint, and on their wholly fallacious view that they acted in good faith when it is clear that they did not.  Defendants' reliance on *South v. Baker*, 62 A.3d 1 (Del. Ch. 2012), for example, is misplaced.  Unlike here, the plaintiffs in *South* did not allege particularized facts (such as sworn testimony of the company's own executives or media reports of misconduct) demonstrating that defendants possessed contemporaneous knowledge that their statements were false and misleading.  There also were no particularized facts alleged in *Wood v. Baum*, 953 A.2d 136 (Del. 2008) or *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003), showing the directors had actual or constructive knowledge of the misconduct.  Defendants' reliance on *Citigroup* fares no better, as there were no allegations of media coverage, executive testimony, or similar allegations "showing that the director defendants were even aware of any misstatements or omissions" concerning the Company's market risk disclosures.  *In re Citigroup S'holder Derivative Litig.*, 964 A.2d 106, 134 (Del. Ch. 2009).

Defendants also misconstrue Plaintiffs' breach of fiduciary duty claims as so-called "*Caremark*" claims for "failure of oversight." (D.I. 84 at 16-18). A *Caremark* claim is "a claim that directors are subject to personal liability for *employee* failures." *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996)). *Caremark* and its progeny do not provide the applicable standard for evaluating Defendants' liability (or demand futility) because, here, Plaintiffs allege that Defendants are liable for their *own* misconduct.

Accordingly, Defendants' Motion should be denied as to Plaintiffs' claim for breach of fiduciary duty.

## II.    PRE-SUIT DEMAND UPON THE DUKE BOARD IS EXCUSED AS FUTILE.

A pre-suit demand upon the board of a Delaware corporation is excused as futile where the complaint contains particularized factual allegations raising a reasonable doubt that: (i) a majority of "the directors are disinterested and independent," or (ii) "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The two prongs of *Aronson* are disjunctive; therefore, demand is excused if *either* prong is satisfied. *Brehm*, 746 A.2d at 256.

Plaintiffs' Complaint satisfies both prongs of the *Aronson* test.

### A.    Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Misleading Stockholders and Regulators in Order to Obtain Approval of the Merger.

Here, demand is excused under the first prong of *Aronson* because the Complaint alleges particularized facts demonstrating that Defendants—who comprised a majority of the Board

when this action was filed[5]—face a substantial likelihood of liability for issuing the misleading Proxy Statement and withholding material information in order to obtain stockholder and regulatory approval of the Merger.  It is well settled that "[d]irectors will be deemed interested for demand purposes under *Aronson* where the complaint alleges specific facts establishing that 'the potential for liability . . . may rise to a substantial likelihood.'"  *In re Affiliated Comp. Srvcs., Inc. S'holders Litig.*, 2009 WL 296078, at *8 (Del. Ch. Feb. 6, 2009) (quoting *Aronson*, 473 A.2d at 815).

As alleged in the Complaint and as set forth above in Sections I.A-B, Defendants knowingly caused Duke to violate the federal securities laws.  Such misconduct subjects Defendants to liability for breaches of the duty of loyalty under Delaware law.  *See, e.g.*, *In re Am. Int'l Group, Inc., Cons. Deriv. Litig.*, 976 A.2d 872, 896 n.48 (Del. Ch. 2009) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); *Hampshire Grp., Ltd. v. Kutner*, 2010 WL 2739995, at *3 (Del. Ch. 2010) ("[B]y consciously causing the corporation to violate the law, [Defendant] breached his duty of loyalty and is responsible for the corporation's costs of . . . rectifying the misconduct."); *In re the Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66-67 (Del. 2006) (hereinafter, "*Disney II*," stating "where the fiduciary acts with intent to violate applicable positive law," he does not act in good faith).  Liability for breaches of the duty of loyalty is non-exculpable.  *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015).  Defendants, therefore, face a substantial likelihood of personal liability, and demand is excused.  *See, e.g.*, *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514 (Del. Ch. May 21, 2013) (finding

---

[5] When this action was filed, Duke's Board consisted of fifteen directors—the Director Defendants comprised eleven of the fifteen.  ¶197.

demand was futile where majority of board of directors faced substantial likelihood of liability).

Defendants' assertion that they had no duty under state law to disclose the change in CEO until "after the Board voted to remove Johnson" (Mot. at 20) is unavailing. It is well-settled that directors "are under a fiduciary duty to disclose fully and fairly all material [information] within the board's control when it seeks shareholder action." *In re Reliance Securities Litigation*, 135 F.Supp.2d 480, 519-20 (D. Del. 2001); *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998) (same). Further, the Board was "under a fiduciary obligation to avoid misleading partial disclosures." *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del.1996). Accordingly, "[e]ven if the additional [omitted] information independently would fall short of the traditional materiality standard," disclosure was still required because it was "necessary to prevent other disclosed information from being misleading." *See Chen v. Howard-Anderson*, 87 A.3d 648, 689 (Del. Ch. 2014).[6]

### B.   Demand Is Excused Under *Aronson*'s Second Prong Because a Majority of the Board Failed to Act in Good Faith.

To show demand was futile under *Aronson*'s second prong, "a plaintiff must plead sufficient particularized facts to 'raise (1) a reason to doubt that the [board] action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.'" *Seinfeld v. Slager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012). For the same reasons discussed in Section II.A, *supra*, the Complaint raises a reason to doubt

---

[6] Defendants argue that they did not make any "statements" that are actionable (Mot. at 19-20), but because the Board had a duty to disclose the material omitted information, whether any individual Defendant made a "statement" is irrelevant. *See, e.g.*, *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 368-69 (E.D. Pa. 1997) (compiling cases, denying motion to dismiss and stating that "Plaintiff here claims not only that Defendants' omission rendered their affirmative statements misleading, but that Defendants breached a duty to disclose material information, regardless of whether or not such omissions rendered any affirmative statements misleading.").

that the Board acted in good faith in approving disclosures that "misleadingly []emphasized …

and mischaracterized" the intended management structure of the post-merger Company.  *See*

*Chen*, 87 A.3d at 692.

Defendants attempt to dispute the Complaint's well-pled allegations that the Board had

determined to remove Johnson from the CEO position well before the merger was completed,

pointing to "excerpts" of the testimony of defendants Browning, Gray, and Rogers before the

NCUC.  *See* Mot. at 5 n.3.  But Defendants' interpretation and the inferences they seek to draw

from self-selected "excerpts" of the testimony are not more reasonable than the inferences that

must be drawn in Plaintiffs' favor.

Defendants' attempt to dispute the Complaint's well-pled allegations is improper on this

motion to dismiss and must be rejected.  When the substance of the Board's decisions to approve

the Proxy is considered "***in the context of all the circumstances***," the Complaint's allegations

give rise to an inference of bad faith.  *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770,

780-81 (Del. Ch. 1988).  Thus, demand is excused, and Defendants' Motion to Dismiss pursuant

to Rule 23.1 should be denied.

## III.     COLLATERAL ESTOPPEL DOES NOT BAR PLAINTIFFS' CLAIMS.

Defendants' argument that *Kreiger v. Johnson*, 2014 NCBC LEXIS 13 (N.C. Super. Ct.

Apr. 30, 2014) should bar the instant action on collateral estoppel grounds is not supported by

any legitimate legal authority.   *Kreiger* was a North Carolina state court derivative case

dismissed for failure to adequately allege demand futility.  The *only* issue in *Kreiger* involved a

challenge to the amount of severance paid to Johnson upon his termination.  Defendants do not

(and cannot) establish the critical element for collateral estoppel to apply – the issues in this case

are clearly different than the issues in *Kreiger*.  Under North Carolina law, collateral estoppel

does not apply unless the party asserting it establishes all four of the following elements: "(1) the

issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and essential to the resulting judgment." *State v. Summers*, 528 S.E.2d 17, 20 (N.C. 2000).

First whether demand is excused with respect to challenged board conduct is determined issue by issue. *Abrams v. Wainscott*, 2013 U.S. Dist. LEXIS 161556 at *8 (D. Del. Nov. 13, 2015). *Kreiger*'s allegations relating solely to the claimed improper severance agreement was all that was before the court in that case. That the court held that demand was not excused has no bearing on the instant matter and does not clothe the Defendants with a get out of jail free card for all wrongs committed. Rather, as to each transaction the issue of pre-suit demand is determined separately and is factually based. Thus the *Krieger* court never ruled on any issue raised in the instant action and its decision has no import here. *Krieger* has no application here.

In *In re EZCorp Inc. Consulting Agreement Derivative Litigation*, 130 A.3d 934 (Del. Ch. 2016), Vice Chancellor Laster similarly held that a dismissal under Rule 23.1 cannot be preclusive with respect to shareholders other than the named plaintiff, so *res judicata* does not bar similar derivative actions brought by different shareholders. The court explained that only post-Rule 23.1 judgments will bind the corporation and all of its stockholders because "the named plaintiff is the only party who could be bound by a dismissal with prejudice entered before the denial of a Rule 23.1 motion or before the board or a duly empowered committee permits the stockholder to sue." *Id.* at 945. The court reasoned that dismissing a derivative complaint with prejudice "as to the world," rather than as to just the named plaintiff, would bar the company and its other stockholders from litigating against the wrongdoers, "no matter what

27

the future might reveal about their conduct." *Id.* at 942.  This outcome is consistent with the substantive law holding that until a derivative action passes the Rule 23.1 stage, the named plaintiff does not have the authority to sue on behalf of the corporation or anyone else.  *Id.* at 944.  Due process also forecloses a judgment in a derivative action that is entered before the stockholder plaintiff acquires authority to litigate on behalf of the corporation from binding anyone besides the named stockholder plaintiff.  *Id.* at 946-49.  *Krieger* does not provide any basis to dismiss Plaintiffs' claims.

Defendants rely on one case applying New York law, which found derivative stockholders in privity for purposes of the demand futility analysis, to suggest that North Carolina and "other jurisdictions" have held that stockholders are in privity.  Mot. at 24 n.17 (citing *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *14, *17 (Del. Ch. May 22, 2015) (applying New York's "controlling facts" test to collateral estoppel analysis)).  Defendants cite no North Carolina authority for this proposition, which is contrary to Vice Chancellor Laster's recent decision in *EZCorp*.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.  In the event the Court grants Defendants' Motions on any ground, Plaintiffs respectfully request leave to amend.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

FRIEDLANDER & GORRIS, P.A.

*/s/ Joel Friedlander*
Joel Friedlander (Bar No. 3163)
Christopher P. Quinn (Bar No. 5823)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3503
jfriedlander@friedlandergorris.com
cquinn@friedlandergorris.com

*Liaison Counsel for Plaintiffs*

OF COUNSEL:

John Halebian
LOVELL STEWART HALEBIAN
  JACOBSON LLP
420 Lexington Avenue, Suite 2440
New York, NY 10170
(212) 500-5010
jhalebian@lshllp.com


Brian J. Robbins
Felipe J. Arroyo
Gina Stassi
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
(619) 525-3990
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
gstassi@robbinsarroyo.com

*Co-Lead Counsel for Plaintiffs*



Dated:  March 25, 2016

{FG-W0406346.}